# EXHIBIT 1

First Amended Complaint

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| GAYSHA GLOVER and COURTNEY GRIFFIN, individually and on behalf of the ESTATE OF D'ETTRICK GRIFFIN,<br><br>    *Plaintiffs*,<br><br>***versus***<br><br>CITY OF ATLANTA; ERIKA SHIELDS; OLIVER SIMMONDS; and DOES 1–5,<br><br>    *Defendants*. | Civil Action File No. 1:20-cv-04302-VMC |

## FIRST AMENDED COMPLAINT

Plaintiffs Gaysha Glover and Courtney Griffin ("Plaintiffs"), individually and on behalf of the Estate of D'Ettrick Griffin, bring this action against Defendants City of Atlanta, Erika Shields, Oliver Simmonds, and Does 1–5 (collectively "Defendants"), and allege as follows:

## INTRODUCTION

1.       On January 15, 2019, Atlanta Police Department Officer Oliver Simmonds shot 18-year-old D'Ettrick Griffin in the back and killed him.

---

Harman Law Firm LLC                                                      Page **1** of **55**



REPORT OF
THE MEDICAL EXAMINER



19-0112
D'ETTRICK DEANDRE GRIFFIN
Page 2 of 8
Examiner:  Karen E. Sullivan, MD

**REASON FOR PERFORMING AN EXAMINATION:**

This 18-year-old adolescent black male was shot by another individual. He was pronounced dead at the scene.

**SUMMARY OF FINDINGS:**

I.    Penetrating gunshot wound of the back of indeterminate/distant range of fire.
    A.  Entrance wound on the left side of the back.
    B.  Neither soot nor stippling on the skin.
    C.  Pathway: left side of the back, rib cage, descending aorta, left lung, left atrium of the heart, ascending aorta, right atrium of the heart, right lung, rib cage, and into the skeletal muscle of the right side of the chest.
    D.  Associated bilateral hemothoraces, hemopericardium, and fracture of the right 3rd rib.
    E.  Projectile recovered from the right pectoralis major muscle.
    F.  Direction: Back to front, left to right, and upward.
II.   No evidence of active natural disease processes.

**CAUSE OF DEATH:**

Gunshot wound of the back.

**MANNER OF DEATH:**

Homicide.

**OPINION:**

It is my opinion that D'ettrick Griffin died as a result of a gunshot wound of his back which damaged each of his lungs and his heart. The manner of D'ettrick Griffin's death is classified as a homicide.

2.    D'Ettrick was unarmed.

3.    D'Ettrick did not threaten anyone with physical harm.

4.    D'Ettrick did not take any action consistent with intent to physically harm anyone.

## DETAILED BACKGROUND

### I.    D'Ettrick's Murder

5.    Officer Simmonds was employed by the Atlanta Police Department ("APD") as a member of the department's "Executive Protection Unit" ("EPU").

6.    On January 15, 2019, Officer Simmonds parked his unmarked APD police car at a gas station located at the intersection of Whitehall Street and McDaniel Street in Atlanta.

7.    Officer Simmonds then left the keys in the ignition of the APD vehicle, left the vehicle unlocked, and left the vehicle unattended.

8.    D'Ettrick subsequently entered Officer Simmonds' APD vehicle and began to drive away.

9.    D'Ettrick was not armed with any weapon of any kind.

10.    D'Ettrick and Officer Simmonds did not have any interaction.

11.    D'Ettrick did not pose any physical danger to Officer Simmonds.

12.    D'Ettrick did not pose any physical danger to anyone else.

13.    Nonetheless, Officer Simmonds fired several shots at D'Ettrick's back.

14.    Officer Simmonds shot D'Ettrick in the back intentionally.

15.    He drew his weapon from the holster, aimed it at D'Ettrick, and fired multiple shots.

16.    There is no possible explanation for Officer Simmonds' conduct but that he intended to, and made an effort to, kill D'Ettrick.

17.    Officer Simmonds shot D'Ettrick out of anger because he believed D'Ettrick was attempting to steal his police car.

18.    Officer Simmonds shot D'Ettrick in the back even though (1) he was not in the path of the vehicle or in any physical danger, (2) D'Ettrick was unarmed, and (3) D'Ettrick did not pose an immediate threat of bodily harm to Officer Simmonds or any member of the public.

19.    In contrast, Officer Simmonds' intentional decision to kill D'Ettrick created great danger for bystanders.

20.    In addition to the risk posed by errant bullets, the decision to kill the driver of a moving vehicle created an immediate threat of serious bodily harm to members of the public.

21.    After D'Ettrick was shot, the vehicle predictably moved in an uncontrolled manner.

22.    The vehicle proceeded south on Whitehall Street for a short distance before crashing into two other vehicles.

23.     The subsequent vehicle wreck caused serious injuries to a bystander.

24.     Officer Simmonds did not make any effort to render emergency first aid to D'Ettrick.

25.     Additional APD officers responded to the scene where D'Ettrick was found dead.

26.     A homicide investigation is pending with the Fulton County District Attorney.

27.     APD suspended Officer Simmonds temporarily, but he remains employed with the department.

28.     APD has possession of a surveillance video that captured the shooting.

29.     But, APD has hidden that video from the public and refused to disclose it.

30.     According to APD, Officer Simmonds did not complete any written statement or incident report concerning these events.

31.     Two other responding officers, Hunter Wiggens and Welkin Rodriguez did.  Yet neither officer thought it appropriate to mention that a fellow APD officer had shot an 18-year-old boy in the back and killed him:

ATLANTA POLICE DEPARTMENT
Offense Report
INCIDENT NUMBER: 190152086-01

INCIDENT NARRATIVE

On 01/15/2018 City of Atlanta vehicle 33624 was involved in a inccident that originally occured at the location of 490 Whitehall St. Due to the incident the City of Atanta vehicle was eventually in an auto accident at the location of 510 Whitehall St. Once the vehicle stopped at 510 Whitehallst the damges to the front end and the windsheild occured. While attempting to render aide to the driver of the vehicle the front driver and passenger side windows were busted out by City of Atlanta issued Asp battons.

OFFENSE REPORT REVIEWED BY WIGGINS, HUNTER ON 1/17/2019

OFFENSE REPORT APPROVED BY PRICE, R ON 1/17/2019 7:47:02 PM

INCIDENT NARRATIVE

On 01/15/19 I, Officer W. Rodriguez, Operating as unit 3511, was dispatched to 490 Whitehall @ Shell Gas Station, to an attempted vehicle theft call.

Upon arrival I was informed that at approximately 1921 hours an off duty officer pulled into the above mentioned location to get gas on his city issued vehicle. While pumping gas the off duty officer realized that an unknown suspect was inside the driver side of his city issue vehicle. An altercation broke off between the off duty officer and the suspect which led the suspect speeding off at a high rated speed West bound on Whitehall St. SW.

Investigation is still in progress.

OFFENSE REPORT REVIEWED BY RODRIGUEZ, WELKIN ON 1/15/2010 11:07:10 PM

OFFENSE REPORT APPROVED BY SMITH, ALAN C ON 1/15/2019 11:08:38 PM

32.     Officer Simmonds shot D'Ettrick with his APD-issued handgun, loaded with APD-issued ammunition.

33.    At the time Officer Simmonds shot D'Ettrick, he was engaged in APD and EPU business refueling his APD vehicle.

34.    Officer Simmonds was required by APD policy to carry his handgun at the time he used it to shoot D'Ettrick.

35.    Officer Simmonds was required by APD policy to intervene in D'Ettrick's alleged crime.

## II.    APD's Cover-Up and Violation of the Georgia Open Records Act

36.    On January 22, 2019, Plaintiffs submitted a request to view public records pursuant to the Georgia Open Records Act, O.C.G.A. § 50-18-17, *et seq.* ("ORA"), to the City of Atlanta seeking documents related to the shooting death of D'Ettrick Griffin and the employment history of Defendant Oliver Simmonds with the APD.

