# EXHIBIT 3

Oliver Simmonds Deposition

In The Matter Of:
## *Glover vs. City Of Atlanta*

Deposition Of:
## *Oliver Simmonds*

Taken On:
*7/13/2022*

Pope Reporting & Video, LLC
2741 Pangborn Road
404-856-0966

www.popereporting.com



Case 1:20-cv-04302-VMC   Document 153-3   Filed 10/25/23   Page 3 of 16

Glover vs. City Of Atlanta					Oliver Simmonds					7/13/2022

Page 13

1  interactions with the mayor?
2      A.  Say that again.
3      Q.  Did you have regular interactions with the
4  mayor?
5      A.  Yes.
6      Q.  Did you talk to her -- was it -- who --
7  let's back up.
8          Who was the mayor while you were in the EPU?
9      A.  Keisha Lance Bottoms.
10     Q.  Was that for your entire six years in the
11 EPU?
12     A.  No.  The first one was Kasim Reed.
13     Q.  Okay.  Did the mayor ever give you
14 instructions while you were on the job?
15     A.  No.
16     Q.  Okay.  Let's talk about the day of the
17 incident.  When did you start work on January 15,
18 2019?
19     A.  What time?
20     Q.  Yes.
21     A.  2 p.m.
22     Q.  Walk me through your shift.  What was going
23 on that day?
24     A.  The mayor wasn't in office, and we were just
25 at the office.

Page 14

1      Q.  When did your shift end?
2      A.  It was supposed to be at 10:00.
3      Q.  What time did you leave city hall?
4      A.  I can't recall.  Sometime after I got there.
5  I can't recall.
6      Q.  Where did you go?
7      A.  I go to the T.J. Maxx on Howell Mill Road.
8      Q.  Where did you go after the T.J. Maxx?
9      A.  To a gas station.
10     Q.  And that's the Shell station at Whitehall
11 and McDaniel?
12     A.  Yes, sir.
13     Q.  Okay.  Were you familiar with that area?
14     A.  Not really.  Just driving past there.  Not
15 really familiar.
16     Q.  Had you been to that gas station before?
17     A.  I can't recall.
18     Q.  What time did you get there?
19     A.  I can't recall also.
20     Q.  Describe for me in as much detail as you can
21 what happened at this gas station.
22     A.  Okay.  Got out of the car to pump gas.
23 Retrieved the -- when I go open the -- we use gas
24 cards.  So go retrieve the gas card from the -- from
25 the -- from the car, place it in the -- in the

Page 15

1  machine.  I start pumping the gas.
2          After I finished pumping the gas, closed it
3  back.  Go to enter the vehicle.  Open the door.
4  Someone was -- somebody was inside, inside the car.
5  When I went to enter, the person start pushing me out
6  of the car, and a little struggle ensued.  And then
7  they pull off.
8          The door of the thing -- when they pull out,
9  the door was still open.  So I held onto the door.
10 And I realized it was about to make a U-turn on
11 Whitehall -- to speed up to go down Whitehall Avenue
12 into Zone 3.
13         So at that point, the door closes.  I'm not
14 sure how it closed.  And part of my jacket was stuck
15 to the car.  When I realized that he was about to turn
16 to go on Whitehall and to increase speed, I drew my
17 pistol and I fired while tugging onto my jacket.  Then
18 I got released from the car.
19         My -- in the process at some point the
20 vehicle run over my foot.  So when I -- when I got
21 released from the car, I fell onto the side of the
22 street trying to call -- get on my radio, trying to
23 call dispatch to tell them exactly what happened.
24 Then the car apparently crashes.
25     Q.  Okay.  Let me ask a few follow-ups on this.

Page 16

1  How long was your jacket stuck in the car door?
2      A.  I don't know.  It happened so fast.  I
3  wasn't -- I can't tell.
4      Q.  Roughly, how much distance did you and the
5  car cover while your jacket was stuck in the door?
6      A.  I don't know.
7      Q.  When you were pulling on the door, did you
8  step into the car?
9      A.  At the -- at the -- at the pump?  I tried to
10 step in the car at the pump.
11     Q.  And did you grab the steering wheel when you
12 reached into the car?
13     A.  Yes.
14     Q.  From the time your -- you realized that your
15 jacket was stuck in the door, how much time passed
16 before you fired your gun?
17     A.  As I said, I can't recall.  The time go by
18 fast.  It seemed like an eternity, but I can't put a
19 time on it.  I don't know.
20     Q.  Can you say was it, you know, 30 seconds or
21 2 seconds?
22         MS. BENSON:  Object to form.  Asked and
23 answered.
24     A.  I don't know.
25

Case 1:20-cv-04302-VMC   Document 153-3   Filed 10/25/23   Page 4 of 16

Glover vs. City Of Atlanta    Oliver Simmonds    7/13/2022

Page 17

1  BY MR. FREDRICKSON:
2  Q. Where exactly were you when you fired?
3  A. In terms of -- I was outside the car.
4  Q. Were you on the gas station property?
5  A. No. I don't -- I don't know.
6  Q. Where was the --
7  A. But the --
8  Q. -- car?
9  A. -- car -- the car was driving. So as soon
10 as it was in the process of making a turn to go down
11 Whitehall Avenue.
12 Q. So the car was in the process of making a
13 U-turn when you fired?
14 A. Yes.
15 Q. So it was not yet on Whitehall Avenue?
16 A. I'm not sure.
17 Q. Which way was the car facing?
18 A. When I shot?
19 Q. Yes.
20 A. It was turning. So when I parked, the car
21 was facing towards the city of Atlanta. So it was
22 going towards the opposite direction.
23 Q. Was it -- I understand it was in the process
24 of turning, but at the time that you fired, was it
25 perpendicular to Whitehall or was it on Whitehall

Page 18

1  parallel with the street?
2  A. It wasn't parallel. It was -- it was making
3  a turn; so it couldn't be parallel.
4  Q. Why did you determine it was necessary to
5  fire your gun?
6  A. I feared for my life or severely injured.
7  Q. And why did you fear for your life?
8  A. Because I was stuck to the car and it was in
9  motion and it was about to speed up.
10 Q. Where did you aim?
11 A. I didn't get a chance to aim. I just pulled
12 my gun and fired inside the car to stop him.
13 Q. When you fired, were you holding the gun in
14 both hands?
15 A. No.
16 Q. Which hand were you holding it in?
17 A. My right hand.
18 Q. You're right-handed?
19 A. Yes.
20 Q. When you got out of the car to start pumping
21 gas, did you leave the car unlocked?
22 A. Yes.
23 Q. Did you leave the car running?
24 A. I can't -- I can't -- I can't recall that.
25 Q. Did you leave the door open?

Page 19

1  A. No.
2     MR. FREDRICKSON: Let's mark this Exhibit 1,
3  if we can. Or I'm happy to if you want.
4     (Exhibit 1 marked.)
5  BY MR. FREDRICKSON:
6  Q. Okay. Officer Simmonds, I'm going to hand
7  you what we just marked Exhibit 1. Are you familiar
8  with the APD's policies regarding use of force?
9  A. Yes.
10 Q. Are you familiar with this particular
11 document?
12 A. Yes.
13 Q. What is it?
14 A. The SOP on use of force.
15 Q. Did you fully comply with these policies
16 when you shot D'Ettrick Griffin?
17 A. Yes.
18 Q. Did you violate any APD policy in any way
19 when you shot D'Ettrick Griffin?
20 A. No.
21 Q. When D'Ettrick started to drive away and you
22 grabbed the door handle, what were you trying to
23 accomplish?
24 A. I was trying to retrieve possession of the
25 car.

