# EXHIBIT 26

DeKalb Policy

# USE OF FORCE

**4-6      PURPOSE and SCOPE**

It is the mission of the DeKalb County Police Department to promote order, protect the public, and deliver the optimum police services through an effective, efficient and professional response in partnership with the entire community.

In fulfilling the Department's mission, its officers have been delegated the ultimate responsibility to protect life and property and apprehend criminal offenders. The apprehension of criminal offenders and protection must at all times be subvertient to the protection of life. The officer's responsibility for protecting life must include the officer's own life.

It is the responsibility of every member of the department to keep our standards at an adequate level to provide protection and service to the community while at the same time keeping ourselves as safe as possible.

The value of human life is immeasurable. One of the department's core value statements is the preservation of life. Officers must exhaust every means available of non-lethal force, prior to utilizing deadly force. When non-lethal force is utilized, officers should only use that force which is minimal and reasonable to effect control of a non-compliant subject.

Litigation resulting from a shooting by a police officer will usually require the Department to prove the individual officer was properly trained in all aspects of the use of force, up to and including the use of firearms. This type of requirement demands that the Department take a pro-active approach to defending itself long before litigation is filed.

The purpose of this policy is to structure the use of force, including deadly force, by members of the DeKalb County Police Department and to provide a framework whereby the law enforcement duties can be properly and lawfully discharged by police officers. Since police officers have 24-hour/7 day-a-week law enforcement powers, this policy will be adhered to concerning off-duty conduct as well as on-duty conduct. This policy also applies to all other employees who may encounter situations with the public where a degree of force is required in order to carry out and complete their job responsibilities.

This policy is for departmental use only and does not apply in any criminal or civil proceeding. The departmental policy shall not be construed as a creation of a higher-level standard of safety or care in an evidentiary sense with respect to third party claims. Violations of this policy will form the basis for departmental administrative sanctions only. Violations of law will form the basis for civil and criminal sanctions in a recognized judicial setting.

**4-6.1   USE of FORCE**

Georgia Statutory Law, under Criminal Code Section 16-3-21 (Use of Force), justifies the threat or use of force. Ga. O.C.G.A. 16-3-21 reads:

"*A person is justified in threatening or using force against another when and to the extent that he reasonably believes that such threat of force is necessary to defend himself or a third person against such others' imminent use of unlawful force; however, a person is justified in using force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent death or great bodily harm to himself or a third person, or the commission of a forcible felony*".

Officers are often confronted with situations where control must be exercised to affect arrests and to protect the public safety. Control may be achieved through advice, warnings, and persuasion or by the use of necessary force.
Necessary Force is the use of a reasonable amount of force to achieve a legitimate police objective. Reasonable refers to belief that is supported by facts or circumstances. Force may be used by a police officer in the performance of police duties:

    A.    When necessary to preserve the peace, prevent commission of offenses, or prevent suicide or self inflicted injury

    B.    When preventing or interrupting a crime or attempted crime against property

    C.    When making lawful arrests and searches, overcoming resistance to such arrests and searches, and preventing escapes from custody

    D.    When in self-defense, or defense of another against unlawful violence to that person.

**USE OF FORCE**

The amount and degree of force which may be employed are based upon, but not limited to, the following factors:
   A.    The nature of the offense
   B.    The behavior of the subject against whom the force is to be used
   C.    Action by third parties who may be present
   D.    Physical conditions and tactical considerations
   E.    The possibility of creating an unreasonable risk of injury or death to innocent persons
   F.    The feasibility or availability of alternative actions

At times necessary force will include the use of certain tactics or equipment by the officer or specialty team, such as:
   A.    Verbal Skills and Empty Hands
   B.    Physical Strength and Compliance Techniques
   C.    Soft or Hard Hand Techniques
   D.    Handcuffs
   E.    Oleoresin Capsicum (OC)
   F.    ASP  Baton
   G.    Electronic Control Devices (ECDs)
   H.    Patrol-rifles
   I.    Chemical Munitions
   J.    Specialty Impact Munitions
   K.    Distraction Devices
   L.    Approved Weapon and Ammunition
The use of any unauthorized weapon is prohibited unless very unusual, severe, and justifiable circumstances prevail.

In every community, the proper utilization of force is crucial to the definition, design, and delivery of effective police services. We must recognize that the fate of our function directly impacts the lives of those we have sworn to serve and protect.  Officers with the DeKalb County Police Department will be trained in the use of the Federal Integrated Force Management model.  This Use of Force Continuum model is a concept used in incident handling that simultaneously recognizes the level of subject resistance encountered and the level of control and force required for the situation.  This concept does not direct an officer on how much control and/or force to use in a particular incident, but gives the officer direction in dealing with changing situations that might dictate the escalation or de-escalation of the amount and degree of force to be used.

The Integrated Force Management program shifts force focus and function from a pattern of confusion, towards a process of consolidation and coordination, consistent with contemporary management procedures and principles.

It is important to note that this Use of Force Continuum is to be used as a general guide and officers must always factor in objective reasonableness in determining the appropriate level of control and force to be utilized.

Any use of force by an officer must be examined from two perspectives: Resistance (Subject) and Control or Force (Officer).  Both control and resistance can be in the form of verbal directives or physical action.

**Resistance** is a subject's non-compliance to the officer. The amount and type of resistance varies based on a number of factors.

**Control** is the force an officer uses to influence or neutralize a non-compliant subject. Officers are justified in using physical control methods in the following situations:
   1.    To protect the officer or another from injury or death.
   2.    To effect the lawful detention or arrest of a non-compliant subject.
   3.    To stop potentially dangerous and unlawful behavior.
   4.    To protect a subject from self-injury.

The DeKalb County Police Department uses broad standards to measure the justification of an officer's use of force.
   The control methods used were initiated by a subject's resistance, and
   The level of control used was necessary and reasonable considering the subject's resistance.

**DEKALB COUNTY POLICE DEPARTMENT**

A **Show of Control** (displaying tactical advantage to persuade the subject to comply with verbal commands) can be implemented to influence a subject to make positive decisions.
A *Show of Control*:
    Reduces reaction time;
    Serves as a visual warning of potential use and imparts to a subject that resistance is futile;
    Adds intermediate steps to the Use of Force Continuum; and
    Can be recalled or de-escalated to lower forms of control.
A **Use of Control** is an action that can result in tissue damage to a subject and when employed cannot be recalled.

Officers must always be alert and attentive to changing situation which may dictate the escalation or de-escalation of control and/or force to be utilized. Officers should never abandon verbal communications when seeking compliance.
**Use of Deadly Force:**
If a situation does occur which dictates the use of deadly force, the decision to take another person's life is the most serious decision a police officer can ever be called upon to make.  Officers should take great strides in attempting to de-escalate an incident and avoid using deadly force whenever possible.

The protection and preservation of human life is a primary goal of this department; therefore, officers have a responsibility to use only the amount and degree of force necessary and reasonable to protect and preserve life.

**Deadly force is defined as that force which is intended to cause death or great bodily harm or which creates some specified degree of risk that a reasonable and prudent person would consider likely to cause death or great bodily harm.**

According to Georgia State Law, O.C.G.A. 16-3-21, deadly force may be used if:
    A.  There is clear and sufficient reason to believe that the person against whom the force is used is about to kill or grievously injure the officer
    B.  There is clear and sufficient reason to believe that the person against whom the force is used is about to kill or grievously injure another person
    C.  There is clear and sufficient reason to believe that the force must be used to prevent the commission of a forcible felony
Great bodily harm has been generally defined to mean harm that is likely to maim or permanently disable.

## O.C.G.A. 17-4-20 (b) addresses the use of deadly force for arrest by peace officers by stating

*"…peace officers…may use deadly force to apprehend a suspected felon only when the officer reasonably believes that the suspect possesses a deadly weapon or any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury; when the officer reasonably believes that the suspect poses an immediate threat of physical violence to the officer or others; or when there is probable cause to believe that the suspect has committed a crime involving the infliction or threatened infliction of serious physical* harm…"

To reasonably believe is the determination of whether or not the officer's decisions and actions are in fact reasonable and is most commonly decided on the basis of the "reasonable officer doctrine," which is a basic standard of our legal system. In common terms it means that if an officer of common judgment and ordinary prudence, experiencing the same facts and circumstances experienced by the officer, would come to the same general conclusion that the officer reached, and then it is a reasonable belief.

Forcible Felony, as defined in Ga. O.C.G.A. 16-1-3, means, *"any felony which involves the use or threat of physical force or violence against any person"*.   From this definition, it is obvious that many crimes that could be technically classified as "forcible felonies" would not be life threatening enough to justify the use of deadly force to prevent them.   It should be noted that Section 16-3-21 does not give the police officer any more authority in using deadly force than any other citizen in the State of Georgia.  The law says, *"a person is…justified in threatening or using force,"* which means that any person may use deadly force under the given circumstances.  Although the courts commonly recognize that officers are frequently involved in the justifiable use of deadly force, technically the law provides no additional authority or latitude to the circumstances under which deadly force may be used by a police officer.

**USE OF FORCE**

It will be the policy of this Department **NOT to use deadly force in order to prevent the escape of a fleeing felon, unless that suspect continues to pose an immediate danger or serious threat to innocent persons.**

If someone is fleeing or attempting to flee (felon or not; convicted or not), the officer will be allowed to use reasonable force to prevent the escape. The fact that someone is escaping or attempting to escape is not justification in itself to use deadly force. It is important to note again that reasonable grounds must exist to justify the use of deadly force, and again the reasonable officer doctrine is the standard of justification.

Once the officer has determined that the use of deadly force is reasonable, the Department's policy is shoot to stop. An officer shall not discharge a weapon to kill, but rather to stop and incapacitate an assailant from completing a potentially deadly act as described in this policy. For maximum stopping effectiveness and minimal danger to innocent bystanders, the officer should shoot at "center mass," unless extreme circumstances cause for an elevated shot to immediately stop the suspect. Appropriate first aid is to be rendered whenever possible after any use of force (either rendered by the officer, or summoning EMS, etc.).