37.    Plaintiffs received an immediate, automated response from APD's online ORA portal acknowledging receipt of the request.

38.    APD did not provide any substantive response to the request in violation of O.C.G.A. § 50-18-71.

39.    Plaintiffs called APD several times leaving multiple voicemails inquiring about the request and still did not receive any response.

40.     On February 5, 2019, Plaintiffs submitted another ORA request through the APD's online portal requesting to view only initial arrest reports and incident reports related to the shooting death of D'Ettrick Griffin on January 15, 2019 by Defendant Simmonds.

41.     On February 7, 2019, Officer J. Smith of the APD responded by releasing the two incident reports written by Officer Wiggins and Officer Rodriguez.  As noted above, these reports make no mention of D'Ettrick Griffin's death.

42.     On February 8, 2019, Plaintiffs emailed Officer J. Smith to inform him that the APD's response to Plaintiffs' ORA request appeared to be incomplete.

43.     On February 11, 2019, Officer J. Smith emailed Plaintiffs to inform them that these two incident reports were the only reports that the APD could release at this time.

44.     On February 13, 2019, Plaintiffs sent an email to Officer J. Smith informing him that Plaintiffs would be submitting another ORA request, and that if all of the requested documents were not released within three business days, that Plaintiffs would be filing a complaint against the Atlanta Police Department for a violation of the ORA.

45.     Only after Plaintiffs threatened legal action did Officer J. Smith respond by emailing a "Traffic Accident Report" to Plaintiffs.  The traffic accident report referenced the vehicle wreck that Defendant Simmonds caused by killing the driver of a moving vehicle.  But it, too, made no mention of D'Ettrick Griffin, or any material facts regarding his death.

46.     On April 9, 2019, the APD finally responded to Plaintiffs' January 22nd ORA request.  The response included the same incident reports already received, a dispatch log, and a few select documents from Officer Simmonds' employment records ranging from 2010 through 2016.

47.     On July 28, 2020, Plaintiffs submitted another ORA request seeking all records of D'Ettrick's shooting death along with *all* of Officer Simmonds' employment files to the present date.

48.     Plaintiffs again received an automated response acknowledging receipt of the request.

49.     APD, again, did not provide any substantive response to the request in violation of O.C.G.A. § 50-18-71.

50.     Despite multiple requests for *all* of Officer Simmonds' employment records, APD has not released any of Officer Simmonds' employment records dating past 2016.

51.     Despite multiple requests for all initial incident reports of D'Ettrick's shooting death, Plaintiffs have not received a single incident report that mentions an APD officer involved shooting or D'Ettrick's death.

## III.   Pre-litigation Posture

52.     On February 8, 2019, Plaintiffs provided ante litem notice to the City of Atlanta via hand delivery and certified mail pursuant to O.C.G.A. § 36-33-5. (attached as Exhibit 1)

53.     In March of 2019, Mayor Keisha Lance Bottoms and Police Chief Erika Shields contacted Plaintiffs directly to discuss a possible settlement agreement.

54.     Plaintiffs informed Mayor Bottoms and Police Chief Shields that they were willing to discuss settlement options but wanted counsel present.

55.     Mayor Bottoms and Defendant Shields then refused to engage in their previously requested settlement discussions.

## IV.   Defendant Simmonds' History of Violence

56.     Officer Simmonds has a history and pattern of violence and anger issues, including violent acts directed at vulnerable persons.

57.     On June 6, 2012 Officer Simmonds was involved in a verbal dispute with his girlfriend, Ms. Allison Guy.

58.    During the dispute, Officer Simmonds violently attacked Ms. Guy.

59.    Gwinnett County Police arrested Simmonds for domestic abuse—specifically, the assault and battery of his girlfriend.

60.    Despite an initial recommendation of suspension without pay until the adjudication of his criminal charges, Officer Simmonds instead remained employed by the APD and was given an administrative assignment.

61.    Presumably after the adjudication of his domestic abuse charge, Officer Simmonds was finally "disciplined" by being suspended without pay for a mere five days starting on June 2, 2013.

62.    Officer Simmonds returned to normal patrol duty sometime before July 1, 2013.  The exact date of his reassignment is not known since the APD has not released those employment records as requested by Plaintiffs.

63.    More recent instances of Officer Simmonds' criminal and violent behavior are unknown since the APD has refused to release any of his employment or disciplinary records past 2016.

## V.    APD's Custom and Policy of Lawlessness by the Executive Protection Unit

64.    Under official Atlanta policy, the APD's Executive Protection Unit ("EPU") exists only to provide "security for Office of the Mayor, City Hall, visiting dignitaries, and VIPs when directed by the Mayor or the Chief of Police."

65.     In practice, however, City of Atlanta officials routinely use the EPU as a personal extra-legal task force to conduct personal business with the force of law.

66.     The City of Atlanta has encouraged the unlawful and unethical behavior of the EPU, cultivating a culture among the unit members that they are above the law.

67.     It is formal written policy and normal practice for EPU members to wear plain clothes rather than any form of police uniform.

68.     It is normal practice and custom for the EPU to use their authority as police officers to accomplish personal business both for themselves, the mayor, and associates with close connections to City of Atlanta officials.

69.     For example, when the then-wife of Mayor Kasim Reed, Sara-Elizabeth Langford Reed, ran a red light in Midtown Atlanta crashing into another vehicle and seriously injuring its driver, members of the EPU responded to the scene of the wreck, despite there being no business purpose for their presence. *See* Stephen Deere, *Atlanta Mayor Kasim Reed's Wife Not Cited in 2016 Car Crash*, AJC (Nov. 8, 2019), https://www.ajc.com/news/local-govt--politics/exclusive-atlanta-mayor-kasim-reed-wife-not-cited-2016-car-crash/zMwn27Vv5vPIypvWEx3XvI/.

70.     Despite her clear fault in the wreck and the fact that she ran a red light, Ms. Langford-Reed did not receive a ticket and was not cited after the intervention of the EPU.  *Id.*

71.     The EPU has helped to facilitate the unethical and corrupt behavior of the City of Atlanta's former Chief Financial Officer, Jim Beard, who was recently indicted for multiple federal crimes.  *See* Stephen Deere, *Atlanta Police Issued Glock Handguns to City's Former CFO Jim Beard* (Nov. 26, 2019), https://www.ajc.com/news/local-govt--politics/atlanta-police-issued-glock-handguns-city-former-cfo-jim-beard/woj6hZiHn4k8eKXBuFVtyL/.

72.     Members of the EPU purchased a handgun with taxpayer dollars and "declared under penalty of perjury that the gun would only be used" by employees of the APD.  *Id.*

73.     Nonetheless, the handgun was issued to Jim Beard on the very day that it was purchased, despite the fact that he was not an employee of the APD and did not have a business reason for possessing such a weapon.  This conduct violated federal law.

74.     Similarly, the EPU has frequently aided the mayor and his or her close associates in unethical and corrupt behavior through their continuous violations of city policy which prohibits the making of personal purchases for the mayor on their

city-issued credit cards.  *See* Dan Klepal, *Meals, Laundry and a Vegas Fight: Bodyguards Used City Cards for Reed*, AJC (Jan. 10, 2019), https://www.ajc.com/news/local-govt--politics/meals-laundry-and-vegas-fight-bodyguards-used-city-cards-for-reed/l5Y4zirfyXlnfDRgFNZaeK/.