Page 20

1  Q. I'm sorry. Say that again.
2  A. I was trying to retrieve possession of the
3  car.
4  Q. What do you mean by that?
5  A. Get the car back.
6  Q. When you grabbed the steering wheel of the
7  car, why did you do that?
8  A. Because I didn't know anyone was in the car.
9  I was -- I was about to go inside the car.
10 Q. At the time that you grabbed the steering
11 wheel of the car, you didn't know that anyone else was
12 in there?
13 A. No.
14 Q. Okay. At what point did you realize someone
15 else was in the car?
16 A. When he started shouting.
17 Q. What did he say to you?
18 A. I can't -- I can't recall.
19 Q. Did you say anything to him?
20 A. No.
21 Q. Did you see D'Ettrick's hands on the
22 steering wheel?
23 A. I think -- the car was dark, but he was --
24 he was inside the car. It happened so fast. I don't
25 know.

Case 1:20-cv-04302-VMC   Document 153-3   Filed 10/25/23   Page 5 of 16

Glover vs. City Of Atlanta                Oliver Simmonds                7/13/2022

Page 29

1  issued and put it in there.
2  Q.  You said there's a saying never carry an
3  empty gun?
4  A.  Yes.
5  Q.  Is that a policy from the APD?
6  A.  No.
7  Q.  Like, where would one hear that saying?
8  A.  Just a saying.
9  Q.  Okay.  Is it unique to law enforcement?
10 A.  Yes.
11 Q.  When you took rounds from your Glock 17 to
12 put in the Glock 43, how many rounds did you put in
13 the 43?
14 A.  I can't remember.
15 Q.  If the APD had a policy that forbid officers
16 from firing in moving vehicles except in cases of
17 terrorism, would you comply with that policy?
18     MS. BENSON:  Object to --
19     MR. CUNNINGHAM:  Objection --
20     MS. BENSON:  -- form.
21     MR. CUNNINGHAM:  -- to form.  Speculative.
22 It --
23     MR. FREDRICKSON:  Let's not -- object to
24 form is good.
25     MR. CUNNINGHAM:  I mean, an objection to the

Page 30

1  form isn't limited to -- I can -- I have a duty to
2  inform you why your question is bad so you can --
3     MR. FREDRICKSON:  No.  No, you don't.
4     MR. CUNNINGHAM:  -- potentially try to cure
5  the question.
6     MR. FREDRICKSON:  No.  If you object to
7  form, all form objections are covered.  It's reserved.
8  You don't need to -- you don't need to say anything
9  else.
10    MR. CUNNINGHAM:  I think Judge Batten -- I
11 know we're not in front of him, but he would severely
12 disagree with that.
13    MR. FREDRICKSON:  Well, it's in the court's
14 standing order, if you want to review it.
15    MR. CUNNINGHAM:  I reviewed it this morning.
16 I don't think it's in the standing order.
17    MR. FREDRICKSON:  Do you want me to get it
18 out?
19    MR. CUNNINGHAM:  I'll pull it up right now.
20    MR. FREDRICKSON:  Page 17, speaking
21 objections and other tactics for coaching the witness
22 during the deposition are not permissible.
23    MR. CUNNINGHAM:  That's not a speaking
24 objection.  I'm telling you the basis for my
25 objection.

Page 31

1     MR. FREDRICKSON:  That is a speaking
2  objection.  That's what that means.
3     MR. CUNNINGHAM:  All right.  We can agree to
4  disagree.  But I think a speaking objection would be
5  more than just saying object to form and that it is
6  speculative and it's an improper hypothetical.
7     MR. FREDRICKSON:  Okay.  Well, we do
8  disagree, but hopefully it won't be an issue.
9     Can we read the last question back.
10    Okay.  I got it.  I can do it.
11 BY MR. FREDRICKSON:
12 Q.  Officer Simmonds, if the APD had a policy
13 that forbid officers from firing in moving vehicles
14 except in cases of terrorism, would you comply with
15 that policy?
16    MS. BENSON:  Same --
17    MR. CUNNINGHAM:  Objection --
18    MS. BENSON:  -- objection.
19    MR. CUNNINGHAM:  -- noted.
20 BY MR. FREDRICKSON:
21 Q.  You can answer.
22 A.  Yes, I would.  I would.
23 Q.  If the APD had a policy forbidding officers
24 from in any way pursuing suspects fleeing in vehicles,
25 would you comply with that policy?

Page 32

1  A.  Yes.
2  Q.  If the APD had a policy that required you to
3  warn a suspect prior to firing your gun, would you
4  comply with that policy?
5  A.  Yes.
6  Q.  What is the APD's vehicle pursuit policy?
7  A.  Pursuit policy?  A person should be -- first
8  of all, the severity of the crime.  You're talking
9  about vehicle pursuit?
10 Q.  Yes.
11 A.  The severity of the crime.  And if it's a
12 felony, the supervisor would allow the person to
13 pursue that vehicle.  The supervisor have the right to
14 Code 4, cancel pursuit, or give permission for an
15 officer to pursue a vehicle.
16 Q.  What does "Code 4" mean?
17 A.  Cancel.
18 Q.  What is APD's policy regarding firing a gun
19 at moving vehicles?
20 A.  It's prohibited.
21 Q.  Is that a written policy?
22 A.  Yes.
23 Q.  Was that a policy in effect on January 15,
24 2019?
25 A.  That's totally different.  I was stuck to

Case 1:20-cv-04302-VMC   Document 153-3   Filed 10/25/23   Page 6 of 16

Glover vs. City Of Atlanta　　　　　　Oliver Simmonds　　　　　　7/13/2022

Page 33

1 the car.
2　Q.　Well, I'm not asking about whether you were
3 stuck to the car, though.
4　A.　Yes.
5　Q.　Was there a policy forbidding officers from
6 firing at moving vehicles?
7　A.　Yes.
8　Q.　Where would you find that policy?
9　A.　APD SOPs.
10　Q.　Are there exceptions to the policy?
11　A.　I can't recall.
12　Q.　Is it in Exhibit 1, the use of force SOP?
13　A.　I'm not -- I'm not sure.
14　Q.　Could you take a look at that SOP and tell
15 me if it's in there.
16　A.　I don't -- no, I don't see it.  I don't see
17 it.
18　Q.　Okay.  How did you come to learn of the
19 policy against firing in moving vehicles?
20　A.　In service training.
21　Q.　How long after firing did your jacket free
22 from the door?
23　A.　Seconds after.  I can't give a -- I can't
24 give a precise time.
25　Q.　After you fired at the car, it didn't stop;

Page 34

1 correct?
2　A.　No.
3　Q.　So did firing at the car make any difference
4 on whether your jacket was going to come free from the
5 door?
6　A.　Well, I tried -- I tried to stop the
7 suspect.  So I can't tell it wouldn't make a
8 difference.
9　Q.　Well, if the car didn't stop after you
10 fired, if you had not fired, the jacket still would
11 have come free from the door; true?
12　　　　MS. BENSON:  Objection to form.
13　A.　I don't know.
14 BY MR. FREDRICKSON:
15　Q.　What is your definition of "force" as a law
16 enforcement officer?
17　A.　Force is different categories.  Force is
18 any -- it could be deadly force.  It could be force to
19 get a person under -- subdue a person.
20　Q.　Is that it?
21　A.　Yeah.  I mean . . .
22　Q.　And what does "reasonable force" mean to
23 you?
24　A.　Reasonable force is you got to go one step
25 above the force the person is using in order to get a