*Self-defense and imminent threat shall be the only policy guideline for employing deadly force.* The discharge of a firearm is an irreversible action and officers should ensure that their actions do not unreasonably precipitate the use of deadly force by placing themselves or others unnecessarily in jeopardy by engaging in actions that are inconsistent with the officer's training and/or Departmental policies and guidelines.

In all situations, justification for the use of deadly force must be limited to the facts reasonably apparent to the officer at the time the officer decides to use the force.

These considerations are provided to aid officers who decide to utilize deadly force:
1. other methods available to effect an arrest or apprehension
2. whether the suspect is in plain view
3. the need for extreme caution at night as darkness may inhibit vision
4. danger posed to bystanders by the discharge of the firearm, regardless of whether they are in plain view or concealed, such as in a building
5. the direction of fire
6. moving to cover, repositioning and/or waiting for additional responding units to gain and maintain a superior tactical advantage
7. the possibility of collateral injury or death.

Officers should not take undue risks that could result in death or serious bodily injury. Whenever possible, officers should attempt to defuse and stabilize the situation by using communication skills and/or waiting for additional responding officers. Officers are never required to take unreasonable risks and may opt to disengage or withdraw if such action can be safely accomplished without further endangering themselves, other officers or the public. Officers should always be prepared to constantly re-evaluate any situation and de-escalate or escalate as needed or required.
Any threat used to justify the use of deadly force must be immediate and there must be no other possible remedy. Speculation as to what the suspect may or may not do if allowed to escape is not sufficient reason for the use of deadly force.
 Deadly force will be used with great restraint, as a last resort, and only when the level of resistance warrants the use of deadly force. The DeKalb County Police Department places a greater value on human life than on the protection of property; therefore, the use of deadly force is not allowed to protect property interests.

No distinction shall be made relative to the age of the intended subject of deadly force.
Officers must make every attempt to identify and isolate a specific subject and then "shoot to stop."
Officers **will not** discharge a firearm as a warning shot.

Officers who are authorized can deploy with patrol rifles when they have reason to believe the suspect(s) is (are):
1. Wearing body armor
2. Armed with firepower that is superior to their sidearm
3. Armed and situated at a distance or fortified position with a tactically superior position requiring accuracy at a greater range

4. When an armed confrontation is imminent or when the officer is engaged in activities that have a high probability that the suspect(s) may be armed and dangerous, such as armed robberies in progress or active shooter situations, or

5. With prior authorization from a supervisor in situations where the tactical environment is such that a rifle would be the most effective way to prevent the death or serious physical injury to officers or the public.

Officers are prohibited from discharging firearms when it appears likely that an innocent person may be injured. Officers will not discharge a firearm at or from a moving vehicle except as the ultimate measure of self-defense or defense of another when the suspect is using deadly force. Any threat used to justify the use of deadly force must be immediate and there must be no other possible remedy. Speculation as to what the suspect may or may not do if allowed to escape is not sufficient reason for the use of deadly force. This policy is intended to be concordant with OCGA Title 17, Chapter 4, Article 2, Section 17-4-20 (b) and (d).

Every time a firearm is discharged (accidentally or not) it is that officer's duty to report the incident to a superior officer(s), who will then report it to Internal Affairs. In addition, officers must also report to the firing range for re-qualification and weapons inspection by a member of the range staff. Officers will not have to re-qualify for shooting an injured animal unless otherwise directed to do so by Internal Affairs.  Only Range staff or Internal Affairs are authorized to provide replacement ammunition following a weapon discharge event. Exceptions to this policy are when the weapon is fired during qualification or other training exercises.

Excessive force and brutality on individuals by any member of this Department will not be permitted.  When an officer is affecting an arrest, reasonable force may be used as previously mentioned. The use of any piece of equipment, whether county issue or not, (i.e., flashlight, handcuffs, ASP baton, etc) will be used for their intended purposes only and not as a method for inflicting injury except in cases where the officer must defend himself against deadly force or great bodily harm. The use of any type of neck restraint or choke hold is prohibited.

When a person is arrested or placed into custody and resistance by that person has ceased, the officer shall immediately reduce their level of force to control techniques. It shall be the responsibility of the officer to take appropriate behavior or physical contact with the individual. It shall be the responsibility of the officer to take appropriate action without any unnecessary use of force.

Pursuant to Section 519 of Public Law 101-104, the 1990 HUD Appropriations Act, officers are, in addition to the prohibitions previously mentioned, specifically prohibited from using excessive force against any individual engaged in a nonviolent civil rights demonstration.

Officers who are working off-duty jobs and are involved in situations, which require a degree of force, shall report the incident immediately to the area supervisor who shall complete a Use of Force report as if the incident occurred while the officer was on duty.

The killing of an animal is justified: (1) for self-defense; (2) to prevent substantial harm to the officer or another; or (3) when the animal is so badly injured that humanity requires its relief from further suffering. A seriously wounded or injured animal may be destroyed only after all attempts have been made to request assistance from an agency (humane society, animal control, game warden, etc.) responsible for the disposal of animals. The destruction of vicious animals shall be guided by the same rules set forth for self-defense and the defense and safety of others.

**Domesticated Animals injured in a use of force incident**
If a domesticated animal is injured during a use of force incident, the animal will be provided medical treatment to the best ability of the officer. This treatment may include;
   A) Allowing the owner, or designee, to transport the animal to a veterinarian unless the animal must remain at the scene related to a crime or investigation.
   B) If the owner cannot be located in a timely manner, DeKalb County Animal Enforcement will be called to transport the animal to a veterinarian.
This policy applies to domesticated animals injured by Department personnel. Officers must always use caution and their best judgment when handling an injured animal.

USE OF FORCE

Except for general maintenance, storage or authorized training, officers shall not draw or exhibit a firearm unless circumstances create strong reasonable cause to believe that it may be necessary to lawfully use the weapon in conformance with other sections of this policy.

**4-6.2 OLEORESIN CAPSICUM**

**PURPOSE**

The purpose of this policy is to establish guidelines for the use of oleoresin capsicum (OC) aerosol restraint spray.

**POLICY**

The department has issued OC aerosol restraint spray to provide officers and non-sworn personnel with additional use-of-force options for gaining compliance of resistant or aggressive individuals in arrest and other enforcement situations. It is the policy of this agency that personnel use OC when warranted, but only in accordance with the guidelines and procedures set forth here and in this agency's use-of-force policy.

**PROCEDURES**
  A.  **AUTHORIZATION**
   1.  All sworn personnel will be required to complete the prescribed course of instruction in the use of OC spray. Only sworn and non-sworn personnel who have completed the prescribed course of instruction on the use of OC are authorized to carry the device. Only Departmental issued 10% oleoresin capsicum cone spray will be carried.
   2.  All on-duty uniformed officers shall be equipped with the Department issued OC spray.
   3.  Sworn and non-sworn personnel whose normal duties/assignments may require them to make arrests or supervise arrestees shall be required to carry departmentally authorized OC while on duty.
   4.  Uniformed officers shall carry only departmentally authorized OC canisters in the prescribed manner on the duty belt. Non–uniformed personnel may carry OC in alternative devices as authorized by the agency.
  B.  **USAGE CRITERIA**
   1.  OC spray is considered a use of force and shall be employed in a manner consistent with this agency's use-of-force policy. OC is a force option following verbal compliance tactics and the use of physical strengths and skills (the "soft or hard hands" approach) when appropriate on the use-of force continuum.
   2.  OC may be used when a verbal dialogue has failed to bring about the subject's compliance and the subject has signaled his intention to actively resist the officer's efforts to make the arrest.
   3.  Whenever practical and reasonable, personnel should issue a verbal warning prior to using OC against a suspect.
   4.  An officer may use deadly force to protect himself from the use or threatened use of OC when the officer reasonably believes that deadly force will be used against him if he becomes incapacitated.
   5.  Once a suspect is incapacitated or restrained, use of OC is no longer justified except in extreme cases where the suspect still poses a significant threat of injury or danger to the officer(s), or has attempted or succeeded in injuring the officer(s) after being restrained.
  C.  **USAGE PROCEDURES**
   1.  Whenever possible, officers should be upwind from the suspect before using OC and should avoid entering the spray area.
   2.  Personnel should maintain a safe distance from the suspect of between two and 10 feet.
   3.  A single spray burst of between one half and one second should be directed at the suspect's eyes, nose and mouth. Additional burst(s) may be used if the initial or subsequent burst proves ineffective.
   4.  Use of OC should be avoided, if possible, under conditions where it may affect innocent bystanders. Caution should be taken during the use of OC in enclosed areas, business, homes, etc.
  D.  **EFFECTS of OC, OFFICER RESPONSE and MEDICAL AID**
   1.  Within several seconds of being sprayed by OC, a suspect will normally display symptoms of temporary blindness, have difficulty breathing, burning sensation in the throat, nausea, lung pain and/or impaired thought processes.
   2.  The effects of OC vary among individuals. Therefore, all suspects will be handcuffed as soon as possible after being sprayed. Personnel should also be prepared to employ other means to control the suspect - to include, if necessary, other force options consistent with the agency policy - if the suspect does not respond sufficiently to the spray and cannot otherwise be subdued.

3. Immediately after spraying a suspect, personnel will be alert to any indications that the individual needs medical care. This includes, but is not necessarily limited to, breathing difficulties, gagging, profuse sweating and loss of consciousness. Upon observing these or other medical problems or if the suspect requests medical assistance, the employee will immediately summon emergency medical aid.
4. Air will normally begin reducing the effects of OC spray within 15 minutes of exposure. However, once the suspect has been restrained, officers may flush the exposed area with water if the suspect request.
5. Suspects that have been sprayed will be monitored for indications of medical problems and will not be left alone while in police custody. Personnel should provide assurance to suspects who have been sprayed that the effects are temporary and encourage them to relax.
6. Assistance will be offered to any individuals accidentally exposed to OC spray who feel the effects of the agent. All such incidents will be reported as soon as possible to the officer's immediate supervisor and shall be detailed in an incident report. Non-sworn personnel will report any such incident to the nearest police supervisor.