75.     The personal purchases that were facilitated by the Executive Protection Unit were rarely reimbursed by the mayor and his or her close associates to the detriment of taxpayers.  *Id.*

76.     The EPU has received special benefits for its members as a result of its continued support of the city officials and their associates.

77.     Members of the EPU are offered lucrative overtime and salaries that exceed the amount authorized for the positions that they are occupying.  *See* Dan Klepal, *APD Busted Salary Cap for Retired Officer Hired for Mayors' Protection*, AJC (Dec. 2, 2018), https://www.ajc.com/news/local-govt--politics/apd-busted-salary-cap-for-retired-officer-hired-for-mayors-protection/9BHM6ExDglAATwwEqAdakL/.

78.     In 2018, for reasons that were never explained but are easily inferred, members of the EPU received bonuses that far exceeded the bonuses permissible under express APD policy.  *See* Dan Klepal, Stephen Deere & J. Scott Trubey, *Ex-Mayor Kasim Reed Doles out $500k in Bonuses, Gifts on Way out*, AJC (Nov. 14,

2018), https://www.ajc.com/news/local-govt--politics/mayor-kasim-reed-doles-

out-500k-bonuses-gifits-way-out/8hmGPU4X3lO2z1PZkTMHrO/.

79.     The EPU has made it a routine practice to utilize emergency lights and

sirens in non-emergency situations—a practice that violates state law.  *See* Lori

Geary, *Is Mayor Kasim Reed Breaking the Law?*, WSB-TV (Nov. 2, 2016, 6:16

PM), https://www.wsbtv.com/news/2-investigates/is-mayor-kasim-reed-breaking-

the-law/462400973/.

80.     In one such incident, EPU Sergeant Stephen Nichols was using

emergency lights and sirens as he was driving former Mayor Kasim Reed to a

meeting simply because the mayor was running late.  *See Atlanta Mayor's Driver*

*Faces Four Charges*, MARIETTA DAILY J. (Dec. 6, 2016),

https://www.mdjonline.com/news/bigstory/atlanta-mayor-s-driver-faces-four-

charges/article_8b6f72be-bc2a-11e6-852b-fba45843c23b.html.

81.     Sergeant Nichols rear-ended another driver, resulting in his

hospitalization.  Sergeant Nichols was ultimately charged with driving too fast for

the conditions, improper use of sirens, failure to maintain lane, and making an

improper U-turn.  *Id.*

82.     Mayor Reed left the scene of the accident before the police arrived

and was not cited for his involvement in the reckless conduct.  *Id.*

83.     Nonetheless, the wreck exposed the EPU's conduct and sparked an investigation by federal prosecutors.  *See* Dan Klepal, *Feds Seek Records from Reed's 2016 Blue Lights Accident in Cobb County*, AJC (Jan. 7, 2019), https://www.ajc.com/news/local-govt--politics/feds-seek-records-from-reed-2016-blue-lights-accident-cobb-county/v0UJDGV4vkGMWGUgsPvN8J/.

84.     Federal prosecutors have subpoenaed records relating to the wreck as part of its probe into corruption in the City of Atlanta, which suggests that there was widespread wrongdoing on the part of the city in the aftermath of this incident. *Id.*

85.     Throughout its routine training, supervision, and operation, the APD's EPU is allowed and encouraged to use the force of law to accomplish personal ends without repercussions for the consequences.

86.     In 2017, APD business manager Tracy Woodward came forward after discovering that funds dedicated to purchasing patrol vehicles were used to purchase personal vehicles to be used by Mayor Kasim Reed and his family, with the help of the EPU.  *See, e.g.*, Dale Russel, *Atlanta Police Chief defends purchase and use of executive protection SUVs for Mayor*, FOX5 ATLANTA (April 19, 2017), https://www.fox5atlanta.com/news/atlanta-police-chief-defends-purchase-and-use-of-executive-protection-suvs-for-mayor.

87.     APD fired Woodward who then filed a lawsuit alleging that she was fired in retaliation for her whistleblowing.  *Id.*

88.     Woodward revealed that EPU officers were driving and escorting Mayor Reed and his family on personal errands.  *Id.*

89.     APD Police Chief, defendant Erika Shields, condoned the conduct, saying that, "They are never not his family.  He is never not the mayor.  So, it stands to reason at some point, yes, they [the mayor's family and EPU members] will be in a grocery store together."  *Id.*

90.     Defendant Shields further admitted that this conduct is "standard operating procedure" for the EPU.  *Id.*

91.     Accordingly, according to defendant Shields, all activity by EPU members is official City of Atlanta business.

92.     Therefore, EPU members are never off-duty.

93.     Rather, in virtually all actions, EPU members are acting under color of law pursuant to APD policy.

**VI.    APD's Custom and Policy of Using Excessive Force**

94.     The Atlanta Police Department has a long history of a widespread use of excessive force, often with deadly consequences.  This includes a long history of APD officers using dangerous vehicle pursuit tactics and shooting at moving

vehicles when the occupants of those vehicles are unarmed and pose no threat to officers or anyone else.

**A.    APD's Systemic, Widespread Use of Excessive Force Generally**

95.    In 2013, 543 APD use of force incidents were reported with 15 involving APD use of firearms and two of those involving shooting into vehicles.

96.    In 2014, 608 APD use of force incidents were reported with 16 involving APD use of firearms and two of those involving shooting into vehicles.

97.    In 2015, 618 APD use of force incidents were reported with 15 involving APD use of firearms and six of those involving shooting into vehicles.

98.    Atlanta's "Use of Force Advisory Council" found that in 2019 APD had 615 use of force incidents, 11 involved APD use of firearms, 14 were investigated by the Office of Professional Standards for unreasonable or unnecessary force, and 12 officers received remedial training.

99.    The number of instances involving shooting into vehicles has not been reported.

100.   The recently created "Use of Force Advisory Council" has identified several policies and practices of the APD that have led to excessive use of force, such as: lack of de-escalation tactics, insufficient firearm training, lack of officer accountability, the absence of any policy requiring a warning where feasible before

deadly force is used, along with many other problematic policies and practices. *See* https://www.atlantaga.gov/government/mayor-s-office/projects-and-initiatives/Use-of-Force-Advisory-Council

101.   Although data regarding APD use of force between 2016 and 2019 is not formally available, it is clear that APD use of force has been constant, if not worsening, during this period.

102.   APD has roughly 2,000 police officers.  Therefore, more than 25% of all APD officers engage in the use of force every year.

103.   When factoring in the number of office/administrative positions at APD, the relevant percentage is significantly greater.

104.   Additionally, APD police officers have a long track record of covering up their uses of force in the police reports that they file after such incidents and in any subsequent investigations.

105.   On June 30, 2011, Officer Thomas Atzert pulled over a vehicle that was being driven by Maurice Hampton.  *See* Brad Schrade & Jennifer Peebles, *Unarmed and Shot in the Back*, AJC, https://investigations.ajc.com/overtheline/ga-police-shootings/ (last visited Oct. 2, 2020).

106.   Maurice subsequently fled from the traffic stop and was pursued by Officer Atzert, who engaged in a physical struggle with Maurice.  *Id.*

107.   When Maurice broke away from the struggle and began to run away, Officer Atzert shot him in the back, killing him.  *Id.*

108.   In October 2014, Officer Trevor King was off-duty and working security at a Walmart store when he attempted to detain Tyrone Carnegay, who he believed to be shoplifting a tomato.  *See Ex-Atlanta Cop Gets 5 Years for Beating Walmart Customer Over 'Stolen' Tomato*, AJC (May 8, 2018), https://www.ajc.com/news/crime--law/atlanta-cop-gets-years-for-beating-walmart-customer-over-stolen-tomato/jSnD2Crf5H94c9WjeU5p9I/.