Page 35

1 person compliant.
2　Q.　Subjective fear is not sufficient to justify
3 the use of force; right?
4　　　　MR. CUNNINGHAM:  Object to the form.
5　　　　MS. BENSON:  Yeah.  Objection.  I didn't
6 really understand the question, but object to form.
7　A.　Say that again.
8 BY MR. FREDRICKSON:
9　Q.　Subjective fear is not sufficient to justify
10 the use of force; correct?
11　A.　Could you rephrase it?  I don't understand
12 the question.
13　Q.　Well, let's back up.  What types of
14 circumstances justify the use of force?
15　A.　It could be a lot of stuff.  It could be try
16 to arrest a person.  It could -- it could be -- it
17 could be so much.  You just got to determine exactly
18 what you want.
19　Q.　Do you know what "subjective" means?
20　A.　No.
21　Q.　Do you know what "objective" means?
22　A.　No.
23　Q.　Okay.  Subjective fear would be fear that
24 you personally feel but that someone else in the same
25 situation may not necessarily feel.

Page 36

1　A.　Okay.
2　Q.　So is subjective fear sufficient to justify
3 the use of force?
4　　　　MS. BENSON:  Object to form.
5　　　　MR. CUNNINGHAM:  Object to the form.
6　A.　Rephrase it again.
7 BY MR. FREDRICKSON:
8　Q.　Okay.  Subjective fear would be fear that
9 you personally feel but an average person in the exact
10 same position would not feel.
11　　　　MR. CUNNINGHAM:  Object to the form.
12 BY MR. FREDRICKSON:
13　Q.　Does that make sense?
14　A.　Yeah.  Okay.
15　Q.　Okay.  So is your subjective fear sufficient
16 to justify the use of force?
17　　　　MS. BENSON:  I'm going to object to form.
18 It's a legal conclusion.
19　　　　If you can answer.
20　A.　Yes.
21 BY MR. FREDRICKSON:
22　Q.　Your subjective fear is sufficient to
23 justify the use of force?
24　A.　Yeah, if I feel that I'm in danger.
25　Q.　What does "lethal force" mean?

Case 1:20-cv-04302-VMC   Document 153-3   Filed 10/25/23   Page 7 of 16

Glover vs. City Of Atlanta                         Oliver Simmonds                              7/13/2022

Page 37

1  A. Lethal force. To kill someone, kill
2  somebody.
3  Q. And what does "less lethal force" mean?
4  A. Just use minimum force to get a job done.
5  Q. Are you trained in diffusing techniques?
6  A. Yes.
7  Q. What does that mean?
8  A. You can verbal -- you can talk a person
9  down, de-escalate the whole thing if you can.
10 Q. Are you trained in disengagement and
11 tactical repositioning?
12 A. Yes.
13 Q. And what does that mean?
14 A. If you can't get something done or get a
15 person under control, you call the backup, reposition
16 yourself until you get help.
17 Q. What is a fleeing felon?
18 A. A fleeing felon is a person who commits a
19 felony and fleeing.
20 Q. When can you use deadly force on a fleeing
21 felon?
22 A. If he possessed a weapon or is a danger to
23 the public.
24 Q. Describe what you mean by "a danger to the
25 public."

Page 38

1  A. For example, a person rob a bank and have a
2  gun, killed some people at the bank and running
3  towards the bus stop with a gun.
4  Q. So the danger has to be imminent; right?
5  A. Yeah.
6  Q. Is stealing a car a property crime or a
7  violent crime?
8  A. It all depends on how it was used.
9  Q. It depends on what?
10 A. How the car was used.
11 Q. Describe what you mean by that.
12 A. I mean, it's a property crime if a person
13 just steal a car or whatever. But if it use the same
14 car to inflict harm to another person, it could be
15 construed differently.
16 Q. What does the phrase "totality of the
17 circumstances" mean in a law enforcement situation?
18 A. All the facts put together.
19 Q. And what does the term "situational
20 awareness" mean with regard to a law enforcement
21 situation?
22 A. The whole -- amount of people, just the
23 whole situation around the incident.
24 Q. Does APD have an air support division?
25 A. Yes.

Page 39

1  Q. What is it used for?
2  A. To assist the officers on the -- on the
3  ground.
4  Q. How so?
5  A. Could be a fleeing -- a fleeing suspect,
6  barricaded gunman. Just assisting the police in
7  general.
8  Q. Were you trained to use cover in the event
9  you perceive a possible threat?
10 A. Say that again.
11 Q. Were you trained to use cover in the event
12 you perceive a possible threat?
13 A. Yes.
14 Q. And please describe what "cover" is.
15 A. "Cover" mean if you're exposed to danger,
16 you take cover behind a solid object or . . .
17 Q. What are some examples of cover?
18 A. If you're in a shootout with somebody, you
19 go behind a car, preferably the front of the car where
20 the engine is.
21 Q. An engine is a good form of cover; true?
22 A. If that's what -- is the only thing that's
23 available, yes.
24 Q. What is concealment?
25 A. Same thing.

Page 40

1  Q. Concealment and cover are the same?
2  A. Well, basically.
3  Q. Are there any differences that you're aware
4  of?
5  A. No.
6  Q. If APD officers -- officer injures a
7  subject, is the officer required to render medical
8  aid?
9  A. Yes.
10    MR. FREDRICKSON: Can we make this
11 Exhibit 3, please.
12    (Exhibit 3 marked.)
13 BY MR. FREDRICKSON:
14 Q. Okay. Officer Simmonds, I've handed you
15 Exhibit 3. I understand this to be a report of your
16 law enforcement training; is that true?
17 A. Yes.
18 Q. Does it accurately list the training you've
19 received during your career with APD?
20 A. I would suppose so.
21 Q. Have you received law enforcement training
22 other than what's listed on this report?
23 A. No.
24 Q. When you moved to the EPU, did you receive
25 any training specific to that unit?

Case 1:20-cv-04302-VMC   Document 153-3   Filed 10/25/23   Page 8 of 16

Glover vs. City Of Atlanta　　　　　　　Oliver Simmonds　　　　　　　7/13/2022

Page 57

1　　A.　I got shot before. So bullet fragments
2　was -- is in -- on my chest.
3　　Q.　When did that occur?
4　　A.　I think it's 1990.
5　　Q.　1990?
6　　A.　(Nods head.)
7　　Q.　Was that in Jamaica?
8　　A.　Yes.
9　　Q.　Was your foot run over before or after your
10　jacket was stuck in the vehicle door?
11　　A.　I think it was after.
12　　Q.　So that would mean that your foot was run
13　over after you fired at the driver of the car.
14　　A.　Yes.
15　　Q.　Which portion of your jacket was stuck in
16　the door?
17　　A.　This section right here.
18　　Q.　Your left?
19　　A.　Yes.
20　　Q.　What happened immediately after your jacket
21　freed from the vehicle door?
22　　A.　I get out of the road, sit on the side of
23　the street because I was in pain, and then called
24　the -- that's when the lady pulls up.
25　　Q.　I'm sorry. That's when what?