E. **REPORTING PROCEDURES**
1. An incident report will be submitted. Accidental discharges as well as intentional uses of OC spray against an individual in an enforcement capacity will be reported to the officer's immediate supervisor as soon as possible. All uses of OC spray by non-sworn personnel will immediately be reported to the nearest police supervisor.
2. A use-of-force report will be completed following all discharges of OC spray except during testing, training, malfunction or accidental discharge.

F. **REPLACEMENT**
1. All OC spray devices will be maintained in an operational and charged state by assigned personnel. Replacements for damaged, inoperable or empty devices are the responsibility of officers to whom they are issued.
2. Unexplained depletion of OC canisters will require an investigation and written report by the officer's supervisor to the Division Commander.

G. **TRAINING**
1. The Department's OC spray training program will include comprehensive instruction of (1) Departmental policy on use of force, (2) the legal requirements, (3) effects and first aid procedures, and (4) a practical exercise including exposure.
2. All personnel will receive annual In-Service training on the use of OC. This training will include instruction of the Departmental policy on use of force.

H. **OFF-DUTY/PART TIME EMPLOYMENT**
1. All authorized part-time employment will be approved as per existing Departmental policy.
2. Officers working part-time in uniform must wear the Department issued OC Spray canisters in the prescribed manner on the duty belt.
3. Officers working part-time employment in plain clothes must carry the Department issued OC spray the alternative device as authorized by the agency.

**4-6.3    ASP BATON**

**PURPOSE**

The purpose of this policy is to establish guidelines for the use of the ASP Tactical Baton expandable defensive impact weapon.

**POLICY**

The department has issued the ASP Baton to provide officers and non-sworn personnel with additional use-of-force options for gaining compliance and control of resistant or aggressive individuals in arrest and other enforcement situations. It is the policy of this agency that personnel use the ASP Baton when warranted, but only in accordance with the guidelines and procedures set forth here and in this agency's use-of-force policy.

**PROCEDURES**
A. **AUTHORIZATION**
1. All on-duty uniform officers shall be equipped with the Department issued ASP Baton or authorized self-purchased ASP Baton unless specifically exempted by the Chief of Police. All sworn personnel will be required to complete the prescribed course of instruction in the use of the ASP Baton.
2. Only sworn and non-sworn personnel who have completed the prescribed course of instruction are authorized to carry the device. The 21" and 26" ASP Batons will be the standard authorized impact weapon issued to

**USE OF FORCE**

employees of the DeKalb County Police Department.  In addition, the Airweight 21" or 26" ASP Baton may be carried (*after completing the prescribed training course*) at the employee's expense.  The Airweight Baton is lighter in weight and more practical for carry by non-uniform personnel and those officers who desire to carry less weight on their duty belt.

Personnel who are authorized to wear plain clothes and Command/Administrative Staff not wearing the duty belt may carry the ASP P12 12" baton or the ASP P16 16" baton. These batons are designed for carry without the Sidebreak Scabbard and are purchased at the expense of the employee.  Any employee in full uniform must carry the 21" or 26" baton.

3. Any officer whose normal duties/assignments may require them to make arrests or supervise arrestees shall be required to carry a departmentally authorized ASP Baton while on duty.

4. Uniformed personnel shall carry only departmentally authorized ASP Batons in the issued Sidebreak Scabbard in the prescribed manner on the duty belt.  Non-uniformed personnel may carry the ASP Baton in an alternative manner as authorized by the agency.

5. "Hindi" (mushroom) or other non-ASP end caps shall not be installed on any ASP Baton, as it voids the manufacturer's warranty.

**B.   USAGE CRITERIA**

1. The ASP Baton is considered a use of force and shall be employed in a manner consistent with this agency's Use-of-Force policy. The ASP Baton is an intermediate level of force on the same level with the OC spray and the use of a firearm to control an assailant.

2. The ASP Baton may be used to establish lawful objectives when:
   a) verbal dialogue has failed to bring about the subject's compliance
   b) the use of OC spray has failed to bring about the subject's compliance or the use of OC spray is impractical in the given situation
   c) the subject has signaled his intention to actively resist the officer's efforts to make the arrest or
   d) in self-defense, or defense of another against unlawful violence to that person

3. Whenever practical and reasonable, employees should issue a verbal warning prior to using the ASP Baton against a suspect.

4. An officer may use deadly force to protect himself from the use or threatened use of an ASP Baton when the officer reasonably believes that deadly force will be used against him if he becomes incapacitated.

5. Once a suspect is incapacitated, controlled, or restrained, use of the ASP Baton is no longer justified except in extreme cases where the suspect still poses a significant threat of injury or danger to the officer(s), or has attempted or succeeded in injuring the officer(s) after being restrained.

**C.   USAGE PROCEDURES**

1. All action, relational factors between parties and conditions surrounding the enforcement situation comprise the totality of the situation. These include officer/subject factors and special circumstances. Each relevant condition relates to the confrontation in determining the officer's course of action.

   Officer/Subject Factors may include:
   a. age
   b. gender
   c. size
   d. fitness
   e. skill level
   f. multiple officers
   g. multiple subjects

It is reasonable that a discrepancy in the age, gender, physical size, fitness, or skill level of individuals involved in the confrontation may mandate that an officer use more or less force to control the situation.  In a similar manner, it would be reasonable for a single officer to use more force controlling a situation when confronted by multiple subjects.

Special Circumstances may include:
   a. close proximity to a firearm/weapon
   b. special knowledge
   c. injury or exhaustion
   d. ground position
   e. disability
   f. imminent danger

A subject in close proximity to a firearm or other weapon creates an increased danger to the officer, which must be dealt with immediately. An officer may have special knowledge of a subject's skills that would require the use of increased

force.  An officer who is injured, exhausted, on the ground, disabled, or is in imminent danger would be justified in escalating through the use-of-force options.

2. The ASP Tactical Baton is drawn with the weapon hand or drawn with the reaction hand (off-hand) and transferred to the weapon hand.
3. All basic strikes are delivered with the baton in the weapon hand, unless the weapon hand is incapacitated.
4. There are two modes of the ASP Baton, Open Mode and Closed Mode.  The Baton Mode is determined by the distance to the threat encountered by the employee.
5. When striking a subject, the employee should target those areas of the subject, which are likely to inflict injury to the subject (i.e., center mass of arm, center mass of leg, center mass of body).  These targets are the vehicles, which transport force against the employee.
6. Open Mode strikes are ideally delivered to target areas with the last three inches of the shaft or tip of the ASP Baton.  Closed Mode strikes are delivered to target areas with the end cap or fist.
7. Do not target strikes to the head, neck, spine, sternum, or groin.  Strikes to these areas may produce injuries that could be fatal, while not effectively terminating assailant resistance.

D. **EFFECTS of the ASP BATON, OFFICER RESPONSE, APPROPRIATE MEDICAL AID**
1. Strikes to the center mass of the extremities effectively disable an assailant's "delivery system." Strikes to the center mass of the body generate fluid shock waves.  Strikes to the primary "center mass" target areas have a high potential for control and a low potential for fatal injury.
2. If the assailant moves or a strike misses its target, surrounding targets also have a high potential for control and a lesser potential for damage.
3. All suspects will be handcuffed as soon as possible after being controlled. However, personnel should also be prepared to employ other means to control the suspect – to include, if necessary, other force options consistent with agency policy – if the subject does not respond sufficiently to the strikes and cannot otherwise be subdued.
4. Immediately after employing the ASP Baton, employees should be alert to any indications that the individual needs medical care and if needed, will ensure appropriate medical aid.  This includes, but is not limited to, loss of consciousness, breathing difficulties, and excessive swelling to extremities.  Upon observing these or other medical problems or if the suspect requests medical assistance, the employee will immediately summon emergency medical aid.
5. Suspects on which the ASP Baton has been used will be monitored for indication of medical problems and will not be left alone while in police custody.
6. In order to minimize the stress involved in the use of force, any officer or non-sworn personnel involved in a use of force incident, which results in death or serious injury, will be placed on "administrative leave" directly upon completion of their preliminary report of the incident.  This leave will be without loss of pay or benefits, pending the results of the investigation.  The assignment to administrative leave will not be interpreted or indicate that the employee has acted improperly.

   While on administrative leave, the employee will remain available at all times for official departmental interviews and statements regarding the incident and shall be subject to recall at any time.  The employee will not discuss the incident with anyone except the District Attorney, departmental personnel assigned to the investigation, the employee's private attorney, the employee's psychologist, the employee's chosen clergy, and the employee's immediate family.

   Upon returning to duty, the employee may be assigned to "administrative duty" for a period of time deemed appropriate by the employee, his psychologist, and the Chief of Police.

E. **REPORTING PROCEDURES**
1. Use of the ASP Baton against an individual in an enforcement capacity will be reported to the officer's immediate supervisor as soon as possible.  If non-sworn personnel employ the baton, the incident will immediately be reported to the nearest police supervisor.
2. A use-of-force report and an incident report will be completed following all tactical uses of the ASP Baton.
3. To properly complete the Use of Force Report, it will be necessary to document and photograph the strike area on the suspect's body.
4. The Department will conduct an annual analysis of reported usage of the ASP Baton, via documented reports conducted by the Internal Affairs Department.

F. **REPLACEMENT**
1. Assigned personnel will maintain ASP Batons in an operational state.  Repair or replacements for damaged or inoperable batons are the responsibility of employees to whom they are issued.

2. Qualified personnel in the Training Division will make all repairs of ASP Batons. No employee should attempt to repair his or her own baton. If repair of the baton is not possible, Training Division personnel will recommend the Supply Unit replace the ASP Baton.

**G.   TRAINING**

1. The Department's ASP Baton 8-hour certification program will include comprehensive instruction of (1) Departmental policy on use of force, (2) the legal requirements, (3) ASP baton skills, and (4) a practical exercise for proficiency.

2. Once an officer or non-sworn personnel completes the certification class, he/she must annually be re-certified to retain carry authorization.

3. Those employees failing to re-certify by December 31st of each year, will no longer be authorized to carry the ASP Baton until completion of the 2-hour certification class for ASP re-familiarization.