109.   When Tyrone Carnegay attempted to exit the store, Officer King struck him seven times with a metal baton, breaking two bones in his legs (including a severe a compound fracture).  *Id.*

110.   Incredibly, Officer King then arrested his victim and charged him with obstructing a police investigation and assaulting a police officer.  *Id.*

111.   Officer King lied in the police report that he filed following the incident and indicated that Tyrone Carnegay reached for a gun.  *Id.*

112.   Surveillance footage revealed that these claims were not true, and Officer King was federally charged with using unreasonable force and falsifying a police report.  *Id.*

113.   Despite the shocking conduct and criminal charges, Officer King was not fired from the APD.  Instead, he was permitted to retire.  *Id.*

114.   As a result of APD permitting King to "retire" rather than be terminated, King was able to keep retirement benefits and APD was able to avoid tacitly acknowledging that its employee engaged in wrongful conduct.

115.   Officer King was nonetheless ultimately convicted on federal charges and sentenced to five years in prison.  *Id.*

116.   On August 5, 2016, a task force that included Atlanta police officer William Sauls was attempting to arrest Jamarion Robinson for outstanding warrants.  *See* Catherine Park, *U.S. Marshals Task Force Accused of Excessive Force, Cover Up After Shooting Man 76 Times*, 11 ALIVE (Jan. 10, 2018), https://www.11alive.com/article/news/local/lawrenceville/us-marshals-task-force-accused-of-excessive-force-cover-up-after-shooting-man-76-times/85-506792680.

117.   The task force knew that Jamarion was schizophrenic and was not taking his medication.  *Id.*

118.   When the task force attempted to arrest Jamarion, its members broke down the door of the apartment where he was located, entered the apartment, and began shooting their submachine guns and handguns at him.  *Id.*

119.   Jamarion Robinson was ultimately shot 76 times.  *Id.*

120.   In an ensuing cover-up, members of the task force claimed that

Jamarion Robinson engaged in a shootout with officers.  *Id.*

121.   In truth, however, Robinson was unarmed when they shot him 76

times.  *Id.*

122.   Atlanta police officer William Sauls was not disciplined for his

involvement in Jamarion's death and remained with the Atlanta Police Department,

where he would continue to use excessive force.  *Id.*

123.   On September 16, 2016, Atlanta police officer Matthew Johns was

involved in a police chase and was pursuing a vehicle in which Antraveious Payne,

a teenager, was an occupant.  *See* Asia Simone Burns, *Ex-Atlanta Officer

Sentenced to 5 Years in Prison After Kicking, Choking Teen* (Aug. 26, 2019),

https://www.ajc.com/news/crime--law/atlanta-officer-sentenced-years-prison-after-

kicking-choking-teen/uRKXtUia2i7g7qHuNEfTcM/.

124.   After the police chase ended, Antraveious exited the vehicle and laid

on the ground with his hands up; he was unarmed and obviously surrendered.  *Id.*

125.   Nonetheless, Officer Johns ran up to Antraveious, kicked him in the

head three times, and pressed his knee on the teenager's neck until he was

unconscious.  *Id.*

126.   Officer Johns lied about the circumstances leading up to his use of force and repeated these assertions in written statements to cover-up the excessive nature of the force that he used.  *Id.*

127.   Officer Johns was fired by the Atlanta Police Department for his use of force against Antraveious and was indicted on criminal charges.  *Id.*

128.   Officer Johns ultimately pleaded guilty to three counts of aggravated assault, one count of aggravated assault/strangulation, two counts of making a false statement, and two counts of violating his oath of office.  *Id.*

129.   Officer Johns received a twenty-year sentence including five years in prison.  *Id.*

130.   On December 22, 2018, Officers Ian Mayfield and Virginia Pena Barrientos approached Saleem Wilson and another man in a McDonald's dining room.  *See* Janice Yu, *Atlanta Man Files Lawsuit Against APD and Officer Following 2018 Shooting*, FOX 5 ATLANTA (June 24, 2020), https://www.fox5atlanta.com/news/atlanta-man-files-lawsuit-against-apd-and-officer-following-2018-shooting.

131.   Officers Mayfield and Barrientos confiscated guns that were among the possessions of Saleem Wilson and the third party.  Both men were then unarmed.  *Id.*

132.   Upon having his gun confiscated, Saleem Wilson got up and began to run from the officers, at which point he was simultaneously tased by Officer Barrientos and shot in the back of his neck by Officer Mayfield with the third party's gun (not his department-issued firearm). *Id.*

133.   After the shooting, Officers Mayfield and Barrientos lied about the circumstances leading up to the shooting. *Id.*

134.   Officer Mayfield reported that Saleem shot himself with his own gun while Officer Barrientos's statement did not mention seeing Officer Mayfield pursuing Saleem with a gun in his hand or hearing a gunshot. *Id.*

135.   Both officers remain employed with the Atlanta Police Department, even though the Fulton County District Attorney's Office is investigating the incident for possible criminal charges. *Id.*

136.   On January 22, 2019, Officer Sung Kim was serving as part of a federal task force that was attempting to arrest Jimmy Atchison. *See* Christian Boone, *New Details About FBI Task Force Shooting of Unarmed Man*, AJC (Oct. 29, 2019), https://www.ajc.com/news/crime--law/new-details-about-fbi-task-force-shooting-unarmed-man/udjLPncbiB4ISAEcIvybSN/.

137.    When the task force attempted to arrest Jimmy, he fled the original

location where he encountered law enforcement and hid in the closet of a friend's

apartment.  *Id.*

138.    When officers found Jimmy, he was unarmed and emerged from the

closet with his hands up, at which point Officer Sung Kim shot Jimmy in the face,

killing him.  *Id.*

139.    As is routine practice by APD, Officer Kim was allowed to retire in

lieu of termination.  *See* Raisa Habersham, *Atlanta Cop Retires After New Details

Emerge in FBI Task Force Shooting*, AJC (Nov. 1, 2019),

https://www.ajc.com/news/local/atlanta-cop-retires-after-new-details-emerge-fbi-

task-force-shooting/HneBGNgnBKhDdUp26FuNCL/.

140.    The Fulton County District Attorney's Office is investigating the

incident for possible criminal charges.

141.    On May 30, 2020, six Atlanta police officers—Ivory Streeter, Mark

Gardner, Lonnie Hood, Armon Jones, Willie Sauls, and Roland Claud—engaged in

the use of excessive force against two college students that were leaving a protest

against police brutality.  *See* Phil Helsel & Austin Mullen, *2 More Atlanta Police

Officers Fired Over Use of Force During Protest*, NBC NEWS (June 10, 2020),

https://www.nbcnews.com/news/us-news/2-more-atlanta-police-officers-fired-over-use-force-during-n1229656.

142.   Messiah Young and Teniyah Pilgrim were driving down the road when they were stopped by officers who were enforcing a curfew that was issued by Mayor Keisha Lance Bottoms.  *Id.*

143.   Without giving the students any time to respond to their commands, the officers broke the driver's side window with a baton, tased them both, and took them into police custody.  *Id.*

144.   The incident was broadcast live on television, prompting a quick response from the City of Atlanta and the Atlanta Police Department.  *Id.*

145.   All six officers were charged with crimes for their roles in the incident, including charges of aggravated assault, aggravated battery, and criminal damage to property.  *Id.*

146.   Officers Streeter and Gardner were fired the day after the incident while Officers Hood and Jones were fired around a month later.  *Id.*

147.   Officers Sauls and Claud remain employed with the City of Atlanta despite the criminal charges that are pending against them for aggravated assault (Officer Sauls) and criminal damage to property (both officers).