Page 58

1　　A.　The witness -- not the witness. The lady
2　officer pulled up. So I stand up, start talking to
3　her, and then I called dispatch.
4　　Q.　So when you first saw -- I'm sorry.
5　　　　MR. FREDRICKSON: Let's go off the record
6　for a second.
7　　　　VIDEOGRAPHER: Going off the record at
8　11:46 a.m.
9　　　　(OFF THE RECORD)
10　　　　VIDEOGRAPHER: We're back on the record at
11　11:46 a.m.
12　BY MR. FREDRICKSON:
13　　Q.　Okay. So I want to make sure I heard that
14　last answer. After your jacket freed from the car
15　door, you fell to the ground?
16　　A.　Yes. Yes.
17　　Q.　And you were on the ground when you first
18　saw the investigator who you talked about earlier?
19　　A.　Yeah. I got up, and I spoke with her.
20　　Q.　How hard did you fall?
21　　A.　No. It's not -- it's not -- it's not like I
22　fall. When I released from the -- from the car, got
23　out of the road and, because I was in so much severe
24　pain, kind of go down to the ground to heal my foot.
25　　Q.　Okay. So you didn't fall because you were

Page 59

1　off balance from the car.
2　　A.　No.
3　　Q.　You fell because your foot hurt and --
4　　A.　Yeah.
5　　Q.　Okay. Were you injured at all by the fall
6　to the ground?
7　　A.　No.
8　　Q.　When your foot was run over, was your shoe
9　damaged at all?
10　　A.　No.
11　　Q.　And when your -- during this incident in
12　which your jacket was stuck in the car door, was your
13　jacket damaged at all?
14　　A.　Yes.
15　　Q.　How so?
16　　A.　When I -- when I tug it from the -- pull it
17　from the car.
18　　Q.　What kind of damage happened to the jacket?
19　　A.　It got a -- it got a tear inside of it.
20　　　　MR. FREDRICKSON: This will be Exhibit 5.
21　　　　(Exhibit 5 marked.)
22　　　　MS. BENSON: And, look, before we start this
23　questioning on here, I definitely want to just put a
24　general objection to the timing of this notice to
25　produce -- I assume that's what this is -- in that it

Page 60

1　was only served less than a week ago. But I am going
2　to let him go ahead and answer any questions.
3　BY MR. FREDRICKSON:
4　　Q.　Okay. Mr. Simmonds, this is Exhibit 5.
5　Have you seen this document before?
6　　A.　No.
7　　Q.　Okay. If you look at Exhibit A, which is
8　attached to Exhibit 5, on the last page it asks you to
9　produce at this deposition the clothing items that you
10　were wearing during this incident on January 15, 2019.
11　　　　Do you see that?
12　　A.　Yes.
13　　Q.　Did you bring those items today?
14　　A.　No.
15　　Q.　Why not?
16　　A.　I don't have them.
17　　Q.　Did you attempt to locate them?
18　　A.　Yes.
19　　Q.　Why don't you have them?
20　　A.　I don't know where they're at.
21　　Q.　What did you do to attempt to locate them?
22　　A.　I searched the closet. I haven't seen them
23　from that -- from that night.
24　　Q.　You haven't seen the suit since the night of
25　the shooting on -- in January 2019?

Case 1:20-cv-04302-VMC   Document 153-3   Filed 10/25/23   Page 9 of 16

Glover vs. City Of Atlanta                Oliver Simmonds                         7/13/2022

Page 61

1  A. Yes.
2  Q. And you haven't seen the shoes you were
3  wearing since that night?
4  A. The -- I didn't -- I didn't look for the
5  shoes. I didn't -- I didn't -- I didn't search for
6  the shoes.
7  Q. Okay. Do you still have the shoes?
8  A. I'm not sure.
9  Q. When was the last time that you can be
10 certain of that you did have the shoes?
11 A. I can't -- I can't say.
12 Q. Have you worn the shoes since this incident
13 in --
14 A. No.
15 Q. -- 2019?
16    Okay. Well, I'll ask that you attempt to
17 locate those shoes and not do anything to repair or
18 alter them. Okay?
19 A. Okay.
20 Q. As a police officer, you're aware that
21 evidence pertaining to an incident that's under
22 investigation needs to be carefully preserved; right?
23 A. Yes.
24 Q. And it's your testimony that you fired at
25 the driver of this vehicle because your jacket was

Page 62

1  caught in the door; true?
2  A. Yes.
3     MR. CUNNINGHAM: Object to the form.
4  A. Yes.
5  BY MR. FREDRICKSON:
6  Q. So evidence that your jacket was damaged
7  during that struggle would be beneficial to your
8  defense; right?
9     MS. BENSON: Object to form.
10 A. I wasn't thinking at the time about -- at
11 the time about that.
12 BY MR. FREDRICKSON:
13 Q. What did you do with the suit?
14    MS. BENSON: Object to --
15 A. When I --
16    MS. BENSON: I'm sorry. Go ahead.
17 A. When I got home, I threw it -- I threw it --
18 because it was damaged, I threw it in a corner.
19 BY MR. FREDRICKSON:
20 Q. You threw it in a corner at your house?
21 A. Yes.
22 Q. What did you do with it after that?
23 A. I don't know what happened after that.
24 Q. Did you intentionally throw the suit away?
25 A. No.

Page 63

1  Q. Did you take it anywhere that you're aware
2  of?
3  A. No.
4  Q. Did you take it to a tailor?
5  A. No.
6  Q. To a cleaner?
7  A. No.
8  Q. When was the last time you saw this suit in
9  the corner that you threw it in?
10 A. Just that night.
11 Q. And you never saw it again?
12 A. I can't recall.
13 Q. When you took it off and threw it in a
14 corner, this was at your home in McDonough?
15 A. Yes.
16 Q. Who lives with you there?
17 A. My wife.
18 Q. Do you think that she did anything with the
19 suit?
20 A. I can't tell.
21 Q. Did you ask her if she did anything with the
22 suit?
23 A. I asked her for it. She said she don't
24 remember seeing it. It's been so long.
25 Q. Where did you purchase that suit?

Page 64

1  A. I can't remember.
2  Q. Did anyone other than your wife live with
3  you at the time?
4  A. Yes.
5  Q. Who was that?
6  A. I've got a son and two stepsons.
7  Q. So three?
8  A. Yes.
9  Q. One son and two stepsons?
10 A. Yes.
11 Q. Did you ask each of them if they did
12 anything with your suit?
13 A. Yes.
14 Q. And what did they say?
15 A. They don't know.
16 Q. When you fell after your jacket came out of
17 the door, which portions of your body hit the ground?
18 A. I think my knee.
19 Q. You said your knee?
20 A. Yeah.
21 Q. Which knee?
22 A. I think my left knee.
23 Q. Anything else?
24 A. No.
25    MR. FREDRICKSON: This will be Exhibit 6.