4. Should the officer fail to meet certification standards, the authority to carry the weapon shall be IMMEDIATELY REVOKED by the certifying authority and written notification of such revocation shall be forwarded to the officer's Commander, the Training Division, and the Chief of Police. Officers, whose authority to carry the ASP Baton has been revoked, shall be reassigned to non-uniformed administrative duty for a period of 5 days. Within the 5 day period, the officer must report to the Training Division for remedial ASP Baton training and certification. Officers who fail to achieve certification after attending remedial ASP Baton training will be recommended for termination for failing to maintain standards. A non-sworn employee who, after receiving remedial training fails to meet certification standards, will have the authority to carry the ASP Baton immediately revoked by the certifying authority and written notification of such revocation will be forwarded to the employee's Commander, the Training Division, and the Chief of Police.

5. Any employee who is absent from duty for any extended period of time and fails because of that absence to re-certify as scheduled will have 10 days to re-certify upon their return to full duty status. Responsibility for notifying the Training Division will rest with the individual employee.

6. All sworn personnel will receive annual In-Service training on the use of the ASP baton. This training will include re-certification and instruction of Departmental policy on use of force.

**H.   OFF-DUTY/PART TIME EMPLOYMENT**

1. All authorized part-time employment will be approved as per existing Departmental policy.

2. Officers working part-time employment in uniform must wear the Department issued ASP Baton in the issued Sidebreak Scabbard.

3. Officers working part-time employment in plain clothes must carry the Department issued ASP Baton in the alternative manner as authorized by the agency.

## 4-6.4   ELECTRONIC CONTROL DEVICES - TASERS

### PURPOSE and SCOPE

The purpose of this policy is to establish guidelines for the DeKalb County Police Department's use of Electronic Control Devices (ECD).

### POLICY

An ECD may be used to control resistant or aggressive individuals in arrest and other enforcement situations. It is the policy of this agency that officers use an ECD when warranted, but only in accordance with the guidelines set forth here, in training, and in the use-of-force policy. An ECD is on the same level of force as Oleoresin Capsicum in the non-deadly force category. **An ECD is a control device.**

The Taser X26 will be the standard authorized electronic control device issued to members of the DeKalb County Police Department.

It shall be the policy of the DeKalb County Police Department to resolve incidents requiring law enforcement intervention in as humane and safe a manner as reasonably possible.

### PROCEDURES

**A.   AUTHORIZATION**

1. Only officers who have completed the prescribed course of instruction on the use of the ECD will be authorized to carry the device.

**DEKALB COUNTY POLICE DEPARTMENT**

2. Basic certification for the use of an ECD shall consist of no less than the manufacturer's minimum recommendation.
3. Re-certification shall be conducted once a year.
4. Training topics for both the basic certification and annual re-certification should consist of, but are not limited to, the following topics:
   a. Manufacturer's Recommendations / Maintenance
   b. Deployment / Use / Documentation
   c. Response to Resistance Matrix Levels and other Tactical Options
   d. ECD Retention and Transition Drills
   e. Scenario Based Training
   f. Recognition of Symptoms: Excited Delirium, Medical Concerns, etc.

5. Only current Manufacturer Certified Instructors are eligible to instruct officers in the use of an ECD.
6. Officers whose normal duties/assignments may require them to make arrests or supervise arrestees shall carry the authorized departmental ECD.
7. Uniformed Supervisors/Officers shall carry only a departmental authorized ECD in the issued cross-draw holster.  Non-uniformed officers may carry the ECD in alternative devices as authorized by the agency.

**B.    PRIOR TO DEPLOYMENT**
1. An officer's response level to subject resistance should always be based upon reasonable objectiveness,  and depending upon subject/officer factors such as age, size, weight, and the subject's apparent ability to physically challenge the officer or do harm to himself or others, balanced against the seriousness of the incident.
2. An officer's decision to deploy the ECD shall involve an arrest or custodial situation wherein the subject is escalating resistance from passive physical resistance towards active physical resistance.  Passive resistance includes subjects who question an officer's commands in a non-threatening manner and persons who are participating in a non-violent public protest. The ECD shall not be used as a tool of coercion to intimidate an individual into compliance with simple requests or directives by an officer.
3. The primary purpose in the decision to deploy the ECD is to prevent a continuing escalation of the subject's resistance or violence and to minimize injury to both the officer(s) and subject(s).
4. Prior to deployment of the ECD, officers must take into consideration environmental factors which may contribute to serious injury. These factors include but are not limited to; subjects standing on or near the edge of a roof, stairwells, next to a window or body of water.
5. No policy or guideline can anticipate every situation that officers might face, but in general terms, the following deployment procedures are established. An ECD can be utilized under the following circumstances:
   a. When the subject is exhibiting threatening body language associated with verbal threats or refusing to comply with the officer's instructions, and the subject has the apparent ability to physically challenge the officer. Threatening body language includes, but is not limited to:
      1. blading the body
      2. assuming a "boxer stance"
      3. circling or surrounding the officer
      4. moving the hands from open to closed, forming a fist, etc.
   b. When a subject makes physically evasive movements to defeat an officer's attempt to control. This may be in the form of:
      1. bracing or tensing of the body
      2. attempts to kick, push, or pull away
      3. not allowing the officer to get close to him
   c. When a subject makes overt, hostile, attacking movements, which may cause injury, but are not likely to cause death or great bodily harm to the officer or others.
   d. When subject makes overt, hostile, attacking movements with or without a weapon with the intent and apparent ability to cause death or great bodily harm to the officer or others.
   e. When lesser force options may be ineffective.
6. The ECD is a sensitive electronic device (similar to a cell phone) and should be treated with appropriate care.  It should not be dropped or thrown around. When not in use it should remain in an approved holster and should be protected from rain.
7. The ECD will be turned over to any supervisor or the Internal Affairs Unit upon request to investigate the use of the ECD.

**USE OF FORCE**

8.  Only department issued batteries and cartridges will be used with the Taser.  No changes, alterations, modifications or substitutions shall be made to the Taser.  All repairs to a Taser shall be completed by an authorized vendor or armorer.
9.  At the beginning of each shift the ECD shall be tested to ensure it is functioning properly.  It is the responsibility of each officer to test the ECD prior to the shift or part time job, and to immediately report any improperly functioning ECD to their supervisor.

**IMPORTANT:** Make sure to remove the air cartridge prior to testing and replace it afterwards. Defective ECD's and cartridges should be returned to the Training Division as soon as possible and should not be used until repaired or replaced.

10.  Personnel issued a Taser shall be issued a minimum of one spare cartridge as a backup in case of cartridge failure or the need for reapplication.  The spare cartridges shall be stored and carried in a manner consistent with training and the cartridges replaced by the officer's division.  Each division/unit/precinct will maintain an adequate supply and keep a log of the cartridge serial number, date of issue, and the name of the officer to whom cartridge was issued.  Always replace the Air Cartridges by the expiration date and use expired cartridges for training purposes only.
11.  The Taser shall be pointed at the ground in a safe direction with the safety on during administrative handling procedures.

**C.  DEPLOYMENT**
1.  The ECD should be deployed at the same level of force as OC spray.
2.  Prior to the deployment of the Taser the officers deploying the device have the responsibility to reasonably visually and physically confirm that the use of force tool selected is in fact the Taser and not a firearm.
3.   When multiple officers are present and an ECD is to be used on a subject, **only one officer should deploy the ECD on the subject.**  In the event the ECD malfunctions or both probes are not in contact with the subject, an additional officer may deploy an ECD if compliance has not been gained.  Officers will communicate with each other on which officer will deploy the ECD and which officers will act to take the subject into physical custody.
4.  Care should be taken that the ECD not be aimed at the neck or above, and the point of aim for front deployment of the Taser should be lower-center of mass, when possible.  The Taser should be aimed at the suspect's back to reduce risk of injury; however, this may not always be possible.
5.  When possible, avoid prolonged, extended, uninterrupted discharges or extensive multiple discharges.  When activating the ECD the officer should use it for one cycle and stop to evaluate the situation and the subject.  Use of the Taser should be combined with physical restraint techniques to minimize the total duration of the struggle and Taser use.  **Every attempt should be made to take the subject into custody as quickly as possible after the initial deployment of the ECD in order to reduce the need for subsequent cycles of the ECD. Officers should transition to a different force option if multiple Taser deployments fail to gain compliance.**
6.  When reasonable, the ECD should not be used near flammable liquids and fumes. Do not deploy the ECD near suspected meth labs, or after alcohol-based OC spray has been deployed.
7.  The ECD will cause most everyone to fall and therefore should not be used when the risk of falling would likely result in death (e.g. on a roof or next to a swimming pool).
8.  The ECD should not be used against handcuffed subjects, pregnant women, juveniles, or the elderly unless exigent circumstances exist.
9.  The ECD is prohibited from being used, or threatened to be used, in questioning or interrogating a suspect.  It is prohibited to use the ECD as a "prod," to awaken a person, to needlessly display the ECD, or to exhibit careless or haphazard muzzle control of the ECD.
10.  An officer's decision to deploy the ECD on fleeing person(s) who are subject to arrest, should be predicated upon the totality of the circumstance and the considerations outlined above, along with distance and the difficulty in accurately deploying on a moving subject.  **A subject's flight should not be the sole justification for deploying the ECD.**
11.  The ECD should not be deployed on subjects in physical control of a moving motor vehicle while the engine is running, or the vehicle is in gear.
12.  If practical, the officer should verbally warn the subject that they will be subjected to a 50,000 volt electrical charge if they do not comply. Officers should also give verbal warnings of "taser, taser, taser" (this term will be used as long as the department uses the Taser International's M26 or X26 Taser) to let other officers know that an ECD is being deployed. *This is to alert other officers that the* ECD *is being deployed so that officers do not mistake the "POP" of the* ECD *for a gunshot.* If possible, any officer on the scene shall broadcast a "Code ECD," via the radio channel. Dispatch shall acknowledge this broadcast and repeat the announcement (note, *the officer does not have to wait for radio to acknowledge before taking action).*

13. The ECD has a built–in 5-second timer.  The electrical current will continue for the full five seconds every time the trigger is depressed.  Unless special circumstances dictate the 5-second cycle should never be stopped early. If needed, pressing the trigger again can extend the cycle.