148.   Alarmingly, Officer Sauls has been involved in three fatal shootings of unarmed men, yet still remains employed with the Atlanta Police Department. *See* Brad Schrade & Jennifer Peebles, *APD Cop in Tasing Incident Faced Earlier Excessive Force Allegations*, AJC (June 4, 2020),

https://www.ajc.com/news/crime--law/apd-cop-tasing-incident-faced-earlier-excessive-force-allegations/9ajNXyELh8hWweqNF8Yh9J/.

149.   Officer Sauls was involved in (1) the fatal shooting of an unarmed man, Jerry Jackson, at a body shop in 1996—the subject of a civil case that the City of Atlanta settled for $1.4 million; (2) the shooting of Jamarion Robinson, discussed above; and (3) the fatal shooting of a man who was merely holding a cell phone, Thomas F. Truitt, while Officer Sauls was serving an arrest warrant.  *Id.*

150.   On June 12, 2020, APD Officer Garrett Rolfe fatally shot Rayshard Brooks in the back at an Atlanta Wendy's restaurant.  *See* Ryan Young et al., *Ex-Atlanta Police Officer Who Killed Rayshard Brooks Charged with Felony Murder*, CNN (June 17, 2020), https://www.cnn.com/2020/06/17/us/rayshard-brooks-atlanta-shooting-wednesday/index.html.

151.   After the shooting, Officer Rolfe was fired by the Atlanta Police Department and charged with felony murder, aggravated assault (five counts), violation of oath (four counts), and damage to property.  *Id.*

152.   Officer Devin Brosnan was also charged with aggravated assault and violation of oath (two counts), though he remains employed with the Atlanta Police Department.  *Id.*

153.   Defendant Erika Shields resigned the day after this shooting.

154.   In the aftermath of the shooting, APD defended the actions of Officers Rolfe and Brosnan and criticized the criminal charges by the Fulton County District Attorney and the statements that were made by Mayor Keisha Lance Bottoms.  *Id.*

155.   In protest against the enforcement of criminal law against Officers Rolfe and Brosnan, numerous APD officers collectively called out of work for several days following announcement of the charges.  *Id.*

156.   The APD continues to support Officers Rolfe and Brosnan and oppose the criminal charges to this day.  *See* Christian Boone & Shaddi Abusaid, *Atlanta's Acting Chief on Crime, Morale, Rayshard Brooks Case*, AJC (Oct. 1, 2020), https://www.ajc.com/news/crime/atlantas-acting-police-chief-on-citys-crime-wave-cops-morale-rayshard-brooks-case/W4OFHCRQUJCSBIH6JVLIYC7BNU/.

157.   Officer Rolfe has previously covered up a police shooting in which he was involved.  *See* Christian Boone, *Ex-Cop Charged in Rayshard Brooks Case Involved in Earlier Shooting*, AJC (Oct. 2, 2020),

https://www.ajc.com/news/crime--law/cop-charged-rayshard-brooks-case-involved-earlier-shooting/cd6Ck2gYuCfGeBu7OKPv1N/.

158.   In the incident, Officer Rolfe and two other officers were attempting to arrest Jackie Harris, an unarmed man, when Jackie began to drive away from the officers. *Id.*

159.   All three officers opened fire, shooting Jackie in the back. *Id.*

160.   Each officer completed a police report after the shooting and subsequent arrest, though none of them indicated that there had been a shooting or that Jackie had been taken to the hospital for a gunshot wound. *Id.*

161.   The fact that Jackie had been shot by the police did not come out until his own criminal trial, leading the trial judge to (1) accuse the involved officers of covering up the police shooting, and (2) refer the matter to the Atlanta Police Department and District Attorney for investigation. *Id.*

162.   Despite the shooting cover-up, none of the involved officers were punished by the Atlanta Police Department, including Officer Rolfe. *Id.*

163.   It is clear that the APD and the City of Atlanta have a demonstrated history of widespread use of excessive, including deadly, force against unarmed people, covering up such conduct, and protecting the officers involved from facing repercussions for such conduct.

164.   The policies encourage and condone the use of excessive, including deadly, force.

**B.    APD's Custom and Policy of Dangerous Vehicle Pursuits and Firing at Occupants of Vehicles**

165.   In a widespread and systemic fashion, APD has engaged in dangerous, life-threatening vehicle pursuit tactics, including routinely firing at occupants of vehicles who pose no threat to anyone's physical safety.

166.   For example, on August 8, 2012, Atlanta police officers shot and killed Christopher Calhoun as they were attempting to arrest him at West End Mall for an outstanding warrant.  *See* Mike Morris & Angel K. Brooks, *Authorities: Fugitive Shot and Killed by Atlanta Police*, AJC (Aug. 10, 2012), https://www.ajc.com/news/local/authorities-fugitive-shot-and-killed-atlanta-police/LUMQMbu4sM2GWAGj2FVy5I/.

167.   As officers approached his vehicle, Christopher Calhoun began to drive off, at which point Atlanta police officers shot at him several times and killed him.  *See* Brad Schrade, *Atlanta Officer Fired as Shooting at Cars by Police Gets New Scrutiny*, AJC (Oct. 3, 2016), https://www.ajc.com/news/breaking-news/atlanta-officer-fired-shooting-cars-police-gets-new-scrutiny/YwaWGRUPU2fvYmCbAjEtpI/.

168.   On October 10, 2015, Atlanta police officer Emanuel Thompson was parked outside of a downtown Atlanta strip club when Demetric Favors and several other individuals exited the building and entered a vehicle. *See* Sam Starks, *APD Use of Force Policy Needs Reform*, CREATIVE LOAFING (June 30, 2020), https://creativeloafing.com/content-471861-apd-use-of-force-policy-needs-reform.

169.   The group was being pursued by security officers from the club because one of the men was believed to have stolen some money.  *Id.*

170.   Once the men entered the vehicle and began to drive off, Officer Thompson shot at the vehicle five times, hitting Demetric twice.  *Id.*

171.   Officer Thompson resigned from the Atlanta Police Department after this shooting and was indicted on counts of aggravated assault, violation of oath by a police officer, and making false statements.  *Id.*

172.   Officer Thompson ultimately pleaded guilty to a charge of simple assault and received a sentence that included twelve months of probation and the revocation of his Peace Officer Standards and Training Counsel certification.  *Id.*

173.   On June 22, 2016, Atlanta police officer James Burns responded to an apartment complex on a suspicious person call. *See* La'Raven Taylor, *Family Seeks Justice for Man Killed by Atlanta Police in 2016 as New Dashcam Video*

*Released*, AJC (Aug. 18, 2020), https://www.gpb.org/news/2020/08/18/family-seeks-justice-for-man-killed-by-atlanta-police-in-2016-new-dashcam-video.

174.    As he arrived, Officer Burns witnessed a car attempting to exit the apartment complex and, as a result, stopped his car in the middle of the street in an attempt to block the driver, Caine Rogers, from exiting.  *Id.*

175.    When Caine attempted to drive around the police car, Officer Burns exited his vehicle and shot Caine in the head, killing him.  *Id.*

176.    Officer Burns fatally shot Caine despite the fact that he was unarmed and the officer was not in any danger.  *Id.*

177.    As a result of this fatal use of force, Officer Burns was fired by the Atlanta Police Department and charged with felony murder, aggravated assault with a deadly weapon, and violating his oath of office.  *Id.*

178.    On January 26, 2017, Officer Yasim Abdulahad—a plainclothes Atlanta police officer—approached a car in the parking lot of the Atlanta police annex.  *See* Christian Boone, *Video of Atlanta Police Shooting Contradicts Official Account*, AJC (Feb. 24, 2017), https://www.ajc.com/news/crime--law/video-atlanta-police-shooting-contradicts-official-account/wGDQgzJ94qJa3GEo4uEPLP/.