Case 1:20-cv-04302-VMC   Document 153-3   Filed 10/25/23   Page 10 of 16

Glover vs. City Of Atlanta                    Oliver Simmonds                         7/13/2022

Page 65

1      (Exhibit 6 marked.)
2  BY MR. FREDRICKSON:
3      Q.  Exhibit 6 is several photos that I believe
4  are you immediately after this incident inside the
5  ambulance; is that true?
6      A.  Yes.
7      Q.  Have you seen these photos before?
8      A.  No.
9      Q.  Do you recognize when they were taken?
10     A.  Yes.
11     Q.  Who took the photos?
12     A.  The GBI -- GBI personnel.
13     Q.  If you look at the fourth image, we can see
14 your right foot fairly well.  Is there any marking at
15 all on your right shoe?
16     A.  No.
17     Q.  Would you expect a car tire to leave some
18 kind of marking after running over your foot?
19     A.  Not necessarily.
20     Q.  Not even a scuff or some dirt?
21     A.  I mean, it was fast, so not -- not
22 necessarily.
23     Q.  And if you turn back to the first page, does
24 the jacket in this photo appear to be damaged in any
25 way?

Page 66

1      A.  It's the inside of the jacket.
2      Q.  There's no damage to the outside of the
3  jacket?
4      A.  No.
5      Q.  And in any of these photos in Exhibit 6 is
6  there any damage or dirt on either of your knees?
7      A.  No.
8      Q.  Would you expect there to be some dirt or
9  scuff if you fell onto your knee?
10     A.  No.  It's -- it's not -- it wasn't any dirt.
11     Q.  The street was not dirty?
12     A.  It's asphalt.  I mean . . .
13     Q.  After the incident, you told someone that
14 D'Ettrick had a gun; correct?
15     A.  Yes.
16     Q.  Who did you tell that to?
17     A.  The officer responding.
18     Q.  Was that true?
19     A.  When we was struggling inside the car, he
20 reached for some -- come up with something looked like
21 a gun.  So I told the officer I think he got a gun.
22     Q.  He -- explain that.  He reached for
23 something like a gun?
24     A.  Yes.
25     Q.  Explain to me exactly what you saw.

Page 67

1      A.  Something looked like a gun, a black object.
2      Q.  Which hand was it in?
3      A.  I think his right hand.
4      Q.  What kind of gun was it?
5      A.  I don't know.
6      Q.  Was it a handgun?
7      A.  Yes.
8      Q.  Where was it at?
9      A.  I said -- I said like a gun.  I'm not sure
10 it was a gun.  It was something looked like a gun.
11     Q.  What else might it have been?
12     A.  I don't know.
13         MS. BENSON:  Object to form.
14 BY MR. FREDRICKSON:
15     Q.  Where was it pointed?
16     A.  He reached for it.  At that time, the door
17 closes and I got stuck in the car.
18     Q.  So you were never sure whether it was, in
19 fact, a gun?
20     A.  No.
21     Q.  Is it reasonable to use deadly force because
22 someone has an unknown object in their hand?
23         MS. BENSON:  Object to form.
24     A.  Say it again.
25

Page 68

1  BY MR. FREDRICKSON:
2      Q.  Is it reasonable to use deadly force against
3  someone who has an unknown object in their hand?
4         MR. CUNNINGHAM:  I'm going to note an
5  objection as well.
6      A.  It all depends.
7  BY MR. FREDRICKSON:
8      Q.  What does it depend on?
9      A.  I mean, it all depends on the -- on how the
10 person -- his body language and, you know, how -- the
11 circumstances of how the incident may happen and
12 occur.
13     Q.  What types of circumstances would justify
14 using deadly force against someone with an unknown
15 object in their hand?
16         MS. BENSON:  Object to form.
17     A.  I've learned of incident, you know, people
18 get shot because they got a cell phone.  It just
19 varies.
20 BY MR. FREDRICKSON:
21     Q.  I'm sorry.  What was that last part?
22     A.  I said it varies.  I've seen people get shot
23 because they've got a cell phone.  They reach for a
24 cell phone.  I mean, we don't know if you . . .
25     Q.  When did you see someone get shot because

Case 1:20-cv-04302-VMC   Document 153-3   Filed 10/25/23   Page 11 of 16

Glover vs. City Of Atlanta                      Oliver Simmonds                          7/13/2022

Page 69

1  they had a cell phone?
2     A.  I can't recall.
3     Q.  Was that shooting reasonable, in your
4  opinion?
5     A.  That's what I'm saying.  It's all dependent
6  on the person involved and if the person feel like
7  their life is in danger at some point.
8     Q.  So D'Ettrick, in fact, did not have a gun
9  when he was in your car; correct?
10        MR. CUNNINGHAM:  Object to the form.
11    A.  I don't know.
12 BY MR. FREDRICKSON:
13    Q.  You don't know?
14    A.  I don't know.
15    Q.  Have you tried to find out?
16    A.  No.
17    Q.  Is that something you'd like to know?
18    A.  Yes.
19    Q.  I'm sorry.  I didn't catch the answer.
20    A.  No.  Yes.  But, I mean, I heard that there
21 was no gun found.
22    Q.  You heard from who?
23    A.  I can't -- I can't remember who it was.
24    Q.  Was it someone who was investigating the
25 incident?

Page 70

1     A.  I can't remember.
2     Q.  Were there any guns belonging to you in the
3  vehicle?
4     A.  No.
5     Q.  After the shooting and then the crash, when
6  you attempted to get into the vehicle, did you ever
7  see a gun inside the vehicle?
8     A.  I did not attempt to go inside the vehicle.
9     Q.  You didn't what?
10    A.  I didn't attempt to go inside.
11    Q.  Okay.  You said you had heard that there was
12 no gun; is that right?
13    A.  Yes.
14    Q.  Have you heard from anybody that there was a
15 gun?
16    A.  No.
17    Q.  I believe you testified earlier that you
18 couldn't tell whether D'Ettrick's hands were on the
19 steering wheel when you reached inside the car; is
20 that right?
21        MR. CUNNINGHAM:  Object to the form of the
22 question.
23        MS. BENSON:  Same.
24    A.  I can't -- say that again.
25

Page 71

1  BY MR. FREDRICKSON:
2     Q.  When the car started to drive away and you
3  reached inside, were D'Ettrick's hands on the steering
4  wheel?
5     A.  Yeah, it was on the steering wheel.
6     Q.  Were both hands on the steering wheel?
7     A.  That, I'm not sure.  But hands was on the
8  wheel.
9     Q.  If his hands were on the wheel, he was not
10 holding a gun, though; correct?
11    A.  No.  But technically, I mean, like, he was
12 pushing me out of the car anyway.  So at some point, I
13 mean, either one or two hands may be on the wheel or
14 not.
15    Q.  Which hand did he push you with?
16    A.  I have no idea.
17    Q.  But it's your testimony that he was driving
18 the car, pushing you, and reaching for a gun?
19    A.  Yep.
20    Q.  Wouldn't that require three hands?
21        MR. CUNNINGHAM:  Object to the --
22        MS. BENSON:  Object to form.
23        MR. CUNNINGHAM:  -- form.  It's
24 argumentative.
25    A.  No.