14. The Taser is an effective tool for stopping the aggressive behavior of wild or potentially dangerous animals. Reporting procedures should be followed with the completion of an incident report.

15. Often, the mere display of the Taser or the activation of the laser on the subject will gain compliance.  This compliance should be noted in the incident report and on a Taser Use of Force supplemental form.

**D.     AFTER DEPLOYMENT-- REPORTING and APPROPRIATE MEDICAL AID**

Once the subject is subdued, restrained and in custody the arresting officer shall notify the chain of command that the subject has been subject to an ECD discharge. The officer's immediate supervisor will go to the scene. The supervisor will photograph the subject and the probe placement before the probes are removed. After removal the supervisor will photograph any marks left on the subject by the ECD as well as the probes with the cartridge.

1. Under certain circumstances, Fire Rescue shall be summoned to evaluate and treat the victim. Police officers must provide Fire Rescue personnel with as much information as possible (i.e. history of the original incident, behavior observed, symptoms, etc.). This information would include, but not be limited to:
    a. Probe embedded in the eyeball or inside the mouth
    b. Unconscious even for short period
    c. Visible seizure when ECD is NOT being discharged
    d. Display of signs consistent with excited delirium
    e. Obvious significant injury from fall or take-down
    f. Person volunteers that they are having chest pain or trouble breathing
    g. Persistent confusion or altered mental status more than one minute after application of      the ECD
    h. Victim of an ECD used by a member of the public (i.e., non-police use)
    i. If the victim requests EMS
    j. Any use of an ECD on a juvenile (17 years of age or younger), pregnant female or elderly    person
    k. If an officer has any doubt as to the health of the person based on:
        1. The officer's training
        2. The officer's previous use of an ECD
        3. The subject exhibits any of the conditions and/or symptoms above
        4. The subject exhibits any unusual behavior

2. Fire Rescue will not be responsible for the removal of probes embedded in a subject.  It shall be the responsibility of the officer discharging the ECD to remove the probes.

3. Probes embedded in the neck, head, groin area or a woman's breast should only be removed by qualified medical personnel at a hospital. The officer will remove probes in any other location. Probes that have penetrated the body should be placed in "sharps" containers. These containers will be maintained in the trunk of all supervisor vehicles.

4. Immediately after deploying the ECD, employees should be alert to any indications that the individual needs medical care and will ensure appropriate medical aid.  The employee will summon emergency medical aid.

5. The following reports will be completed after a deployment of the ECD. Incident report, Use of Force Report and an ECD Report. The Department will conduct an annual analysis of reported usage of the ECD's, via documented reports conducted by the Internal Affairs Unit.

6. In order to minimize the stress involved in the use of any force, any officer or non-sworn personnel involved in a use of force incident, which results in death or serious injury, will be placed on "administrative leave" directly upon completion of their preliminary report of the incident.  This leave will be without loss of pay or benefits, pending the results of the investigation.  The assignment to administrative leave will not be interpreted or indicate that the employee has acted improperly.

7. While on administrative leave, the employee will remain available at all times for official departmental interviews and statements regarding the incident and shall be subject to recall at any time.  The employee will not discuss the incident with anyone except the District Attorney, departmental personnel assigned to the investigation, the employee's private attorney, the employee's psychologist, the employee's chosen clergy, and the employee's immediate family. Upon returning to duty, the employee may be assigned to "administrative duty" for a period of time deemed appropriate by the employee, his psychologist, and the Chief of Police.

**E.     TASER TRACKING CHIP DOWNLOAD AND REVIEW**

Each Taser device is equipped with an internal tracking chip. This chip stores the time and date of the last 1500 firings of the X26 model Taser. Supervisors can retrieve information stored in the data chip by connecting to the data port on the rear of the Taser and downloading the information into the Department's computer system.

**USE OF FORCE**

The Taser data chip will be downloaded for investigative purposes in reference to any use of force incident, or in reference to a complaint of the use of the Taser that was not reported on a use of force report. The downloaded report will be attached to the use of force report or to any report where the Taser was alleged to have been used. Additionally, the Taser data chip should be downloaded prior to return for repair or return for any other reason.

    **F.**    **OFF-DUTY/PART TIME EMPLOYMENT**
        1.    All authorized part-time employment will be approved as per existing Departmental policy.
        2.    Officers working part-time employment in uniform must wear the Department issued ECD in the approved holster.
        3.    Officers working part-time employment in plain clothes must carry the Department issued ECD in the alternative manner as authorized by the agency.

**4-6.5   SPECIALTY LETHAL and LESS-LETHAL WEAPONS**

**PURPOSE**
The purpose of this specific policy in the Use of Force section is to establish guidelines for the use of lethal and less-lethal systems by the S.W.A.T. Team following their deployment.

**POLICY**
Use of Force guidelines are no different for the S.W.A.T. Team than for any other officer, with the exception that the team deploys more options as related to less-lethal systems and due to the nature of team deployment, the totality of the operation circumstances and combined information may likely be used in the determination of the need to use reasonable force to defend self and/or third person(s) against unlawful force and/or the use of force likely to cause death or great bodily harm. The use of deadly force in hostage situations will become an option only after there is clear and sufficient reason to believe that the person against whom the force is used is threatening the life of hostages, innocent civilians, or public safety officers or to prevent the commission of a forcible felony.

    **A.**    **AUTHORIZATION**
The S.W.A.T. Team Commander has the authority to determine the force required to complete a tactical situation successfully. Force may include, but is not limited to, the use of chemical agents, direct assault or the use of selective firepower.

Less-Lethal systems include but are not limited to impact projectiles and chemical munitions, which can be fired, launched, placed or otherwise propelled for the purpose of compliance, overcoming resistance, or preventing serious injury without posing a significant potential for causing death.  Authorization for use is located in this section entitled, *Authorization for Use of All Departmental Weapons.*

    **B.**    **USAGE CRITERIA**
The approval of said systems will be for certified S.W.A.T. officers, as later listed, and will be approved by the Less-Lethal and Chemical Munitions supervisor who will forward the requested approval through the Entry Team Leader and the S.W.A.T. command staff.

All current systems and munitions will only be used by trained and certified S.W.A.T. officers, who have received appropriate training via the system manufacturer, P.O.S.T. courses and other approved chemical agents and less-lethal courses, such as the 40-hour course provided by the FBI.

Less-lethal systems and chemical munitions will be deployed according to manufacturers and tactical deployment specialist's recommendations.

    **C.**    **RESPONSE, MEDICAL AID FOLLOWING LESS LETHAL and LETHAL USAGE**
DeKalb Fire and Rescue Department medical personnel currently support the DeKalb Police S.W.A.T. Team.  This group of tactical medics has received additional training, related to supporting a tactical team for emergency medical attention. In addition, they all have completed the basic DeKalb Police S.W.A.T. course.  This team provides medical support not only to the team, but also to any suspect, victim, civilian and/or other personnel as needed.  This support includes medical aid and/or supportive care for less-lethal and chemical munitions.

    **D.**    **AFTER DEPLOYMENT – REPORTING and REVIEW**
A departmental Use of Force Report, Supervisor's Incident Investigation Report and necessary statements will be completed in accordance to departmental policy 4-6.6 of this chapter and 3-8.5 located in the *Internal Affairs* section of this manual. If the S.W.A.T. Team and/or any member during a S.W.A.T. operation is involved in an use of force incident, including but not limited to the following:

        1.    Use of lethal force, including the use of firearms
        2.    Use of less-lethal options, such as chemical munitions and other impact systems
        3.    Other use of force as applicable under policy

**DEKALB COUNTY POLICE DEPARTMENT**

4.   All incidents applicable to investigation

All such investigations are to be forwarded through the chain of command for review and when applicable in policy, will be reviewed by Internal Affairs.

All S.W.A.T. incidents require the completion of the DeKalb Police S.W.A.T. *After-Incident Report*.  This will be forwarded for review and approval, through the S.W.A.T. chain of command.  All such reports will be maintained on record.

If a S.W.A.T. officer is directly involved in a use of deadly force incident, in order to minimize the stress -- the officer will be placed on "administrative leave" directly upon completion of their preliminary report of the incident.  This leave will be without loss of pay or benefits, pending the results of the investigation.  The assignment to administrative leave will not be interpreted or indicate that the employee has acted improperly. While on administrative leave, the employee will remain available at all times for official departmental interviews and statements regarding the incident and shall be subject to recall at any time.  The employee will not discuss the incident with anyone except the District Attorney, departmental personnel assigned to the investigation, the employee's private attorney, the employee's psychologist, the employee's chosen clergy, and the employee's immediate family. Upon returning to duty, the employee may be assigned to "administrative duty" for a period of time deemed appropriate by the employee, his psychologist, and the Chief of Police.

**E.     APPROVED WEAPONS and SPECIFICATIONS**

Recognizing that the missions of the DeKalb Police S.W.A.T. Team are performed in hazardous environments and recognizing that the safety of citizens, suspects and officers is often jeopardized by these conditions, it is the intent of the team to utilize regular and special equipment and weapons, which are listed and explained, to lessen the risk of injury and/or death to all involved, during said missions.

All S.W.A.T. used firearms are approved for use through the S.W.A.T. chain of command. Approval is completed only after the weapon(s) has been inspected by a county firearms instructor and/or armorer and the officer has been trained to use and has qualified on the prescribed course for that particular system. Each weapon is recorded on the S.W.A.T. inventory and when applicable is assigned to individual officers, using the appropriate issue form. All weapon systems are to be maintained according to manufacturers' recommendations. Listed below are approved weapons, along with ammunition:

*Smith and Wesson M&P .40 caliber*:
Approved and issued ammunition; 15-round capacity

*Sig Sauer P220 .45 caliber*:
Approved and issued ammunition.