179.   Officer Abdulahad had a brief interaction with the vehicle's driver, Deaundre Phillips, before entering it.  *Id.*

180.   Shortly after Officer Abdulahad entered the vehicle, Deaundre began to drive off.  *Id.*

181.   Officer Abdulahad then shot Deaundre in the head, killing him instantly.  *Id.*

182.   After the shooting, Officer Abdulahad lied about the circumstances leading up to the fatal shooting, and his account of the shooting was later disproven by surveillance footage.  *Id.*

183.   Despite his fatal use of force against Deaundre and his lies and misrepresentations in the aftermath of the shooting, Officer Abdulahad remains employed with the Atlanta Police Department.

184.   On February 25, 2017, Atlanta police officer Mathieu Cadeau was working an off-duty job directing traffic outside the Georgia Dome.  *See Fulton County Grand Jury Indicts Former Atlanta Police Sergeant for Shooting Motocross Dad Leaving the Georgia Dome*, OFF. OF THE FULTON CNTY.  DIST. ATT'Y (Oct. 11, 2018), https://www.atlantafultoncountyda.org/fulton-county-grand-jury-indicts-former-atlanta-police-sergeant-for-shooting-motocross-dad-leaving-the-georgia-dome/.

185.   Officer Cadeau told a driver, Noel Hall, that he could not turn into a particular parking lot.  *Id.*

186.   When Noel proceeded to make the turn any way, Officer Cadeau fired his gun into the vehicle that Noel was driving, striking him in his arm and chest. *Id.*

187.   Officer Cadeau shot Noel despite the fact that he was unarmed, posed no threat of physical harm, and there were five other occupants in the vehicle that he was driving.  *Id.*

188.   Officer Cadeau was ultimately fired by the Atlanta Police Department and indicted on four counts of aggravated assault, two counts of violating his oath of office, and one count of reckless conduct.  *Id.*

189.   Officer Cadeau pleaded guilty to these charges and was sentenced to thirty years of probation.  *See* Alexis Stevens, *Man Says He Wasn't Told Cop Who Shot Him Got Probation*, AJC (Mar. 9, 2020), https://www.ajc.com/news/crime--law/man-says-wasn-told-atlanta-cop-who-shot-him-got-deal-probation/qISgwkSOixzdFA6qndp56K/.

190.   In January 2020, Defendant Shields finally changed course, announcing a change to the APD's vehicle pursuit policy.

---

191.   Prior to January 2020, APD policy allowed three APD vehicles to chase a single suspect.

192.   Officers were permitted to chase suspects in vehicles if:  (1) the suspect had a deadly weapon; (2) the officer believed the suspect posed an immediate threat of violence to officers or others; or (3) when there is probable cause to believe the suspect has committed or threatened serious physical harm.

193.   Under the new policy Defendant Shields announced, officers are no longer permitted to chase vehicles.

194.   Defendant Shields' express bases for this policy change included:  (1) "the level of pursuit training received by officers who are engaged in such pursuits;" (2) "the rate of occurrence of injury/death as a result of the pursuits;" and (3) "the department is assuming an enormous amount of risk to the safety of officers and the public for each pursuit, *knowing that the judicial system is largely unresponsive to the actions of the defendants*."  Matt Johnson, *Atlanta Police Begins No-Chase Policy Effective Immediately*, WSB-TV (January 3, 2020), https://www.wsbtv.com/news/local/atlanta/atlanta-police-sets-no-chase-policy-effective-immediately/NMXS6JZ6LRBBPP2FE5KMY25RAY/.

## **PARTIES**

195.   Plaintiff Gaysha Glover is the natural and legal mother of D'Ettrick

Griffin.  Plaintiff Gaysha Glover is a resident of the State of Georgia.

196.   Plaintiff Courtney Griffin is the natural and legal father of D'Ettrick Griffin.  Plaintiff Courtney Griffin is a resident of the State of Georgia.

197.   Plaintiffs' Gaysha Glover and Courtney Griffin are co-administrators of the Estate of D'Ettrick Griffin.

198.   Defendant City of Atlanta is a Georgia municipality that exists pursuant to and is organized under the laws of the State of Georgia.  The City of Atlanta is responsible for (1) the policies, practices, customs, and regulations of the City of Atlanta Police Department and (2) the hiring, training, supervision, and discipline of the Atlanta Police Department's employees, including its officers and Chief of Police.

199.   Defendant Erika Shields was, at all relevant times, the Chief of Police of the APD.  As the Chief of Police, Defendant Shields acted under color of state law and as an official policymaker responsible for (1) the policies, practices, customs, and regulations of the City of Atlanta Police Department and (2) the hiring, training, supervision, and discipline of the Atlanta Police Department's employees, including its officers.

200.   Defendant Oliver Simmonds was, at all times relevant to this complaint, an officer of APD and a member of the EPU.  At all times relevant to

this complaint, Officer Simmonds was an employee or agent of APD, acted within the scope of his employment or agency with APD, and acted under color of state law.

201.   Does 1–5 are employees or agents of APD who: (1) were responsible for promulgating and enforcing, or in fact did promulgate and enforce, customs, practices, policies, and procedures applicable to the use of force by Defendant Simmonds; (2) were responsible for hiring, training, supervising, retaining, and/or disciplining Defendant Simmonds; (3) directed, encouraged, and/or caused the use of unreasonable and excessive force by Defendant Simmonds against D'Ettrick; or (4) had actual knowledge of a history of widespread abuse that put them on notice of the need to correct the constitutional deprivation and failed to do so.

## **JURISDICTION AND VENUE**

202.   This Court has jurisdiction over each Defendant because they are domiciled in the State of Georgia and/or acted and caused injury within the State of Georgia.

203.   This Court has jurisdiction over the subject matter of this action because it asserts claims arising under the Constitution and laws of the United States.

204.   Venue is proper in the Northern District of Georgia pursuant to 28

U.S.C. § 1331 and Local Rule 3.1 because a substantial part of the events giving

rise to the cause of action occurred in Fulton County, Georgia, which is situated in

the district and divisional boundaries of the Atlanta Division of the Northern

District of Georgia.

## CLAIMS FOR RELIEF

**Count I:**   **42 U.S.C. § 1983: Violation of Constitutional Rights by Officer Simmonds**

205.   Plaintiffs incorporate paragraphs 1 through 204 as if fully stated

herein.

206.   At all times relevant to this complaint, Officer Simmonds was an

officer of the Atlanta Police Department and was acting (1) under color of state

law and (2) within the scope of his employment with the APD.

207.   As an officer of the APD, Officer Simmonds was acting pursuant to

the ordinances, regulations, customs, and policies of the APD.

208.   D'Ettrick had clearly established Fourth and Fourteenth Amendment

rights to be free from the use of excessive force.

209.   D'Ettrick had not committed any crime involving the infliction or

threatened infliction of physical harm.

210.   D'Ettrick did not pose any threat to the safety of Officer Simmonds or anyone else.

211.   D'Ettrick was unarmed.

212.   D'Ettrick gained access to the vehicle nonforcibly—the keys to the vehicle were already in the ignition, the vehicle was unlocked, and the vehicle was unattended.

213.   Officer Simmonds was not in the path of the vehicle as it began to drive away and was not in any physical danger when he fired the fatal shots at D'Ettrick.

214.   D'Ettrick Griffin did not otherwise pose an immediate threat of serious bodily harm to Officer Simmonds or any other member of the public.

215.   Nonetheless, Officer Simmonds fatally shot D'Ettrick Griffin in the back without any prior warning regarding Officer Simmonds' intention to use deadly force on D'Ettrick.

216.   Officer Simmonds' fatal shooting of D'Ettrick Griffin occurred in the absence of any of the circumstances that could justify the use of deadly force by a police officer against a suspect.