Page 72

1  BY MR. FREDRICKSON:
2     Q.  How was he accomplishing those three things?
3     A.  I mean, I -- I mean, a person -- everything
4  wasn't happening at one -- at one point.  He wasn't
5  doing all three things at the same time.
6     Q.  So over the course of how much time did
7  those things elapse?
8     A.  I don't know.
9     Q.  Was it 30 seconds? 5 minutes?
10        MS. BENSON:  Object to form.  Asked and
11 answered.
12 BY MR. FREDRICKSON:
13    Q.  Roughly, how long did this struggle --
14    A.  I don't know.
15    Q.  -- cover?
16        Was the car ever traveling at a dangerous
17 speed?
18    A.  It was -- it was -- I'm not -- I'm not sure
19 what's required a dangerous speed.
20    Q.  Have you received any training on what would
21 constitute dangerous driving?
22    A.  Yes.
23    Q.  But you don't know what would be a dangerous
24 speed on Whitehall Street?
25    A.  A car could be going 15 miles per hour and

Case 1:20-cv-04302-VMC   Document 153-3   Filed 10/25/23   Page 12 of 16

Glover vs. City Of Atlanta | Oliver Simmonds | 7/13/2022

Page 73

1  kill somebody.  I mean, it all depends.  Like, I can't
2  understand that question.  I can't answer the
3  question.
4      Q.  How fast was the car going, roughly?
5      A.  I don't know.
6      Q.  If the left side of your jacket was stuck in
7  the driver's door, you would be facing, then, towards
8  the rear of the vehicle; correct?
9      A.  No.  Facing towards the car.
10     Q.  But the car's on your right side; correct?
11     A.  No.  I was -- the car was right here.  I'm
12 right here.
13     Q.  Explain that for me.  I'm not sure what you
14 mean.
15     A.  I was stuck in the car.  So the car is right
16 here, and I'm right here.  I don't know how to explain
17 it.  It's the left side of my jacket.
18     Q.  So you're facing directly --
19     A.  To the car.
20     Q.  -- towards the car --
21     A.  Yes.
22     Q.  -- perpendicular.
23         I'm trying to understand if you left -- your
24 left lapel is in the driver's side of the door, where
25 is the gun in relation to your body when you fire?

Page 74

1      A.  I fired -- I fired up over my head.
2      Q.  Okay.  So you would be firing over your head
3  downward towards the driver of the vehicle?
4      A.  I can't explain to you how it happened.  But
5  I was stuck.  I fired.  It happened so fast.  It was a
6  stressful situation.  I can't tell you exactly how I
7  fired.
8      Q.  If the left side of your jacket is stuck in
9  the driver's door, we can agree, though, that there's
10 only several inches between you and the car.
11     A.  Yes.
12     Q.  In which you fit your gun to fire or reach
13 over your head?
14     A.  I can't tell you that.
15     Q.  And if you are facing directly toward the
16 driver's side of the car, when you fired, the
17 trajectory of the bullet would be towards the
18 passenger side of the car; true?
19         MS. BENSON:  Object to form.
20     A.  I said before, the car was moving.  So
21 the -- I've got to be behind a little.
22 BY MR. FREDRICKSON:
23     Q.  Behind the car?
24     A.  Behind the door.
25     Q.  Well, regardless of whether it's moving, if

Page 75

1  your jacket is stuck to the car, you're moving with
2  it; correct?
3      A.  Yeah.
4      Q.  So if you're directly facing the car, what
5  would the backdrop of the bullet trajectory be?
6      A.  I don't know.
7         MR. FREDRICKSON:  Let's mark Exhibit 7.
8         (Exhibit 7 marked.)
9  BY MR. FREDRICKSON:
10     Q.  Exhibit 7 is a set of photos of the front of
11 the vehicle.  Have you seen these photos before?
12     A.  No.
13     Q.  Have you seen the GBI's summary of
14 investigation regarding this incident?
15     A.  No.
16     Q.  There are what I understand to be two bullet
17 holes in the windshield in these photos.
18        MS. BENSON:  Object to --
19        MR. CUNNINGHAM:  Object to the --
20        MS. BENSON:  -- form.
21        MR. CUNNINGHAM:  -- form.
22        MR. FREDRICKSON:  Okay.
23        MS. BENSON:  Nothing has indicated that.
24 So . . .
25        MR. FREDRICKSON:  This is going to be

Page 76

1  Exhibit 8.
2         (Exhibit 8 marked.)
3         MR. CUNNINGHAM:  Do you mean to give us the
4  personnel file?
5         MR. FREDRICKSON:  Oh, no.  I'm sorry.
6  That's the wrong document.
7         MR. CUNNINGHAM:  That's what I figured.
8         MR. FREDRICKSON:  Thank you, Pearson.
9         MR. HARMAN:  It's already been marked,
10 though.  So --
11        MR. FREDRICKSON:  We can call it Exhibit 8.
12 That's fine.
13        MR. CUNNINGHAM:  All right.  So we're
14 leaving that as Exhibit 8?
15        MR. FREDRICKSON:  Yeah.
16        MS. BENSON:  And this is 9?  Okay.
17        MR. FREDRICKSON:  And this will be 9.
18        (Exhibit 9 marked.)
19 BY MR. FREDRICKSON:
20     Q.  I didn't realize this one was not
21 consecutively numbered.  About halfway through the
22 document there's a page that says Exhibit 25 at the
23 bottom right corner, and at the bottom left it has the
24 number 690580.
25        MR. CUNNINGHAM:  58 -- yeah.

Case 1:20-cv-04302-VMC   Document 153-3   Filed 10/25/23   Page 13 of 16

Glover vs. City Of Atlanta                Oliver Simmonds                         7/13/2022

Page 93

1  video file with the time stamp 1930 and 25 seconds a
2  person enters the screen in the top right; correct?
3      A.  Yes.
4      Q.  Is that the person who got in your vehicle?
5      A.  I don't know.
6      Q.  Okay.  I want to play from this point.  And
7  can you tell me at which point you grabbed the door of
8  the car and attempted to step in?
9          (Video played.)
10     A.  I cannot tell the exact time.
11 BY MR. FREDRICKSON:
12     Q.  Okay.  On this frame at 1930 and 35 seconds,
13 is this you running behind the car?
14     A.  It appears so.
15     Q.  And at that point, you are not in contact
16 with the car; correct?
17     A.  No.
18     Q.  And you're not holding on to the car?
19     A.  No.
20     Q.  I'm sorry.  It just wasn't clear.  At this
21 point in the video, at 1930 and 35 seconds, you are
22 not holding on to the car.
23     A.  No.
24     Q.  In fact, you're not in contact with the car
25 in any way.

Page 94

1      A.  No.
2      Q.  But you are chasing the car; true?
3      A.  Yes.
4      Q.  At this point, you were in no danger from
5  the car; right?
6      A.  No.
7      Q.  No, that's not right?
8      A.  No.
9      Q.  No, you were not in danger?
10     A.  Yes.
11     Q.  I'm sorry.  That's just a bunch of -- it's
12 unclear.
13         At this point in this video, 1930 and
14 35 seconds, are you in any danger from the car?
15     A.  No.
16     Q.  Okay.  Thank you.
17         If at this point you had simply stopped
18 chasing the car, you would have been fine; right?
19         MS. BENSON:  Object to form.
20     A.  I was trying to retrieve the car.
21 BY MR. FREDRICKSON:
22     Q.  Okay.  But if you had not tried to retrieve
23 the car and had stopped chasing it at this point, you
24 would have been fine.
25         MS. BENSON:  Same objection.