*H&K .9 mm Sub-guns*:
Federal .9 mm BPLE, 115 jacketed hollow point; 30-round capacity - single, 3-round and full-auto

*.223 cal. Tactical Rifles*
*Colt M4 Carbine, DPMS M4 Carbine, Colt Short Barrel M4 Carbine*
Federal .223 Rem. GM223M 69 grain, Sierra MatchKing BTHP; 30-round capacity - semi-auto and 3-round Burst

*12 gauge Shotguns*
*Remington 879, Benelli Super 90*
Hornady 8 pellet 00 buck

*Sniper/Marksmen Rifles*
▪   Remington 700 .308 cal Rifle System; Federal .308 Win. GM308M, 168 grain, Sierra MatchKing BTHP
▪   Remington 700 .223 cal Rifle System; Federal .223 Rem. GM223M 69 grain, Sierra MatchKing BTHP
▪   .223 cal Tactical Rifle; Federal .223 Rem. GM223M 69 grain, Sierra MatchKing BTHP

**Less-Lethal Delivery Systems and Loads and Chemical Munitions**
1.   Remington 12-gauge pump shot gun (Less-Lethal Dedicated); CTS 12ga Super-Sock Cartridge
- Less Lethal impact munitions
- Non- chemical
- Pain compliance

**USE OF FORCE**

- Maximum effective range – 30ft

2. Sage SL6 37mm Less Lethal Launcher
   Sage Deuce 37mm Less Lethal Launcer
   Super soft tip baton – Standard Energy
   - Rubber baton impact round
   - Non-chemical
   - Pain compliance
   - Maximum effective range – 60ft
   - Minimum range – 7ft
   CS Crush Nose Chemical Baton – Less Energy
   - Soft impact baton round
   - Contains CS (powder)
   - Can be introduced into an area / building target
   - Can be used as direct fire against persons
   - Maximum effective range – 60ft
   - Minimum range – 7ft
   CS Smoke – long range

3. CS Barricade Penetrator – Regular Penetration
   - Used to introduce CS into an area / building target
   - Specifically designed to penetrate windows
   - Not for direct fire against persons
   - Maximum range – 80ft.

4. JAYCOR Pepperball Launcher –
   1. Powder OC Round
      - Direct Fire against a person to introduce OC
      - Pain compliance
      - Maximum effective range – 30ft
      - Minimum 5ft
   2. Liquid Filled Round
      - Direct fire against person for pain compliance only
      - Maximum effective range – 30ft
      - Minimum range – 5ft

5. CTS Baffled Grenade Smoke Canisters –
   - Smoke only
   - Used to mask movement
   - Hand delivery

6. CTS Jet-Lite Rubber Ball CS Grenade –
   - Introduce the irritant CS
   - Hand delivery

7. CTS CS Grenade Canister –
   - Introduces the irritant CS
   - 5 times more CS smoke that the Rubber Ball Grenade
   - Hand delivery

8. Omni-Blast 100 Tactical Diversion Device
   - Produces bright light
   - Produces a loud sound
   - Used to distract and overwhelm the suspect's senses
   - Hand delivery

9. CTS OCV Aerosol Grenade

**F.     TRAINING and CERTIFICATION(s)**

DeKalb County Police Training provides basic use of force training and updates. However, further training and S.W.A.T. specific issues are taught on a monthly basis and as necessary. Furthermore, all S.W.A.T. members receive a basic level S.W.A.T. course, which provides an overview of weapons and use of force issues.

The S.W.A.T. Team requires the following specific training and qualifications:
- Smith and Wesson M&P .40 caliber Pistol: Qualify Monthly on the County Prescribed Course (92.7%)
- Sig Sauer P220 .45 caliber pistol (92.7%)
- H&K 9 mm Sub-gun: Qualify on the S.W.A.T. Sub-Gun Course (80%)
- .223 Colt M4 and DPMS M4 Tactical Rifle: Qualify on the S.W.A.T. Tactical Rifle Course (80%)
- .223 Colt Short Barrel M4 Tactical Rifle: Qualify on the S.W.A.T. Rifle Course (90%)
- .223 and .308 Remington Rifles: Qualify on the S.W.A.T. Sniper Rifle Course (90%)
- 12 Gauge Shotgun: Qualify Yearly on the County Prescribed Course (70%)
- Less-Lethal Delivery: Qualify Annually on the S.W.A.T. Less-Lethal-Delivery Courses

If a S.W.A.T. member fails to qualify on a particular weapons system, that member is no longer allowed to carry that system until a passing score is achieved, within 10 days of the deadline. In the case of the .40 or .45 caliber pistol, that member will not be allowed to participate in a tactical role at S.W.A.T. incidents, until a passing score is achieved, which will be within 10 days of the deadline. Qualification on the .40 or .45 caliber must be completed prior to S.W.A.T. training. If a S.W.A.T. member is unable to qualify on a weapons system following remedial training, that member's status on the team will be evaluated by the team commander.

## 4-6.6    USE of FORCE REPORT

It will be the responsibility of the supervisor of any employee involved in any of the below listed incidents to complete the Use of Force Report as soon after the incident as possible. A copy of the preliminary Use of Force Report will be immediately (no later than 24 hours) forwarded to the Internal Affairs Unit to be logged as pending. The completed report, along with supporting documentation, will be submitted through the chain-of-command to the Division Assistant Chief.

After review, the Division Assistant Chief will forward the completed Use of Force Report and all supporting documentation to the Internal Affairs Unit. All Use of Force Reports should be submitted to the Internal Affairs Unit no later than 30 days after the incident unless an extension is approved in writing by the Division Assistant Chief of Police.

A Use of Force report shall be completed for incidents involving:
- A) Death, hospitalization, or medical treatment of either the officer or the suspect that occurs as a result of any arrest or confrontation
- B) The use of any chemical agent, such as OC spray
- C) The striking of a suspect with hands, feet, ASP baton or other such device
- D) The presence of blood or broken skin on the person of either the officer or suspect, that occurs as a result of an arrest or confrontation
- E) The discharge of any firearm, whether accidental or not
- F) Any visible bruises caused by an arrest or confrontation
- G) A complaint of physical injury caused by an officer, made by a suspect in the presence of any officer, that arose as a result of any arrest or confrontation
- H) The deployment of the ECD to subdue an individual

For any Use of Force incident not involving a response by the Internal Affairs Unit and the Criminal Investigations Division, it will be the responsibility of every officer witnessing an incident on which a Use of Force Report should be filed to complete a supplemental report. If any officer's name is listed in a Use of Force Report, it will be the responsibility of the reporting supervisor to ensure that each officer completes the supplemental report.

For any Use of Force incident involving a response by the Internal Affairs Unit and the Criminal Investigations Division, all written statements from involved employees will be obtained only by CID detectives for the incident investigation, followed by Internal Affairs detectives for the administrative investigation. Supervisors of the involved employees will be responsible for completing the Use of Force Report after collecting preliminary information at the incident location. The involved employees will not complete statements for purposes of the Use of Force Report, the original incident report, or supplemental reports.

The Use of Force Report will be reviewed at each required level of supervision to ensure compliance with the law, policies and procedures.  Internal Affairs will conduct an annual analysis of all Use of Force reports.

**4-6.7    INJURIES or COMPLAINTS of INJURIES not RELATED to ARREST**
Any injuries or complaints of injuries to a suspect, which occurred prior to the officer's arrival, in a confrontation with non-departmental personnel or were self-inflicted, will be fully described in a supplemental report by the officer.

**4-6.8    IMMEDIATE NOTIFICATION – WEAPONS DISCHARGE AND USE OF DEADLY FORCE**
Any time an employee discharges a firearm, with the exception of training and certification, they will notify or cause to be notified the following entities:
1. Internal Affairs
2. CID – Major Crimes
3. Crime Scene Investigation
4. Chain-of-Command (including Chief of Police)
5. DeKalb District Attorney's Office
6. DeKalb Multijurisdictional Monitoring Team
7. DeKalb Medical Examiner's Office (if a fatality is involved)

**4-6.9    DEPARTMENTAL WEAPONS and TRAINING**
The Smith and Wesson M&P.40 caliber handgun will be the standard authorized weapon issued to members of the DeKalb County Police Department, the SWAT and Bomb units will be issued the Sig Sauer P220 .45 caliber pistol. Issued ammunition will be determined by range staff and approved by the Chief of Police.

Personnel issued a Department service pistol must receive training and be certified as mandated before being authorized to carry the weapon.

Command staff, Detectives and other authorized personnel will be allowed to carry personally owned Smith and Wesson, GLOCK, Sig Sauer or Beretta while on duty. Any detective requesting to have their personal Smith and Wesson, GLOCK, Sig Sauer or Beretta as their authorized weapon will have the Firing Range Staff approve the pistol and the detective must meet certification requirements according to departmental policy. The pistol will be registered with the Department by make, model, and serial number and will be loaded only with 9mm or .40 caliber ammunition as approved by the department. All departmental firearms policies apply to authorized, personally owned weapons.

**4-6.10   DEPARTMENTAL WEAPONS POLICY**
The policies listed below will be strictly adhered to:
   A.     All on-duty officers shall be armed with the Department issued firearm unless specifically exempted by the Chief of Police.
   B.     All issued .40 caliber pistols must be loaded only with departmentally approved ammunition as issued by the Department. Each issued full-size weapon will contain all 15 rounds of approved ammunition; one round chambered and 14 rounds in the magazine. All extra magazines will be loaded with 15 rounds. Approved revolvers will be fully loaded with departmentally approved ammunition. Semi-Automatic weapons will utilize the original manufactured magazines (NO AFTERMARKET EXTENSIONS MAY BE USED) and will be loaded (WEAPONS WILL NOT BE "TOPPED OFF").
   C.     No officer will attempt to repair or modify a Department owned weapon.  Any servicing done to a weapon by an officer will be restricted to routine cleaning. Officers are required to immediately report any malfunction or damage to any issued weapon to the Department armorer. For personally owned secondary weapons, the owner of the weapon will be responsible for its upkeep and repair.
   D.     All firearms must be inspected, fired, and certified safe by the Department armorer prior to issue or authorization to carry.
   E.     All firearms must be registered with the Department by make, model, and serial number and ballistic sample.
   F.     Every police officer, while working in a uniform capacity, on-duty or off-duty, shall wear the Sam Brown belt with the departmental issued holster and all other required county issued uniform items/gear.
   G.     The officer must meet "certification" requirements with each approved weapon. This certification will be monitored by a certified firearm instructor of the Training Section.
   H.     The Department understands there will be special circumstances or assignments that may dictate the use of a smaller, more concealable firearm. Any on-duty officer who desires to carry a smaller weapon to meet the above need must make a written request, including need and type of weapon. The only acceptable weapon will be a five or six shot, two, three or four inch barreled revolver, 38 or 357 caliber. The written request will be studied for need, liability and weapon. The request must be forwarded through the chain-of-command and approved by the Chief of Police. A copy of

the approval will be sent to the Division Commander and Training. If a request is accepted, then the officer must become certified with the firearm before it can be carried.