217.   There was no factual or legal justification for Defendant Simmonds to open fire on D'Ettrick.

218.   Officer Simmonds use of deadly force was not objectively reasonable.

219.   Officer Simmonds used excessive force against D'Ettrick in violation of his clearly established constitutional rights under the Fourth and Fourteenth Amendments.

220.   As a direct result of Officer Simmonds' violation of D'Ettrick Griffin's Fourth and Fourteenth Amendment rights, D'Ettrick experienced conscious pain and suffering and died.

**Count II:    Assault and Battery by Officer Simmonds Under Georgia State Law**

221.   Plaintiffs incorporate paragraphs 1 through 204 as if fully stated herein.

222.   Officer Simmonds committed assault and battery against D'Ettrick Griffin when he fired two shots at D'Ettrick from his APD-issued firearm, striking him in the back and killing him.

223.   Officer Simmonds had no legal justification for such assault and battery, as D'Ettrick Griffin did not pose an immediate threat of serious bodily harm to Officer Simmonds or any member of the public.

224.   Instead, D'Ettrick Griffin was unarmed and peacefully driving away from Officer Simmonds, who was not in the path of the vehicle or otherwise in physical danger, when Officer Simmonds shot and killed D'Ettrick.

225.   Officer Simmonds nonetheless deliberately drew his weapon, deliberately aimed the weapon at D'Ettrick's back, deliberately fired the weapon, deliberately aimed the weapon a second time, and deliberately fired the weapon at D'Ettrick again.

226.   Officer Simmonds was angry because he believed D'Ettrick was attempting to steal his APD vehicle.

227.   Officer Simmonds shot D'Ettrick out of anger, intentionally and maliciously, with a deliberate intent to harm D'Ettrick.

228.   Officer Simmonds has a history and pattern of anger and physical violence.

229.   Officer Simmonds' conduct was willful, wanton, and without legal justification.

230.   Officer Simmonds' assault and battery directly and proximately caused D'Ettrick conscious pain and suffering and death.

231.   Accordingly, Officer Simmonds' conduct is not protected by official immunity and he is liable for his assault and battery of D'Ettrick.

**Count III:   42 U.S.C. § 1983; Supervisory Liability for Violation of Constitutional Rights by Erika Shields and Does 1–5**

232.    Plaintiffs incorporate paragraphs 1 through 204 as if fully stated herein.

233.    D'Ettrick had a clearly established Fourth and Fourteenth Amendment right to be free from the use of excessive force.  Any force used against him was required to be objectively reasonable under the totality of the circumstances.

234.    There was no factual or legal justification for the use excessive force against D'Ettrick described in this complaint.

235.    Erika Shields and Does 1–5 (collectively the "Count III Defendants"), in their individual capacity, have supervisory liability under 42 U.S.C. § 1983 because:

a.    They engaged in, promulgated, and enforced customs, practices, policies, and procedures that proximately caused the use of excessive force against D'Ettrick;

b.    They directed, encouraged, and caused the use of unreasonable and excessive force against D'Ettrick;

c.    They had actual knowledge of a history of widespread abuse that put them on notice of the need to correct the constitutional deprivation and failed to do so;

d.      They knew of Defendant Simmonds' lack of appropriate training regarding use of physical force, use of firearms, and pursuit of vehicles and failed to take any action to correct it; and

e.      They knew of Defendant Simmonds' history of physical violence and chose to employ him anyway.

236.   The Count III Defendants were responsible for the day-to-day operations of the APD and for adopting and implementing the rules and regulations that governed the conduct of Defendant Simmonds.

237.   The Count III Defendants were responsible for hiring, training, monitoring, supervising, retaining, and disciplining Defendant Simmonds.

238.   The Count III Defendants were aware of Officer Simmonds' arrest for domestic abuse in 2012.

239.   The Count III Defendants had actual knowledge of Officer Simmonds' anger issues and violent behavior, yet decided it appropriate to give him a gun and badge.

240.   The Count III Defendants' failure to hold Officer Simmonds accountable for his extra-legal violence, along with the failure to properly discipline, supervise, and train Officer Simmonds in proper use of force techniques evinces a reckless indifference for the safety of all Atlanta citizens.

241.   The Count III Defendants created, fostered, and allowed for persistent and widespread excessive use of force, which led to the use of excessive force by Officer Simmonds and resulted in the death of D'Ettrick Griffin.

242.   APD officers routinely used excessive and deadly force without justification in violation of the constitutional rights of the victims of such force.

243.   Specifically, APD officers regularly use excessive and deadly force by shooting at moving vehicles, which posed an extreme risk of death and serious harm to the victims of such force as well as bystanders.

244.   Specifically, the Count III Defendants failed to institute a policy requiring APD officers give verbal warning where feasible before resorting to the use of deadly force.

245.   The Count III Defendants were aware of the persistent and widespread use of excessive and deadly force by APD officers in violation of the constitutional rights of the victims of such force.

246.   The Count III Defendants (1) failed to take any action to properly train, monitor, supervise, or discipline officers who violated the constitutional rights of persons through the use of excessive force, and (2) were deliberately indifferent to this persistent and widespread practice.

247.   APD officers routinely violate the Department's existing policies and procedures, including policies and procedures regarding the use of force, the use of department-issued firearms, pursuit of vehicles, and reporting requirements after a use of force.

248.   APD officers routinely ignore valid ORA requests concerning officers' wrongdoings.

249.   The widespread violations of these policies and procedures routinely resulted in violations of constitutional rights.

250.   The Count III Defendants were aware of the widespread and persistent violations of departmental policies and procedures that manifested in the violation of the constitutional rights of the citizens of the City of Atlanta.

251.   The Count III Defendants (1) failed to take any action to properly train, monitor, supervise, or discipline officers who violated departmental policies and procedures, and (2) were deliberately indifferent to this persistent and widespread practice through their inaction.

252.   Rather, the Count III Defendants routinely ratified and condoned the unlawful and illegal activities of APD officers by failing to take any action to redress these wrongs or prevent them from happening again.

253.   Further, the Count III Defendants acted to conceal the unlawful and illegal activities of APD officers, avoiding accountability and ultimately ensuring that these wrongdoings would continue to occur.

254.   Only after D'Ettrick's death did the Count III Defendants change their policy regarding vehicle pursuit.  And they did so reluctantly, publicly blaming the court system for the need to do so.

255.   The Count III Defendants had actual knowledge of Officer Simmonds' violent tendencies and anger problems yet failed to take proper remedial action.

256.   The repeated failure to train, monitor, supervise, or discipline officers of APD who (1) used excessive and deadly force, or (2) violated departmental policies and procedures pertaining to the use of force, the use of department-issued firearms, pursuit of vehicles, or reporting requirements following the use of force was an objectively unreasonable response to a known, substantial risk of constitutional violations.

257.   Moreover, this repeated failure to train, monitor, and supervise officers of the Atlanta Police Department more broadly on the departmental policies and procedures pertaining to the use of force, the use of department-issued firearms, pursuit of vehicles, and reporting requirements following the use of force

was an objectively unreasonable response to persistent and widespread constitutional violations by officers of APD.

258.   Accordingly, the Count III Defendants had meaningful notice that they needed to correct the constitutional violations that were being committed by APD officers and took no action to do so.

259.   As a direct and proximate result of the Count III Defendants' constitutional violations, D'Ettrick experienced conscious pain and suffering and died.

**Count IV:   42 U.S.C. § 1983; Municipal Liability for Violation of Constitutional Rights by City of Atlanta and Erika Shields**

260.   Plaintiffs incorporate paragraphs 1 through 204 as if fully stated herein.

261.   Defendants City of Atlanta and Erika Shields, in her official capacity (collectively the "Count IV Defendants"), acting under color of law, were responsible for hiring, training, supervising, retaining, and disciplining Defendant Simmonds.