Page 95

1      A.  Yes.
2  BY MR. FREDRICKSON:
3      Q.  Okay.  I'm going to go a little bit further.
4  At 1930 and 39 seconds, is this again you?
5      A.  Yes.
6      Q.  And, again, at this point, 1930 and
7  39 seconds, you are not in contact with the car in any
8  way?
9      A.  No.
10     Q.  And at this point, 1930 and 39 seconds, are
11 you in any danger from the car?
12     A.  No, not at this -- no.
13     Q.  When in this video did the struggle that you
14 described earlier take place?
15     A.  It -- twice.  At the pumps and, I guess,
16 other frame of the cameras.
17     Q.  Okay.  Let me back up.  Tell me when to
18 pause when you struggled with D'Ettrick at the pumps.
19         (Video played.)
20     A.  It's hard to tell.  Sometime around there.
21 It's hard to tell because --
22 BY MR. FREDRICKSON:
23     Q.  What --
24     A.  -- I don't know when he got inside the car.
25 I just -- I just can't -- that's -- I just can't tell.

Page 96

1      Q.  Okay.  So there was a struggle between you
2  and D'Ettrick at the pumps before the car drove off?
3      A.  Yes.
4      Q.  And describe that for me.
5      A.  When I opened the door to get inside the
6  car, he was -- he was inside the car.  So I hold on to
7  the -- to the door, the steering.  That's when he
8  start pushing me and sped off.
9      Q.  Okay.  And then between -- if I understand
10 your testimony right, between 19:30:35 and 19:30:39
11 here is when the second portion of the struggle
12 occurred.
13     A.  Yes.
14     Q.  And what occurred during that time frame?
15     A.  That's when the door was still open.  So I
16 grabbed on to the door.  The door closes.  And then
17 that's -- sometime I fired.
18     Q.  Which portion was your jacket stuck in the
19 door?
20     A.  Left side.
21     Q.  No.  At which portion of the video?  I'm
22 sorry.
23     A.  I guess other frame of the -- other frame of
24 the camera.
25     Q.  So between, again, those two points when we

Case 1:20-cv-04302-VMC   Document 153-3   Filed 10/25/23   Page 14 of 16

Glover vs. City Of Atlanta					Oliver Simmonds					7/13/2022

Page 97

1 can see that you're not in contact with the car -- let
2 me play again -- 1935 -- 19:30:35 -- I'm sorry -- to
3 19:30:39 -- at some point during those four seconds,
4 your jacket was stuck in the car?
5     A.  Yes.
6     Q.  Was it also during those four seconds that
7 your foot was run over?
8     A.  Yes.
9     Q.  At which point in the video did you fire the
10 gun?
11    A.  I know -- I can't tell you exactly on the
12 video, but when he was making the turn.
13    Q.  Okay.  Let me play it again.
14        (Off-the-record discussion.)
15 BY MR. FREDRICKSON:
16    Q.  Okay.  I'll play from 1930 and 24 seconds.
17 Tell me when to pause the video when you fired the
18 gun, please.
19        (Video played.)
20    A.  When I get in contact with the -- with the
21 car again, I'm not sure -- I can't tell you exactly
22 when, but it's during that time when he was making
23 that turn.
24 BY MR. FREDRICKSON:
25    Q.  Okay.  So it's also between 19:30:35 seconds

Page 98

1 and 19:30:39 seconds on this --
2        MS. BENSON:  Object to --
3 BY MR. FREDRICKSON:
4     Q.  -- video time stamp?
5     A.  I guess.  Whatever time says.
6     Q.  Hang on.  So at this point when we can see
7 you running after the car at 1930 and 35 seconds, you
8 had not fired yet?
9     A.  No.
10    Q.  Okay.  Okay.  And -- oops.  Sorry.  Okay.
11 And at this point, 1930 and 39 seconds, you had
12 already fired?
13    A.  Yes.
14    Q.  Based on this video, wouldn't that mean that
15 you fired while in the Shell parking lot?
16    A.  I don't know where the car was.  I know it
17 was making a turn -- during the process of making a
18 turn.
19    Q.  Does this video show you falling at all?
20    A.  No.
21    Q.  You testified earlier that you did fall
22 after the car ran over your foot; right?
23        MS. BENSON:  Object to form.
24    A.  Yes.
25

Page 99

1 BY MR. FREDRICKSON:
2     Q.  When did that occur?
3     A.  When I went to get up out of the street,
4 went to the sidewalk.
5     Q.  Okay.  So sometime after this point?
6     A.  Yes.  When it was out of the roadway.
7     Q.  Well, let me -- to clarify, tell me -- so at
8 1930 and 39 seconds, we can see you walking in the
9 street; true?
10    A.  Yes.
11    Q.  Okay.  Tell me when you fell from this.
12       MS. BENSON:  Object to form.  Asked and
13 answered.
14    A.  Maybe you misunderstood.  I didn't fall from
15 the moment of the car.  When I get out of the street,
16 I was in so much pain, I fall to my knees because I
17 couldn't -- my -- I was in pain.
18 BY MR. FREDRICKSON:
19    Q.  I'm just trying to understand when that
20 occurred in relation to this video.
21    A.  When I got out of the street.
22    Q.  So after this point in this video?
23    A.  Yes.
24    Q.  1930 and 57 seconds?
25    A.  Yes.

Page 100

1     Q.  Where were the guns on your body, by the
2 way?
3     A.  One -- my personal -- my personal -- my
4 issued weapon was in my -- I know was on my side, and
5 the Glock 43 was -- because it was in the car at first
6 when I got out.  I go back and retrieve it and put it
7 right here.  That's --
8     Q.  So it was in your -- the waistband of
9 your --
10    A.  Yeah.
11    Q.  -- pants?
12    A.  Right here.
13    Q.  Not in a gun holster?
14    A.  No.  No.  No.
15    Q.  Were you wearing a duty belt?
16    A.  No.
17    Q.  Again, I'll play this video starting from
18 1930 and 30 seconds.  At which point did D'Ettrick say
19 something to you?
20    A.  I think at the -- at the -- when I was at
21 the pump.
22    Q.  While the car was still at the gas pump?
23    A.  Yeah.
24    Q.  During the first struggle with D'Ettrick at
25 the pump, how long did that last before he drove off?

Case 1:20-cv-04302-VMC   Document 153-3   Filed 10/25/23   Page 15 of 16

Glover vs. City Of Atlanta                Oliver Simmonds                           7/13/2022

Page 101

1   A.   I said I can't -- I can't give a specific
2   time frame.  It was stressful.  Seemed like forever.
3   I can't -- I can't give you a time -- a time stamp on
4   it.
5   Q.   Was it a full minute or a few seconds?
6   A.   I don't know.
7   Q.   So I want to make sure I'm clear.  We've
8   established that we can see you not in contact with
9   the car at 1930 and 35 seconds and then again at
10  1930 and 39 seconds; right?
11  A.   Yes.
12  Q.   And so it's your testimony that during those
13  four seconds you struggled with the driver of the car,
14  the door closed on your suit, your foot was run over,
15  you drew your gun, fired twice, the jacket came free,
16  all in those four seconds?
17       MS. BENSON:  So I'm going to object to form
18  as compound as well.  And he hasn't testified to the
19  time stamp on the -- on the video.
20       MR. FREDRICKSON:  Well, he just did.
21  BY MR. FREDRICKSON:
22  Q.   Do -- did you understand the question?
23  A.   Yes.
24  Q.   Four seconds elapsed between the points at
25  which we can clearly see that you're not in contact