I.   The carrying or using of any unauthorized weapon and/or ammunition will result in disciplinary action by the Department and a disclaimer in any criminal or civil litigation.

J.   The only shotgun approved for use is either the Department issued Remington 870, or any personally owned 12 gauge pump-action shotgun. Presently, the only approved ammunition is the Remington 8 pellet 00 buck with reduced recoil, issued by Range personnel; all shotguns must meet certification specifications in this section.

K.   The Patrol Rifle will be the .223 caliber AR-15/M-4 design, including piston operated models that is personally owned. The rifle must be approved by the range staff. Any officer considering the purchase of a rifle to carry on patrol should consult with the range staff to ensure authorization of the particular make and model. It must have iron sights and a sling. Officers may also use approved optic sights and will have to qualify with both. If the officer makes any additions or alterations to the rifle re-qualification is mandatory before the weapon can be carried on duty. Departmental armorers will make inspections and approval of the weapons. Only departmental issued Federal TRU 55 grain Nosler Ballistic Tip ammunition will be carried.

L.   A record of approved ammunition will be kept on file at the range.

## SECONDARY WEAPONS/OFF-DUTY WEAPONS

A.   Officers are encouraged, but not mandated, to carry a handgun when off duty. An officer who elects not to carry a handgun while off duty shall not be subjected to disciplinary action if an occasion should arise in which he/she could have taken action if he/she were armed.  EXCEPTION: Off-duty officers, while operating a department vehicle, shall be armed with the Department issued handgun.

B.   The secondary (back-up)/off-duty handgun will not be carried in place of or as a substitute for the Department issued firearm when the officer is in uniform or working an approved job in plain clothes.

C.   Authorized secondary/off-duty weapons are:
1.   the Department issued pistol and ammunition
2.   a double action semi-automatic pistol of the following calibers: .380, 9mm, .40 or .45
3.   a revolver with a two or four inch barrel of the following calibers: .38 or .357
Only Department approved, factory loaded jacketed hollow point (JHP) ammunition will be used.

D.   The Firing Range Staff must approve all weapons and the officer must meet "certification" require-ments with each weapon that is approved. Officers must provide ammunition for certification with each non-issued Department approved weapon.

E.   The firearm(s) must be registered with the Department by make, model and serial number.

F.   The firearm must be loaded only with Department approved factory loaded jacketed hollow point (JHP) ammunition.

## 4-6.11   RETIRED OFFICERS - FIREARMS CERTIFICATION

The Law Enforcement Officers Act of 2004 designates provisions for the certification of retired police officers to carry a concealed firearm anywhere in the United States, with proper identification. In order to meet the standards of this act, the following procedure will be followed to certify DeKalb County Police Department retired officers to carry concealed firearms:

1.   This service will only be provided for officers retired in good standing from the DeKalb County Police Department.
2.   The certification process and qualification will be held at the DeKalb County Outdoor Range.  Retired officers requesting to take part in this process will make an appointment with the range staff prior to qualification.
3.   Retired officers who wish to become certified will complete a form stating their eligibility for this program.  The retired officer must present a current valid departmental retired officer identification card prior to attempting qualification. The eligibility form will be available at the outdoor range.
4.   The retired officer will be required to undergo use of force training, provided by the range staff, prior to qualifying on the course of fire.
5.   The retired officer's weapon(s) he wishes to qualify with will meet current DeKalb departmental requirements for a duty or secondary weapon. An approved handgun is the Department issued handgun, or a double action Semi-automatic pistol .380 ACP, 9mm, .40 S/W or 45ACP. Five or six shot, two, three or four inch (2", 3", or 4") barreled revolvers in .38 SPL or .357 magnums are also approved.  The ammunition required for qualification will be provided by the retired officer.  Training, range time, and targets will be provided by the department.
6.   The retired officer will qualify on a course in accordance with current Georgia P.O.S.T. standards.

USE OF FORCE

7. The retired officer will be allowed to attempt to qualify on the course of fire a total of three times per day.  If the officer fails to qualify during these attempts, he may make additional attempts on a separate day after making arrangements with the range staff.  The retired officer will be allowed practice time prior to qualification attempts, if desired.
8. After completing qualification, the retired officer will be issued a certification card by the range staff.  This card is valid for one year from the date of qualification, and is only valid if carried with an official DeKalb County Police photographic identification for a retired officer when carrying a concealed weapon.
9. All records of retired officer qualifications and firearms certification forms will be kept by the Training Division.

## 4-6.13   KNIVES

Officers are permitted but not required, to carry a folding style pocketknife; the blade shall be no more than three inches. For safety purposes, the knife will be secured inside the uniform pant pocket or in a holder on the duty belt. This is a personal item and will not be issued by the county.

This will be used for emergency needs such as cutting seat belts in severe traffic accidents when the victim is trapped, unconscious, or other similar situations. Officers are not permitted to use said knife during any arrest or confrontation and said knife is not part of the use of force continuum.

Knives should also comply with Federal/State Law and Local Ordinances.

## 4-6.14   PATROL RIFLE

Officers who are authorized can deploy with patrol rifles when they have reason to believe the suspect(s) is (are):
1. Wearing body armor
2. Armed with firepower that is superior to their sidearm
3. Armed and situated at a distance or fortified position with a tactically superior position requiring accuracy at a greater range
4. When an armed confrontation is imminent or when the officer is engaged in activities that have a high probability that the suspect(s) may be armed and dangerous, such as armed robberies in progress or active shooter situations, or
5. With prior authorization from a supervisor in situations where the tactical environment is such that a rifle would be the most effective way to prevent the death or serious physical injury to officers or the public.

The Patrol Rifle will be the .223 caliber AR-15/M-4 design, including piston operated models, that is personally owned. The rifle must be approved by the range staff.  Any officer considering the purchase of a rifle to carry on patrol should consult with the range staff to ensure authorization of the particular make and model.  It must have iron sights and a sling. Officers may also use approved optic sights and will have to qualify with both. If the officer makes any additions or alterations to the rifle re-qualification is mandatory before the weapon can be carried on duty. Departmental armorers will make inspections and approval of the weapons. Only departmental issued Federal TRU 55 grain Nosler Ballistic Tip ammunition will be carried.

## 4-6.15   OFF-DUTY/PART TIME EMPLOYMENT

A. All authorized part-time employment will be approved as per existing Departmental policy.
B. Officers working part-time employment in uniform must wear the Department issued safety holster and carry the Department issued weapon and ammunition.
C. Officers working part-time employment in plain clothes must carry the Department issued weapon in an appropriate holster.

## 4-6.16   FIREARMS TRAINING

A) The Department's firearms training program will include comprehensive instruction of (1) departmental policy on use of deadly force, (2) the legal requirements, (3) moral responsibility of carrying a firearm, (4) firearm safety, and (5) firearm proficiency.

B) The firearms proficiency training will, as closely as possible, reflect those circumstances and conditions that our police officers are most likely to confront in real life deadly force situations.

C) All aspects of the firearms training program will include the Department issued weapon, off-duty and secondary, and special approval weapons.

D) Patrol rifle and shotgun training will include legal, moral and ethical issues; specific rifle/shotgun marksmanship, tactical deployment of a rifle/shotgun, and "immediate action drills." Rifle and shotgun qualifications will consist of a static marksmanship course of fire, a dynamic tactical course of fire and a written exam. All officers must successfully

complete a minimum 30 hour tactical training course before being authorized to carry a personally owned rifle or shotgun, or a Departmental-issued shotgun. Course requirements may be fulfilled by successful completion of training at the DeKalb Police Training Academy, DeKalb County S.W.A.T. Training, Georgia Public Safety Training Center, or any Georgia P.O.S.T. approved patrol rifle/shotgun course. Personnel completing an approved course outside of DeKalb County must qualify on the DeKalb Police qualification course before final authorization is granted.

**4-6.17    FIREARMS CERTIFICATION**
  A)    All officers shall be "certified" with their issued, secondary, special approval and off-duty handguns. "Certification" shall include training regarding the legal, moral, and ethical aspects of firearms use; safety in handling firearms; and proficiency in the use of firearms. This certification is to be monitored by a member of the range staff.
  B)    Certification or qualification for departmental approved issued sidearms will be required for all sworn officers (lieutenants and below) every six months at the indoor range. The qualifying course will be the 30 round stress course. Captains and above will continue to qualify every 12 months.

Officers may come any time of the year, when the outdoor range is open, to practice.  Each officer will be allowed up to 50 rounds every other week to practice.

Officers may come any day of their qualifying month to either practice or qualify. If the officer elects to practice, they will be allowed up to 50 rounds every other week. If the officer elects to shoot the stress course in an attempt to qualify, then the officer must achieve a qualifying score of 80% or greater.  If the officer fails to qualify on the first attempt, he may either immediately attempt to qualify a second time or may shoot some practice rounds and then attempt to qualify a second time. Officers will only be allowed three qualifying attempts per day. If the officer qualifies on the first, second attempt or third, he will be released to continue his assigned duties.

If an officer fails to qualify after three attempts, their authority to carry the service weapon shall be immediately revoked and verbal and written notification of this revocation shall be forwarded to their commanding officer, the Training Division, the Assistant Chief's Office and the Office of the Chief of Police.