262.   Erika Shields was the policymaker and final decision-maker with respect to the operation of the APD.

263.   The Count IV Defendants, acting under color of law, were responsible for promulgating and enforcing customs, practices, policies, and procedures regarding the use of force by APD and EPU officers.

264.   The Count IV Defendants' promulgation and enforcement of inappropriate customs, practices, policies, and procedures, and failure to promulgate and enforce adequate customs, practices, policies, and procedures caused, among other things:

> a.   The widespread and systemic use of excessive and deadly force by APD and EPU officers, including against D'Ettrick;
>
> b.   APD and EPU officers to shoot drivers inside vehicles while they pose no threat of physical harm, including D'Ettrick;
>
> c.   Dangerous vehicle pursuit tactics and practices by APD and EPU officers, including with respect to D'Ettrick;
>
> d.   Plain clothes and off-duty APD and EPU officers to be required to intervene in suspected crimes, including with respect to D'Ettrick;
>
> e.   Plain clothes and off-duty APD and EPU officers to use excessive and deadly force against suspects, including against D'Ettrick;
>
> f.   APD and EPU officers to be incentivized to use excessive and deadly force, including against D'Ettrick;

g.      APD and EPU officers to be incentivized to cover up incidents in which they use excessive force, including with respect to D'Ettrick's death;

h.      APD and EPU officers to lack appropriate use of force training;

i.      The absence of any APD policy requiring officers give verbal warning before using deadly force;

j.      APD and EPU officers to lack appropriate de-escalation training;

k.      APD and EPU officers to lack appropriate vehicle pursuit training;

l.      APD and EPU officers not to render first aid to people against whom they use excessive force;

m.      APD and EPU not to meaningfully discipline officers who break the law; and

n.      APD and EPU to continue employing officers with known violent tendencies.

265.   The existence of inappropriate customs, practices, policies, and procedures governing APD was the result of final decisions by the City's policy-maker and final decision-maker.

266.   The lack of adequate customs, practices, policies, and procedures governing APD was the result of final decisions by the City's policy-maker and final decision-maker.

267.   The Count IV Defendants' promulgation and enforcement of inappropriate customs, practices, policies, and procedures, and failure to promulgate and enforce adequate customs, practices, policies, and procedures directly and proximately caused D'Ettrick's conscious pain and suffering and death.

**Counts V, VI, and VII:  Violation of the Open Records Act by City of Atlanta**

268.   Plaintiffs incorporate paragraphs 1 through 204 as if fully stated herein.

269.   The Atlanta Police Department is a municipal "agency" as defined in the Open Records Act, O.C.G.A. § 50-18-70(b)(1) and O.C.G.A. § 50-14-1(a)(1).

270.   Pursuant to O.C.G.A. § 50-18-70(b)(1)(A), "agencies shall produce for inspection all records responsive to a request within a reasonable amount of time not to exceed three business days of receipt of a request."

271.   Exemptions to the disclosure requirements of the Open Records Act are outlined in O.C.G.A. § 50-18-72(a)(4), which states: "Records of law enforcement, prosecution, or regulatory agencies in any pending investigation or

prosecution of criminal or unlawful activity, *other than initial police arrest reports and initial incident reports.*" (Emphasis added)

272.   Pursuant to the Atlanta Police Department Policy Manual, officers on the scene of a crime and or fatality are required to prepare an incident report that thoroughly documents the facts and circumstances giving rise to the incident and any evidence collected from the scene of the crime.

273.   Plaintiffs have made three ORA requests to the APD seeking documents related to the shooting death of D'Ettrick Griffin on January 15, 2019, and employment records for Officer Simmonds.

274.   APD did not timely respond to any of them.

275.   In its late responses, APD did not disclose all of the requested documents in its possession that are subject to public inspection pursuant to the ORA.

276.   Plaintiffs are entitled to a declaratory judgment that the APD's conduct described in this complaint violated the Georgia Open Records Act.

277.   Plaintiffs are entitled to a judgment ordering the Atlanta Police Department to comply with the Georgia Open Records Act and produce the documents requested by Plaintiffs.

278.   The Atlanta Police Department's failure to provide the requested records was without substantial justification.  Accordingly, pursuant to O.C.G.A. § 50-18-73(b), Plaintiffs are further entitled to an award of their attorneys' fees and other litigation costs incurred as a result of the City's violations of the Georgia Open Records Act.

279.   Plaintiffs repeatedly informed the APD of its failure to comply with the ORA and attempted to secure its compliance without litigation.

280.   In violating the Georgia Open Records Act, the Atlanta Police Department has acted knowingly and willfully, or at a minimum, negligently, and in bad faith.  As a result of the City's knowing, willing, and/or negligent violations, this Court is authorized by O.C.G.A. § 50-18-74 to impose a civil fine of $1,000 for the first violation and $2,500 for each additional violation within a 12-month period.

## DAMAGES AND ATTORNEYS' FEES

281.   Plaintiffs are entitled to recover compensatory damages for the full value of D'Ettrick Griffin's life as determined by a jury.  This includes special damages for the expected lost past and future earnings, and lost past and future household services of D'Ettrick Griffin.

282.   As of February 10, 2023, the value of D'Ettrick Griffin's expected lost past earnings, future earnings, and household service was at least $2,736,809, comprising:

       a.      $42,257 in lost past household services;

       b.      Present value of $395,186 in lost future household services;

       c.      Lost past earnings of $6,026; and

       d.      Present value of $2,293,340 in lost future earnings.

283.   Defendants' actions were willful, deliberate, and in reckless disregard of Plaintiffs' constitutional rights.

284.   Defendants' actions show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

285.   Accordingly, punitive damages should be imposed against Defendants pursuant to O.C.G.A. § 51-12-5.1 and other applicable laws to deter future violations of fundamental constitutional rights.

286.   Defendants have acted in bad faith, have been stubbornly litigious, and/or have caused Plaintiffs unnecessary trouble and expense, which entitle Plaintiffs to punitive attorneys' fees and expenses of litigation pursuant to O.C.G.A. § 13-6-11.

287.    Plaintiffs are additionally entitled to attorneys' fees pursuant to 42 U.S.C. § 1988.

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiffs pray that this Court award the following relief from Defendants:

a.      An award of compensatory damages for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

b.      An award of punitive damages in favor of Plaintiffs against Defendants;

c.      An award of reasonable costs and attorney's fees pursuant to 42 U.S.C. § 1988 and other applicable laws regarding such awards; and

d.      That the Court find the Defendants in willful violation of O.C.G.A. § 50-18-70, et seq;

e.      That Plaintiffs be awarded appropriate penalties under the Open Records Act;

f.      That Defendants be compelled to produce the requested records;

g.      That Plaintiffs be awarded such other and further relief as the Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs hereby demand a trial by jury.

**DATED**:  August 11, 2023.

/s/ Eric S. Fredrickson
Eric S. Fredrickson
Georgia Bar No. 489783
Matthew S. Harman
Georgia Bar No: 327169

**HARMAN LAW FIRM LLC**
3575 Piedmont Road, NE
Bldg 15, Suite 1040
Atlanta, GA 30505
Telephone:  (404) 554-0777
Facsimile:  (404) 424-9370
Email:  efrederickson@harmanlaw.com
         mharman@harmanlaw.com

Alex R. Merritt
Georgia Bar No. 143308
DeWoskin Law Firm, LLC
535 North McDonough Street
Decatur, Georgia 30030
alex@atlantatrial.com
(404) 987-0026

***Attorneys for Plaintiffs***