Page 102

1   with the vehicle; right?
2        MS. BENSON:  I'm going to object to form to
3   the extent --
4        MR. FREDRICKSON:  That's fine.
5        MS. BENSON:  -- that you're --
6        MR. FREDRICKSON:  Your objection is noted.
7        MS. BENSON:  -- asking him to authenticate
8   the time stamp.
9   BY MR. FREDRICKSON:
10  Q.   During the four seconds in this video in
11  which we can see that you're not in contact with the
12  car --
13  A.   Play the video again.
14  Q.   Yeah.  Okay.  Here we are at 1930 and
15  35 seconds, and we see you running after the car;
16  true?
17       I'm sorry.  Can you answer audibly?
18  A.   Say that again.
19  Q.   At 1930 and 35 seconds we can see that
20  you're not in contact with the car.
21  A.   Yes.
22  Q.   Okay.  And again at 1930 and 39 seconds we
23  can see that you're not in contact with the car.
24  A.   Yes.
25  Q.   So it's your testimony that it's during

Page 103

1   those four seconds in which you struggled with
2   D'Ettrick, the door closed on your suit, your foot was
3   run over, you drew your gun and fired twice, and then
4   your suit came free from the door?
5   A.   Yes.
6   Q.   Okay.
7        MR. FREDRICKSON:  Do you want to go off the
8   record for a minute.
9        MR. HARMAN:  Off the record just a second.
10       VIDEOGRAPHER:  Going off the record at
11  1:36 p.m.
12       (OFF THE RECORD)
13       VIDEOGRAPHER:  We are back on the record at
14  1:38 p.m.
15  BY MR. FREDRICKSON:
16  Q.   Okay.  I want to do this another way just to
17  clarify.  If we look at the point in the video in
18  which the time stamp says 1930 and 35 seconds, the
19  video file is at 3 minutes and 39 seconds.
20       Do you see that?
21  A.   Yes.
22  Q.   Okay.  And if we move to the second point at
23  which we can see you, which is at 1930 and 39 seconds,
24  the video file is at 3 minutes and 44 seconds;
25  correct?

Page 104

1   A.   Yes.
2   Q.   Okay.  So three or four seconds elapsed
3   during those two points.
4        MR. CUNNINGHAM:  Object to the form of the
5   question.
6        MS. BENSON:  Same.
7   BY MR. FREDRICKSON:
8   Q.   Three seconds elapsed during those two
9   points; true?
10       MR. CUNNINGHAM:  Same objection.
11  A.   Either three or four.  I mean . . .
12  BY MR. FREDRICKSON:
13  Q.   Yeah.  Which do you think it is?
14       MS. BENSON:  Object to form.
15  A.   I think it's four.
16  BY MR. FREDRICKSON:
17  Q.   You think it's four?  I just didn't hear.
18  Did you say you think it's --
19  A.   Yes.
20  Q.   -- four seconds?  Thank you.
21       Do you agree with me that if you fire the
22  gun between these two points that we've discussed,
23  1930 and 35 seconds and 1930 and 39 seconds, the shell
24  casings would not be in the street where they're shown
25  in Exhibit 12?

Case 1:20-cv-04302-VMC   Document 153-3   Filed 10/25/23   Page 16 of 16

| Glover vs. City Of Atlanta | Oliver Simmonds | 7/13/2022 |

Page 137

1  generally as to financial condition, which I don't
2  believe is inadmissible, but I'm just putting the
3  objection on the record.
4      A.  -- Bank of America.
5  BY MR. FREDRICKSON:
6      Q.  Bank of America.
7          What about a savings account?
8      A.  No.  Yeah.  No, no saving.  I got another
9  checking with iTHINK Financial Credit Union.
10     Q.  Okay.  So you have two checking accounts?
11     A.  Three.
12     Q.  Three.  Where is the third one?
13     A.  iTHINK Financial.
14     Q.  You have two at --
15     A.  I gave you Truist, Bank of America, iTHINK
16  Financial.
17     Q.  Okay.  Thank you.  One at Truist, one at
18  Bank of America --
19     A.  Yes.
20     Q.  -- and one at Icon Financial?
21     A.  Yeah.  iTHINK Financial.
22     Q.  Okay.  No savings account you said?
23     A.  No.
24     Q.  Do you have a retirement account?
25     A.  No.

Page 138

1      Q.  Do you have any other financial accounts,
2  investment account?
3      A.  No.
4      Q.  Stock trading?
5      A.  No.
6      Q.  Cryptocurrency?
7      A.  No.
8      Q.  What is your current rate of pay from APD?
9      A.  I think it's 72,000 annually.
10         MR. FREDRICKSON:  Let's go off the record
11 for a minute.
12         VIDEOGRAPHER:  Going off the record at
13 3:13 p.m.
14         (OFF THE RECORD)
15         VIDEOGRAPHER:  We're back on the record at
16 3:16 p.m.
17 BY MR. FREDRICKSON:
18     Q.  Officer Simmonds, on -- in the time around
19 this incident on January 15, 2019, when you went to
20 this Shell gas station at Whitehall and McDaniel, did
21 you ever go inside the gas station?
22     A.  No.
23     Q.  The gas cap for the vehicle was on the
24 passenger side; correct?
25     A.  Yes.

Page 139

1      Q.  When you were pumping the gas, which
2  direction were you facing?
3      A.  I can't recall.
4      Q.  You don't know whether you were facing
5  towards the front or the rear of the vehicle?
6      A.  Maybe the rear.
7      Q.  And were you at the gas cap where you were
8  fueling the entire time during this -- preceding this
9  incident?
10     A.  I can't remember.
11     Q.  Which side did D'Ettrick get in the vehicle?
12     A.  I don't know.
13     Q.  You didn't see him get in initially?
14     A.  No.
15         MR. FREDRICKSON:  Okay.  That's all I have.
16         MR. CUNNINGHAM:  All right.  I've got some
17 follow-up questions.
18         (Off-the-record discussion.)
19            EXAMINATION
20 BY MR. CUNNINGHAM:
21     Q.  All right.  Good afternoon.  This is Pearson
22 Cunningham.  Officer Simmonds, I've just got some
23 follow-up questions.
24         Earlier today -- it was early this
25 morning -- we were talking about some of your training

Page 140

1  as a police officer and some of your employment too,
2  and I believe -- did I -- did I hear you correctly
3  that you -- did you say that, while you were living in
4  Jamaica, you served as a police officer in Jamaica?
5      A.  Yes, sir.
6      Q.  Prior to serving as a police officer in
7  Jamaica, was there a training program that you went
8  through to become a police officer in Jamaica?
9      A.  Yes.
10     Q.  Once you started -- you know, prior to
11 working for APD, did you attend POST, POST training?
12     A.  Yes, sir.
13     Q.  And then it's my understanding -- correct me
14 if I'm wrong -- when we were looking at your POST
15 profile, there was POST training, and then is there
16 some additional training that APD required of you
17 before you got into the patrol capacity?
18     A.  Yes, sir.
19     Q.  Okay.  And then we looked through that -- I
20 think it was that exhibit, and there was continuing
21 classes you would take on a year-to-year basis; is
22 that right?
23     A.  Yes, sir.
24         MR. CUNNINGHAM:  All right.  What exhibit
25 are we on?