**Officers losing their authority to carry their service weapon shall immediately be reassigned to non-uniformed administrative duties for a period of 10 days.** The 10 day period will consist of the 10 days after the initial qualification attempts that the range is open. During this 10 day period, the officer will report to the range for remedial firearm's training and shoot practice rounds. They will also be allowed a maximum of three attempts to qualify each day (maximum of 150 rounds for qualification/practice per day). During this time, the officer will be prohibited from working secondary law enforcement jobs. If the officer fails to obtain a qualifying score after the 10 day period, they will be recommended for termination.

If an officer obtains a qualifying score prior to the 10 day deadline, the officer will be reinstated to their previous duties and can continue to work secondary jobs. **This officer shall be required to report to the range twice a month for the next six months for remedial firearm's training.** The range training staff will maintain a log on each officer receiving remedial firearm's training and document their progress.  If the range staff identify an officer whose shooting proficiency and qualifying scores are marginal, this officer may also be recommended to receive remedial firearm's training. This information will be shared with the officer's commanding officer, the Training Division, the Assistant Chief's Office and the Office of the Chief of Police.
Officers are encouraged to maintain their firearm's skills through practice.  Certification or qualification for other departmental approved lethal weapons, such as the shotgun, .223 rifle or a secondary sidearm shall occur on an annual basis.  A qualifying score and course shall be determined by the Range Master.  Any officer failing to obtain a qualifying score during their annual qualification attempt shall be prohibited from carrying that weapon while on duty or while working secondary law enforcement jobs. Once a qualifying score is made and the officer has demonstrated that they are proficient with that weapon, the range personnel will approve continued use of that handgun for the officer.

Certification or qualification with specialized weapons for S.W.A.T. Team members shall be determined by the S.W.A.T. team commander. Team members shall demonstrate proficiency with each specialized weapon they are assigned. Failure to demonstrate this proficiency will prohibit that team member from continued use of the specialized weapon.
  C)    Any officer who is absent from duty for any extended period of time and fails because of that absence to re-qualify as scheduled will have 30 days to re-qualify upon their return to full duty status. Responsibility for notifying the Training Division will rest with the individual officer.

USE OF FORCE

D)     Personnel who are authorized to carry a patrol rifle, shotgun or secondary/off-duty weapon will qualify with that weapon during the first qualification session each calendar year. Failure to qualify with the weapon will result in immediate revocation of authorization to carry. If the weapon is a departmental issued weapon, it will be immediately relinquished to the Range Staff.

## 4-6.18   FIREARMS CERTIFICATION RECORDS

The Department range master shall maintain a permanent certification log for every officer authorized to carry firearms. The log shall consist of the following minimum information:

A.  Officer's name
B.  Certified issued on-duty weapon make, mode, caliber and ammunition, serial number of weapon, date results of shooting test, and written test result
C.  Certified off-duty weapon (same as #B)
D.  Certified secondary weapon (same as #B)
E.  Certified special approval weapon (same as #B)
F.   Certified shotgun and/or rifle (same as #B)

## 4-6.19   PSYCHOLOGICAL DEBRIEFING

Any officer or other departmental personnel directly involved in a critical incident, which results in death or serious injury, will be placed on administrative leave directly upon completion of their preliminary report of the incident. This leave will be without loss of pay or benefits, pending the results of the investigation. The assignment to administrative leave will not be interpreted to imply or indicate that the employee has acted improperly.

While on administrative leave, the employee will remain available at all times for official departmental interviews and statements regarding the incident and shall be subject to recall at any time. The employee will not discuss the incident with anyone except the District Attorney, departmental personnel assigned to the investigation, or the employee's private attorney, the employee's psychologist, the employee's chosen clergy and the employee's immediate family. Upon returning to duty, the employee may be assigned to "administrative duty" for a period of time deemed appropriate by the employee, his psychologist and the Chief of Police.

In all cases where any person has been injured or killed as a result of firearms discharge by a police of officer, the involved officer will be required to undergo an emotional debriefing with a Department-furnished psychologist within two days of the incident. The purpose of this debriefing will be to allow the officer to express his feelings and to deal with the moral, ethical, and/or psychological aftereffects of the incident.  The debriefing shall not be related to any Department investigation of the incident and nothing discussed in the debriefing will be reported to the Department. The debriefing session will remain protected by the privileged Professional Psychologist Code of Ethics.

In all cases where any person has been injured or killed as a result of firearms discharge by a police officer, the involved officer will have available the services of a Department-furnished chaplain. The purpose of this offer is to provide the officer with a source of professional consultation to aid them in dealing with the potential moral and ethical aftereffects of a shooting incident. The services shall not be related to any Department investigation of the incident and nothing discussed in the debriefing will be divulged to the Department. The consultation sessions will remain protected by the privileged relationship.

## 4-6.20   AUTHORIZATION for USE of all  DEPARTMENTAL WEAPONS

Only employees demonstrating a proficiency in the use of all agency-authorized weapons will be approved to carry such weapons. This applies to all lethal as well as non-lethal weapons to include handguns, shotguns and other firearms, chemical agents, ECDs, impact weapons, handcuffs, or other weapons. This proficiency is demonstrated through the use of periodic training and/or qualifications.

## 4-6.21   POLICE INTERNAL REVIEW BOARD

A.  The DeKalb County Police Department Internal Review Board is hereby established:
1.  to review all cases where there has been a use of deadly force by officers of the Department or the death of a person has occurred while that person was in the custody of the Department, any of its officers, staff, designees or other representatives;
2.  to assist the Chief of Police in holding all members of the Department strictly accountable for the awesome responsibility of protecting life and property;

**DEKALB COUNTY POLICE DEPARTMENT**

    3.   to ensure that all officers are properly trained in all aspects of the use of force, up to and including the use of firearms; and,

    4.   for any other reason deemed necessary by the Chief of Police.

  B.  The Internal Review Board will hear, on a periodic and timely basis, those cases involving the use of deadly force or in custody death, which involve DeKalb County Police Department personnel.

  C.   ORGANIZATION

The DeKalb County Police Department Internal Review Board will be appointed by the Chief of Police and will be comprised of the following:

        1.   Chairman (the rank of Deputy Chief or above)

        2.   Vice Chairman (the rank of Major)

        3.   All other Majors within the DeKalb County Police Department.

The Internal Review Board members will represent each Division, Precinct, Section and Unit in the Department to include Uniform, Criminal Investigations, Special Operations, Interactive Community Policing, Support Services, Homeland Security, Training and Office of Professional Standards. The Chairman and Vice Chairman will have dual roles of conducting the formalities of the meetings, forming probing questions to the presenters and the members of the Board, and documenting the outcome of the presentations to the Board.

  D.   DEFINITIONS

  1.   Necessary Force – the use of a reasonable amount of force to achieve a legitimate police objective.

  2.   Deadly Force – that force which is intended to cause death or great bodily harm or which creates some specified degree of risk that a reasonable and prudent person would consider likely to cause death or great bodily harm.

  3.   Police Officer/Law Enforcement action – those acts that a reasonably prudent officer would take, whether on or off duty.

  4.   Non-police related action – those acts, taken by an off-duty officer, which a reasonably prudent person would take under similar circumstances.

  5.   Off duty, police related action – those acts that require an off duty officer to assume the role of a certified law enforcement in the State of Georgia, i.e., effecting an arrest, investigating a possible crime (misdemeanor or felony), etc.

  6.   Physical injury – obvious, apparent or reasonable complaint of injury to the limbs, organs, and/or tissue of a human being, including any unborn fetus.

  7.   Property damage – an event that results in obvious physical harm to property, including but not limited to real estate, motor vehicles, personal property or animals.

  8.   Accidental discharge – the discharge of a firearm by an officer that was not intended by the officer.

  9.   Violation of Department Policy – deviation from established Departmental policies, Rules, regulations or training.

 10.   Gross Deviation from Department policy, rules, regulations or training – wanton, willful, or reckless disregard for the established policies, rules, regulations, training or accepted practices of the DeKalb County Police Department.

  E.   CONDUCT OF THE INTERNAL REVIEW BOARD

All Internal Review Board members should be present to hear and review cases. Any absences must be approved by the Board Chair. A quorum must be present before any official findings are rendered. Meetings will be held quarterly during the year and may be called at the direction of the Chief of Police or Board Chair.

Information for review by the Board will be provided by the Internal Affairs detective who investigated the case, and his/her supervisor(s).  The Board retains the right to gather additional information from other sources, such as the DeKalb County Medical Examiner's Office, etc.

It is the purpose of the Internal Review Board to review the investigations of incidents whereby an officer used deadly force or a person died while in custody of the DeKalb County Police Department. The Board will make an informed decision as to whether the use of deadly force was justified or non-justified based on the totality of the circumstances. To determine if an officer was justified in using deadly force, the Board will apply applicable parts of state and federal law regarding use of force, as well as the Department's policies on use of force and use of force training. After that determination is made, the Board will then address, from an administrative perspective, whether any policies, rules, regulations or established training mechanisms were violated and/or whether there is a need for corrective action and/or remedial training in the use of force.

**USE OF FORCE**

The Board may also determine that other departmental policies may have been violated leading up to and/or during an incident where deadly force was used or someone died in police custody. If any other departmental polices were found to be violated, this information will be forwarded back to the officer's division for appropriate corrective action.

**The Internal Review Board will not consider any violations of state or federal law other than to make a preliminary finding of whether the officer involved was justified in using deadly force.**

After review, if the Board determines that a use of force was unjustified, the Board will then decide on the appropriate corrective or disciplinary action and make a recommendation to the Chief of Police.

    F.     REPORTS

A copy of the Internal Review Board final report and recommendations for corrective or disciplinary action, when warranted, will be drafted and signed by the Internal Review Board Chairman and Vice Chairman, and provided to the Chief of Police.

    G.    LETTERS OF NOTIFICATION

Upon final review, and after approval by the Chief of Police, the Chairman of the Board will draft and send a letter to all officers who were found to have been justified in their use of deadly force, or in the event of an in-custody death, there was no wrongdoing on the part of the officer(s) involved.