## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

GAYSHA GLOVER, and
COURTNEY GRIFFIN, individually
and on behalf of the ESTATE OF
D'ETTRICK GRIFFIN,

     *Plaintiffs*,

*v.*

CITY OF ATLANTA; ERIKA
SHIELDS; OLIVER SIMMONDS,
and DOES 1–5,

     *Defendants*.

CIVIL ACTION FILE
NO. 1:20-CV-04302-VMC

---

## DEFENDANT CITY OF ATLANTA'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

## INTRODUCTION

On the night of January 15, 2019, D'Ettrick Griffin, and at least one other individual, committed dangerous felonies. Just around 7:30 p.m. that night, they surveilled a downtown Atlanta gas station looking for a vehicle to steal. Spotting Officer Oliver Simmonds's police vehicle, Griffin exited a black Camaro, walked nonchalantly across the gas station parking lot, and stole it from him—just as Officer Simmonds had finished refueling it. Officer Simmonds attempted to regain control of the vehicle as Griffin was speeding away. And fearing for his life during those few seconds, Officer Simmonds discharged two rounds into the driver's window in quick succession—either

1

just as Griffin violently u-turned the vehicle across Officer Simmonds's path. Griffin sped away, crashed the vehicle into a third-party, and succumbed to his injuries. This lawsuit followed.

Griffin's parents, Plaintiffs Gaysha Glover and Courtney Griffin, filed this civil rights action individually and on behalf of Griffin under 42 U.S.C. § 1983. They allege that Officer Simmonds's use of deadly force violated Griffin's Fourth Amendment rights and that the City of Atlanta is liable for the constitutional violation under *Monell v. New York Department of Social Services*, 436 U.S. 658 (1978), and its progeny. But the City is entitled to summary judgment.

*First*, Plaintiffs cannot demonstrate that Officer Simmonds's conduct was objectively unreasonable under the Fourth Amendment, and absent a Fourth Amendment violation, their *Monell* claim necessarily fails.

*Second*, even assuming Plaintiffs could demonstrate a jury question on the underlying Fourth Amendment claim, the City is still entitled to judgment as a matter of law on the *Monell* claim. Plaintiffs cannot point to a facially unconstitutional policy that was the moving force behind the alleged constitutional violation; nor can they demonstrate that the City was deliberately indifferent with respect to its training of officers. Simply put, Plaintiffs fail to demonstrate that the City caused Officer Simmonds to violate Griffin's rights while Griffin was stealing Simmonds's police vehicle.

For the reasons explained more fully below, the Court should GRANT Defendant City of Atlanta's Motion for Summary Judgment.

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A defendant need not negate the plaintiff's claims with affirmative evidence to be entitled to summary judgment. Rather, the defendant need only establish that there is an absence of record evidence establishing an essential element of the claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If the defendant does so, the plaintiff must then come forward with sufficient evidence demonstrating a genuine issue of material fact for trial. *Id.*

The "requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary" to the ultimate issues do not matter. *Id.* Furthermore, factual disputes must be "genuine" in the sense that the conflicting evidence must be more than "merely colorable" but instead "significantly probative." *Id.* at 249. Of course, courts must resolve reasonable inferences from the record in support of the nonmovant; however, when "opposing parties tell two different stories, one of which is blatantly contradicted by the record . . . a court should not adopt that version of the facts[.]" *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## STATEMENT OF THE CASE

### I.     Procedural Background

***The Parties.*** Griffin's parents are the co-administrators of his estate. [Doc. 1, Compl. at ¶¶ 195–197]. They filed this lawsuit individually and on behalf of the estate on October 20, 2020. [*Id.*]. In the Complaint, they named

as Defendants: (1) the City of Atlanta, (2) former-Chief of the Atlanta Police Department ("APD") Erika Shields, (3) APD Officer Oliver Simmonds, and (4) a group of five unnamed individuals identified as "Does 1–5." [Doc. 1, at ¶¶ 198–201].

At the time of the incident, Officer Simmonds was a member of the Mayor's Executive Protection Unit ("EPU"), which is the unit that protects the Mayor of Atlanta and other dignitaries visiting the City. [*See* Deposition of Oliver Simmonds ("Simmonds Depo."), at 9:19–11:10]. Simmonds became an APD officer in 2011, following his completion of the State's Peace Officer Standards and Training Council ("POST") certification program. Upon graduation, Officer Simmonds served as a patrol officer before being selected to serve on EPU.

Officer Simmonds was sued in his individual capacity, along with Chief Shields, who was sued in her official capacity as well. [Doc. 1 at ¶¶ 199–200]. The City was sued under the doctrine established in *Monell* and its progeny. [*See id.* at ¶¶ 261–267].

***The Motion to Dismiss Order.*** The City moved to dismiss Plaintiffs' Complaint with respect to the claim against it, Chief Shields, and the John Does. [*See* Doc. 14, Defs. Mot. Dismiss]. The Court granted the motion in part, dismissing the claims against Chief Shields and the John Does. [Doc. 50, Order on Mot. Dismiss, at 28]. The Court also dismissed Plaintiffs' state law claims under Georgia's Open Records Act; however, the Court denied the City's motion with respect to the *Monell* claim, finding Plaintiffs' Complaint plausibly

alleged failure-to-train liability under *City of Canton v. Harris*, 489 U.S. 378 (1989), a follow-up decision to *Monell*. [*Id.*].

## II.   Factual Background

***Griffin Determines To Steal a Car.*** On January 15, 2019, Griffin was absent from school, perhaps appearing in court for a traffic citation regarding a motor vehicle accident he caused. [Deposition of Gaysha Glover ("Glover Depo."), at 82:8–85:8]. At some point that day, he and at least one other person determined that they were going to steal a vehicle. So, around 7:25 p.m., they drove to the Shell Station at the corner of Whitehall and McDaniel Streets in a black Camaro, canvassing the scene for several minutes before deciding what car they would carjack. [*See generally* Exhibit A, Camera 12].[1]

***Officer Simmonds Refuels at the Shell Station.*** Just before Griffin and the other person(s) arrived at the Shell Station, Officer Simmonds stopped to refuel his APD vehicle. Officer Simmonds had just finished his shift and was intending to return his vehicle to the APD lot at City Hall. [Simmonds Depo. at 27:14-18]. Prior to doing so, however, he was required to refuel the vehicle. [*Id.* at 113:22-25]. Officer Simmonds stopped at the gas pump on the far side of the gas station closest to the street.

Security cameras captured the incident. [*See* Exhibit A]. Simmonds is seen exiting his vehicle and walking around the front, to the rear passenger side. He inserts the pump into the tank, and then walks back to the driver's

---

[1]   Exhibit A will be filed as electronic media. Defendant City of Atlanta is contemporaneously requesting that it be filed under seal for the reasons contained in the Motion for Filing Under Seal.

side for a few moments, before returning to hang up the pump and leave. Griffin and the driver of the black Camaro watch from the car.

***Griffin Steals the APD Vehicle.*** During those brief few moments, Griffin is seen exiting the passenger side of the black Camaro. He casually strolls across the parking lot. Officer Simmonds meanwhile is turning the corner of the vehicle walking back to the driver's door. The black Camaro lurches forward to the parking lot exit and positions itself as the lead get-away car. A few moments pass, and the APD vehicle, now being driven by Griffin, initially lurches away. [*See* Exhibit A, Camera 12].

Officer Simmonds was, understandably, confused. In the brief moments between waiting for the pump to click, hanging up the nozzle, and walking back to open his car door, Griffin had brazenly entered the vehicle and was starting to drive away. [Simmonds Depo. at 15:2-7 ("After I finished pumping the gas, closed it back. Go to enter the vehicle. Open the door. Someone was— somebody was inside, inside the car.")].

***Officer Simmonds Uses Deadly Force.*** As Griffin pulls away from the pump, Officer Simmonds takes a few quick steps and catches up to the driver's door just as Griffin begins u-turning the vehicle in the opposite direction to exit the parking lot and head west down Whitehall Street. Vehicles are travelling in both directions. [*See* Exhibit A]. Officer Simmonds was immediately beside the vehicle trying to regain control of it. [Simmonds Depo. at 19:24–20:5 ("I was trying to retrieve possession of the car[.]")].

Griffin "was struggling inside the car," and Officer Simmonds believed "he reached for . . . something [that] looked like a gun." [Simmonds Depo. at

66:19-21 (explaining why he told one of the responding officers at the scene that Griffin had a gun)]. It was "a black object" that Griffin's "right hand" was reaching for. [*Id.* at 67:1-20].[2]

As Griffin continued to drive away, Officer Simmonds "was [just] behind the driver's door"; he believed that he "was stuck." The "car was moving, and [he] was trying to keep up." [Simmonds Depo. at 21:18–20]. Griffin then made a u-turn directly across Officer Simmonds's path while the vehicle was entering the street. [Deposition of Jeremy Bauer ("Bauer Depo."), at 45:18–21]. At some point Griffin ran over Officer Simmonds's foot. [*Id.* at 15:19-20 ("[I]n the process at some point the vehicle [ran] over my foot."); *see also id.* at 54:11-22].

At 7:30:38 p.m., or a few centiseconds before, Officer Simmonds discharged his firearm twice directly into the driver's window while Griffin was turning the vehicle toward Officer Simmonds's direction. [Deposition of Jeremy Bauer ("Bauer Depo") at 83:19–84:11; 103:20–21]. Officer Simmonds's shots were fired in rapid succession, within a mere .297 seconds of each other. [Bauer Depo. at 50:2–4]. Griffin and the black Camaro then sped away, but Griffin crashed into a third-party and succumbed to his injuries at the scene.

## **ARGUMENT**

### I.   **Plaintiffs cannot establish a Fourth Amendment violation, so their *Monell* claim necessarily fails.**

Plaintiffs cannot establish that Officer Simmonds violated Griffin's Fourth Amendment rights. Officer Simmonds's use of deadly force was

---

[2] Attached to his belt, Griffin had a large black coin purse resting in his lap. [Exhibit B, Graphic Picture]. Exhibit B will be filed as electronic media along with Exhibit A. *See* Note 1, *supra*.

objectively reasonable under the circumstances he faced, and Eleventh Circuit precedent demonstrates so.

### A. Officer Simmonds used objectively reasonable force under the circumstances.

"A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014); *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Tennessee v. Garner*, 471 U.S. 1 (1985). As with other claims under the Fourth Amendment, "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham,* 490 at 397; *Plumhoff*, 572 U.S. at 774. Certain factors are certainly relevant and guide the inquiry, but "the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Graham*, 490 U.S. at 396 (quotation omitted).

For example, the Supreme Court's decision in *Garner* "says something about deadly force but not everything, especially when facts vastly different from *Garner* are presented." *Long v. Slayton*, 508 F.3d 576, 580 (11th Cir. 2007); *see Scott v. Harris*, 550 U.S. 372, 382 (2007) ("*Garner* did not establish a magical on/off switch that triggers rigid preconditions[.]"). "Accordingly, as set out in *Garner*, the use of deadly force is *more likely* reasonable if: the suspect poses an immediate threat of serious physical harm . . ., such that his being at large represents an inherent risk to the general public; and the officers either issued a warning or could not feasibly have done so before using deadly

force." *Penley v. Eslinger*, 605 F.3d 843, 850 (11th Cir. 2010) (emphasis added). But, again, "none of these conditions are prerequisites[.]" *Id.* Instead, courts must consider all the facts and circumstances of each particular case, including the severity of the crime, whether the suspect was resisting or evading, the level of threat to the officer and to the public, and the relative culpabilities of the parties, along with other relevant considerations. *Graham*, 490 U.S. at 396; *Scott*, 550 U.S. at 383–84.

When conducting this inquiry, perspective is crucial: "it is doctrinal gospel that [courts] do not view an officer's actions with the 20/20 vision of hindsight." *Shaw v. City of Selma*, 884 F.3d 1093, 1100 (11th Cir. 2018) (quotation omitted); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009). As the Eleventh Circuit has repeatedly reiterated, the facts and circumstances that the officer was presented with may look drastically different when viewed from a judge's chambers on a cold paper record:

> We are not to view the matter as judges from the comfort and safety of our chambers, fearful of nothing more threatening than the occasional paper cut as we read a cold record accounting of what turned out to be the facts. We must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal.

*Crosby v. Monroe County*, 394 F.3d 1328, 1333–34 (11th Cir. 2004).

### 1.   *Griffin was committing serious felonies.*

It is undisputed that Griffin was committing serious felonies when Officer Simmonds used deadly force. Griffin had just committed the crime of carjacking in the second degree. *See* O.C.G.A. § 16-5-44.1(b)(2). While Georgia

law may not explicitly distinguish between whether the vehicle is a police vehicle or John Doe's vehicle, it should go without saying that carjacking a police vehicle is more serious in nature. *See Long*, 508 F.3d at 582–83 (collecting cases describing the seriousness of this offense).

Griffin also actively resisted Officer Simmonds's efforts to regain control of the vehicle when he quickly turned it in another direction, across Simmonds's path of travel; and he threatened Officer Simmonds's life through his resistance and erratic driving with Officer Simmonds's body immediately connected to the vehicle, or immediately beside it. By turning the vehicle across Officer Simmond's direction of travel, Griffin put Officer Simmonds's life in immediate danger. [Bauer Depo. at 83:19–84:11, 69:14–70:14, 103:20–21]. Probable cause thus existed for other serious felonies like aggravated assault. *See Frayall v. State*, 259 Ga. App. 286, 287–88 (2003) (holding evidence was sufficient to sustain conviction for aggravated assault where defendant drove away in vehicle *while* officer was struggling to enter it); *Webb v. State*, 256 Ga. App. 653, 654 (2002) ("[O]ne . . . may be convicted of aggravated assault regardless of whether the victim sustained any injuries *or was even touched by the vehicle*." (emphasis added)).

### 2. *Griffin posed an immediate threat to Officer Simmonds and the public.*

The level of threat posed by Griffin's conduct to Officer Simmonds was immediate and palpable; as for the public, it was clear and present. Start with Officer Simmonds: he was clinging to the side of his police vehicle trying to regain control of it. [Simmonds Depo. at 19:24–20:5]. Griffin was accelerating and turning the vehicle in the opposite direction, heading into a street with

10

traffic passing in both directions. In the words of the Fifth Circuit from a similar case: "That brief interval—when [Officer Simmonds] is clinging to the accelerating SUV and draws his pistol on [Griffin]—is what the court must consider to determine whether [Officer Simmonds] reasonably believed he was at risk of serious physical harm." *Harmon v. City of Arlington*, 16 F.4th 1159, 1164 (5th Cir. 2021). Like the Fifth Circuit concluded, in those brief moments Officer Simmonds "could reasonably apprehend serious physical harm to himself as an unwilling passenger on the side of [*his own*] fleeing [police] vehicle." *Id.* at 1165.

Add to these circumstances Officer Simmonds's belief that, at the time, he thought he saw Griffin reach for a gun. Though Officer Simmonds may have been mistaken, such a mistake "does not matter" as long as the mistake was reasonable under the circumstances. *Quiles v. City of Tampa Police Dept.*, 596 F. App'x 816, 820 (11th Cir. 2015); *see Carr v. Tatangelo*, 338 F.3d 1259, 1269 (11th Cir. 2003) ("A reasonable but mistaken belief that probable cause exists for using deadly force is not actionable under § 1983."). Officer Simmonds's apparent mistake was not unreasonable.[3]

The threat Griffin posed to the public was also serious. Consider what Griffin may have done with a stolen police vehicle. *See Long*, 508 F.3d at 582–83 (citing and summarizing cases). "Even a quick check of only published appellate decisions shows the risk of serious harm to the public," in circumstances like this, is "not imaginary." *Id.* at 582. Griffin could have used the vehicle to "cloak[ ] him[self] with the apparent authority of a law

---

[3] *See* note 2, *supra* (noting the black coin purse dangling in Griffin's lap that could easily be mistaken for a gun).

enforcement officer." *Id.* at 583. Impersonating an officer, he could have victimized many. With access to a police radio and emergency lights and a siren, he could have significantly disrupted police operations throughout the City—jeopardizing the lives of many innocent citizens stuck in evening traffic that night as he fled from an actual police pursuit.

### 3.    *Griffin was culpable for creating the risk.*

Griffin's culpability for creating the circumstances that led to Officer Simmonds's use of force is also properly factored in the analysis. *Scott*, 550 U.S. at 384 (explaining the "relative culpability" of the parties and others is a relevant consideration); *see Long*, 508 F.3d at 582 (acknowledging culpability as a relevant consideration); *Carnaby v. City of Houston*, 636 F.3d 183, 188 n.4 (5th Cir. 2011) ("As we have said, culpability is a factor[.]").

Griffin committed a brazen and calculated crime in a populated area with a police officer, his victim. This was not some investigative encounter gone wrong. *Compare Morton v. Kirkwood*, 707 F.3d 1276, 1281–82 (11th Cir. 2013). Nor was it some petty crime that Officer Simmonds had just witnessed and intervened to stop. Instead, Griffin's act of stealing a police vehicle placed himself and the public directly at risk, which further supports the reasonableness of Officer Simmonds's conduct. *See Long*, 508 F.3d at 583.

### 4.    *The forced used was proportionate in scope to the threat.*

Officer Simmonds fired two shots, in rapid succession, directly into the driver's window of his vehicle, while he was attached to it or immediately beside the vehicle. It was at *this* moment that the level of threat to Officer Simmonds's life was at its zenith. Officer Simmonds's shots were fired .297

12

seconds apart. And as soon as Griffin sped away and the level of threat to Officer Simmonds's life waned, Officer Simmonds immediately terminated all use of force. Officer Simmonds did not fire a second volley of shots as Griffin sped away; nor did Officer Simmonds wildly unload his magazine in the very moment his life was clearly threatened—even if that may have been constitutionally permissible. *See Plumhoff*, 572 U.S. at 777. Rather, he used an amount of force that was reasonably proportionate in scope to the immediate level of the threat and the precise duration of it. *Compare Plumhoff*, 572 U.S. at 777–78 (finding no Fourth Amendment violation), *with Hunter v. City of Leeds*, 941 F.3d 1265, 1280 (11th Cir. 2019) (finding a Fourth Amendment violation because second volley of seven shots occurred at a time when the level of threat had clearly diminished).

### 5. *Griffin's felonious conduct rendered a warning impossible.*

When faced with such threat, police officers need not wait and hope for the best. *Scott*, 550 U.S. at 385. Nor must officers necessarily give some sort of "pre-deadly force warning." *Powell v. Snook*, 25 F.4th 912, 922 (11th Cir. 2022) ("As we have just noted, we have rejected exactly that kind of inflexible rule." (quotation omitted)). *"Garner* does not mandate that . . . . *Garner* says 'where feasible.'" *Id.* (quoting *Garner*, 471 U.S. at 11–12). Here, Griffin's felonious conduct made such a warning impossible. Regardless, Officer Simmonds's conduct alone—his quick efforts to regain control of the vehicle—provided Griffin sufficient warning to step on the brakes, not the pedal, and cease his calculated crime.

13

**B.    Eleventh Circuit caselaw demonstrates the reasonableness of Officer Simmonds's conduct.**

Numerous decisions from the Eleventh Circuit support the conclusion that Officer Simmonds's conduct was objectively reasonable. Consider the court's decision in *Tillis ex rel. Wuenschel v. Brown*, 12 F.4th 1291 (11th Cir. 2021). There, the court reversed the district court's *denial* of summary judgment. The Eleventh Circuit exhaustively analyzed prior decisions relating to the use of deadly force and shooting into moving vehicles before concluding the district court's interpretation of those prior cases was clearly mistaken.

Speaking for the court, Chief Judge Pryor explained that the Eleventh Circuit had *never* previously ruled "that [an] officer was *required* to be in the direct path of the moving vehicle to have a reasonable fear for his safety." *Id.* at 1300. Reviewing *Long v. Slayton*, the court explained that "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses [the vehicle] as a deadly weapon to act to stop the suspect." *Id.* (quoting *Long*, 508 F.3d at 581). The *Tillis* Court explained that the officer in *Tillis*, "was on foot next to his vehicle, where he was exposed to danger." *Id.* at 1299. Standing "[i]n close proximity to a moving vehicle, with only seconds to react, [the officer] had reason to believe his life was in danger." *Id.* The slow speed of the vehicle did not matter to the Eleventh Circuit: the officer could legitimately believe the vehicle would quickly accelerate. Nor did the officer's position of somewhat relative safety sheltered in the "V" between his vehicle and its door matter either: "[b]eing crushed between a car door and the car is little better, if at all, than being run over." *Id.*

14

The Eleventh Circuit's decision in *L.T. ex rel. Snorton v. Owens*, 808 F. App'x 814 (11th Cir. 2020), is another somewhat recent case involving deadly force and moving vehicles. There, the court also surveyed some of its prior decisions on the topic and similarly concluded that the use of force was objectively reasonable. The threat to the officers posed by the vehicle in *Snorton* was *even more remote* than the threat Officer Simmonds faced here. *See id.* at 824 ("no officer was in the immediate path of the Maserati at the time of the shooting"). Yet, "the chaotic and quickly unfolding circumstances" demonstrated to the Eleventh Circuit the reasonableness of the officer's conduct. *Id.* at 825.

The Eleventh Circuit's decision in *Long*, however, is perhaps the most analogous case to the circumstances here. 508 F.3d at 580–81. As the *Long* Court acknowledged, the officer's "decision to fire his weapon risked [the driver's] death." *Id.* But, in "light of the potential danger posed to the officers and to the public if [the driver] was allowed to flee *in a stolen police cruiser*," the Eleventh Circuit easily concluded the use of force was objectively reasonable. *Id.* at 581 (emphasis added).

In light of the above, Plaintiffs cannot demonstrate that Officer Simmonds's conduct was objectively unreasonable under the circumstances he faced, and therefore, they cannot demonstrate that Officer Simmonds violated Griffin's rights under the Fourth Amendment. And even if this were not clear in light of that body of Eleventh Circuit precedent, it would at least be clear that the violation at issue *was not a clear* violation of established caselaw.[4]

---

[4]   *See* Section II.B.4, *infra*.

**C.    Plaintiffs' *Monell* claim necessarily fails as a matter of law.**

Because Plaintiffs cannot demonstrate a Fourth Amendment violation, their *Monell* claim against the City necessarily fails. An underlying constitutional violation is a necessary element for purposes of *Monell* liability. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point."); *Knight ex rel. Kerr v. Miami-Dade County*, 856 F.3d 795, 821 (11th Cir. 2017); *Gainor v. Douglas County*, 59 F.Supp.2d 1259, 1291 (N.D. Ga. 1998). Therefore, without an underlying constitutional violation, the City is entitled to summary judgment on the *Monell* claim against it for this reason alone.

**II.    Plaintiffs' *Monell* claim fails for a variety of additional reasons.**

Although an underlying constitutional violation is necessary for *Monell* liability, it is still not sufficient for liability. Section 1983 does not "incorporate doctrines of vicarious liability." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). Thus, "local governments are responsible only for their *own* illegal acts." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quotation omitted). Accordingly, in addition to a constitutional violation, a plaintiff must demonstrate: (1) a policy or a custom of the City, (2) that was established with deliberate indifference to the plaintiff's constitutional rights, and (3) was the moving force behind the constitutional violation. *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004); *see, e.g., City of Canton v. Harris*, 489 U.S. 378, 389–90 (1989). These "strict limitations" ensure that liability is not "based on

the doctrine of respondeat superior." *Grech v. Clayton County*, 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc).

**A.    Most of Plaintiffs' theories under *Monell* were either dismissed or would clearly lack merit.**

**1.    *The only theory the Court found plausible was failure-to-train.***

As an initial matter, this Court's Motion to Dismiss Order already rejected most of Plaintiffs' pleaded theories of *Monell* liability. The only theory that the Court found plausible was Plaintiffs' failure-to-train theory under *City of Canton*. To be sure, the Court found the following theories that Plaintiffs asserted were *not plausible*:

- Failing to Supervise/Sanction Officer Simmonds, specifically;
- Failing to supervise/sanction APD officers, generally; and
- Permitting a "Culture of Condoning Excessive Force"

[*See* Doc. 50 at 16–19 (rejecting these theories)].

The Court rejected the first theory on the "moving force" or causation element. It was undisputed then and now that Chief Shields was the relevant policymaker for the City with respect to supervision of APD officers. This Court reasoned that the Complaint did not "plausibly allege that Simmonds's domestic violence arrest placed Shields on notice of his propensity to use deadly force in pursuit of a suspect fleeing in a vehicle," such that there was any failure to supervise or discipline Simmonds. [*Id.* at 16]. Plaintiffs acknowledged in the Complaint that, "APD took steps to discipline Simmonds after his arrest," including placing him on "an administrative assignment" during the investigation into the arrest and "subsequently suspend[ing] [him]

without pay for five days" after the investigation. [*Id.* at 17 (citing Compl. at ¶¶ 60–61)]. Thus, there could be no plausible theory in which Chief Shields's final decision-making on this issue was the "moving force behind the injury alleged," *See Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 405, 407–09 (1997) (discussing and rejecting theory that a single facially valid employment decision could give rise to *Monell* liability). [*See* Doc. 50 at 16 ("causal connection" element not met)].[5]

The Court rejected the second theory on *Monell*'s deliberate indifference element. Plaintiffs did not plausibly allege that Chief Shields was deliberately indifferent to the need to supervise or sanction APD officers more generally with respect to the "dangerous vehicle pursuit tactics," like what Plaintiffs alleged occurred here; and thereby the City could not have acted with deliberate indifference in this respect, either. [Doc. 50 at 19]. In each of the instances that Plaintiffs cited as evidence of Chief Shields's "custom" of failing to take appropriate remedial action, the Court pointed to the Complaint's *admissions* "that APD *did* take remedial action against officers who used excessive force while pursuing a suspect fleeing in the vehicle." [Doc. 50 at 19

---

[5] Although the Court analyzed these theories in the context of the supervisory liability claim against Chief Shields, the reasoning is just as applicable under *Monell*. The only difference between *Monell* and supervisory liability, in this context, is which defendant will be saddled with the damages: the government entity or the supervisor personally. As the final policymaker, in this context, Shields's conduct is attributable to the City, as the Court itself reasoned. [Doc. 50, at 22 ("Shields's alleged liability is based solely on her position as Chief of the APD at the time of the shooting, and so her actions are the City of Atlanta's actions for purposes of this lawsuit.")].

(emphasis original)]. Thus, it was implausible, this Court reasoned, that the City "acted with deliberate indifference." [*Id.*].

Lastly, the Court rejected the final theory on both the policy/custom element and the causal connection element. Incredibly, Plaintiffs alleged that Chief Shields, as the final policy maker for the City, "created" a custom, or as Plaintiffs put it, "a 'culture[,]' within the APD that condoned the use of excessive force." [Doc. 50 at 17]. But Plaintiffs' allegations were "too general" and did not plausibly "allege a specific act, policy, or custom *related* to the constitutional deprivation at issue," [*Id.* at 18 (emphasis added)]. *See Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005) (reiterating that it is insufficient to point to unrelated incidents of alleged misconduct). Furthermore, "the Complaint contradict[ed] itself in stating that the APD failed to take any action to redress the use of excessive force" because the Complaint *repeatedly* "cite[d] circumstances where the APD investigated such events, fired officers for the use of excessive force, or otherwise took remedial action." [Doc. 50 at 18–19 (footnotes omitted, citing Complaint)]. These allegations therefore "preclude[d] . . . a finding" that there was ever "a custom or policy" to begin with, let alone one that could be said to have been the moving force behind the alleged violation here. [*Id.* at 19].

At bottom, the only theory the Court found plausible was Plaintiffs' failure-to-train theory under *City of Canton*. [Doc. 50 at 20–22 (concluding plausible failure-to-train theory alleged); *see also id.* at 12 (same on *Monell*)]. But even *that* theory fails for the reasons discussed in Section II.B below.

19

### 2.    *Plaintiffs still cannot establish policy-based liability.*

In their far-reaching discovery, Plaintiffs have nevertheless occasionally suggested that they could demonstrate policy-based liability under *Monell*. But that argument would lack merit—assuming Plaintiffs will even make it— because Plaintiffs cannot point to a facially unconstitutional policy.

"A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). And to be sure, the policy itself must be facially unconstitutional for liability to arise under *Monell*; otherwise, liability would be premised on respondeat superior. *City of Canton*, 489 U.S. at 386–87; *see Am. Fed'n of Lab. & Cong. of Indus. Organizations v. City of Miami, FL*, 637 F.3d 1178, 1188 (11th Cir. 2011) (noting that, because "none of the policies [were] facially unconstitutional" the policy-based claim failed); *Sewell*, 117 F.3d at 489 ("Obviously, the Town has no policy commanding its officers to barter arrests for sexual favors."); *see also McDowell*, 392 F.3d at 1291 (noting dichotomy of analysis where "the plaintiff claims that a municipality's facially valid actions violated his constitutional rights"); *accord Edwards v. City of Balch Springs*, 70 F.4th 302, 309 (5th Cir. 2023) ("An official, written policy is 'itself' unconstitutional only if it affirmatively allows or compels unconstitutional conduct.").

Plaintiffs have suggested that APD's use of force policy is facially unconstitutional because, at the time of the incident, it lacked a reference to *Garner*'s warning-where-feasible requirement. That does not render the policy

facially unconstitutional for purposes of *Monell*, though. "Even if a policy fails to include every constitutional requirement for the use of a deadly force, that does not render the policy unconstitutional." *Williams v. City of Burlington, Iowa*, 516 F. Supp. 3d 851, 872 (S.D. Iowa 2021) (holding lack of warning requirement in use-of-force policy did not render it facially unconstitutional under *Monell*), *aff'd*, 27 F.4th 1346 (8th Cir. 2022). That "[t]he policy is simply silent concerning the circumstances under which an officer should provide a warning . . . do[es] not reflect a deliberate choice *by policymakers* to refrain from warning citizens" prior to the use of deadly force." *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 392 (8th Cir. 2007) (en banc) (emphasis added) (holding lack of warning requirement in use-of-force policy regarding canine deployment did not render policy facially unconstitutional under *Monell*).

Plaintiffs have also suggested that APD's use of force policy is facially unconstitutional because it does not provide officers with *detailed* guidance as to when the use of deadly force in connection with moving vehicles is permissible. As the Eighth Circuit has held, however, "a written policy that is facially constitutional, but fails to give *detailed* guidance that might have averted a constitutional violation by an employee, does not itself give rise to municipal liability." *Sabla*, 486 F.3d at 392 (emphasis added) (holding alleged failure to promulgate policy "giving guidance on the use of canines" could not give rise to policy-based liability). "If it were otherwise," the Fifth Circuit held, "a use-of-force-policy would be facially constitutional only if it recited every jot and tittle of the applicable case law." *Edwards*, 70 F.4th at 310 (holding use of

21

force policy's failure to address *Garner*'s immediacy requirement could not give rise to liability).

### 3. *Plaintiffs cannot establish custom-based liability.*

Plaintiffs have also suggested throughout their discovery endeavors that they could demonstrate a custom-based theory of liability. For instance, one of their experts, who is not a lawyer, opines that APD "engaged in a custom or practice of condoning and ratifying use of deadly force" and that he believes this directly caused Officer Simmonds to violate Griffin's Fourth Amendment rights (which he also purports to offer an "opinion" on).

"Because municipalities rarely have an official policy that endorses a constitutional violation," plaintiffs often assert a custom/practice-based theory of liability. *Craig v. Floyd County*, 643 F.3d 1306, 1310 (11th Cir. 2011). "A custom is a practice that is so settled and permanent that it takes on the force of law." *Sewell*, 117 F.3d at 489. Demonstrating a custom therefore requires proof of a longstanding and widespread practice as evidenced by similar, temporally proximate constitutional violations. Random acts or isolated incidents cannot, as a matter of law, amount to a custom.

As noted above, the Court already rejected Plaintiffs' theory that there was a custom of condoning or ratifying the use of deadly force, in general, regardless of their expert's "opinion." That remains the law of the case for now, but even the expert's "opinion" would not call for a different result. Neither Plaintiffs nor their expert have "put forth evidence of a situation in which an APD officer used [similar] excessive force against an individual, APD determined the use of force violated policy, and APD failed to take disciplinary

action against the officer." *Brown v. City of Atlanta*, No. 1:17-CV-04850, 2020 WL 5633399, at *14 (N.D. Ga. Sept. 21, 2020), *aff'd*, No. 21-13565, 2023 WL 3244833 (11th Cir. May 4, 2023) (holding the district court "properly rejected testimony from . . . [Plaintiffs'] expert" on this point). The Complaint itself *admitted* that such cannot be true, as this Court observed. [Doc. 50 at 19].

And to the extent Plaintiffs rely upon some sort of ratification theory, that theory would fail. *See Underwood v. City of Bessemer*, 11 F.4th 1317, 1334 (11th Cir. 2021). Neither Plaintiffs nor their expert have demonstrated that APD has "'persistently failed to take disciplinary action against officers,'" such that it can be said "that the department ratified the misconduct." *Id.* (brackets omitted, quoting *Salvato v. Miley*, 790 F.3d 1286, 1297 (11th Cir. 2015); *accord Salvato*, 790 F.3d at 1297. More to the point, Plaintiffs fail to show where a final policymaker for the City ratified not only the allegedly unconstitutional conduct, "but also the unconstitutional *basis* for it." *Matthews v. Columbia County*, 294 F.3d 1294, 1297 (11th Cir. 2002) (emphasis added). Plaintiffs simply cannot satisfy the requirements of a custom based upon ratification.

### B. Plaintiffs' failure-to-train theory fails.

Plaintiffs' failure-to-train theory under *City of Canton* was the *only* theory this Court found plausible at the pleading stage. Plaintiffs alleged that the City failed to adequately train its officers with respect to the use of deadly force and moving vehicles. While this was a viable allegation at the pleadings stage, *Monell* liability "is at its most tenuous where [the] claim turns on a failure to train." *Connick*, 563 U.S. at 61. And while the Court found the theory

plausible then, Plaintiffs cannot demonstrate liability as a matter of law on the record now.

### 1.  *No pattern of similar constitutional violations can be shown.*

First, Plaintiffs cannot point to a sufficient number of incidents involving constitutional violations "that are substantially similar to the case at hand," such that it can be said that the City was on notice of the particular deficiencies in its training. *Mercado*, 407 F.3d at 1162; *Gold v. City of Miami*, 151 F.3d 1346, 1351 (11th Cir. 1998) ("This Court repeatedly has held that without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise."). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary . . . for purposes of failure to train." *Connick*, 563 U.S. at 62 (internal quotation omitted). To be sure, there must be a *pattern* of *similar* constitutional *violations*. *Id.* (holding four, demonstrated constitutional violations were not similar to establish pattern for purposes of failure-to-train). Plaintiffs do not survive summary judgment—let alone would they sustain a jury verdict—by pointing to general instances of alleged misconduct by APD officers. *Gold v. City of Miami*, 151 F.3d 1346 (11th Cir. 1998) (reversing district court's denial of JMOL motion and setting aside failure-to-train verdict); *Perez v. City of Sweetwater*, 770 F. App'x 967 (11th Cir. 2019) (affirming district court's grant of JMOL motion following plaintiff's verdict). Nor do they survive summary judgment by pointing to random or isolated incidents of alleged constitutional violations. *See, e.g., Gainor v. Douglas County*, 59 F.Supp.2d 1259, 1294 (N.D. Ga. 1998) ("Thus, unless the need for training is obvious, random acts or

isolated instances are usually insufficient[.]" (quotation omitted)); *see Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987) ("[T]he number of [citizen] complaints bears no relation to their validity."). "This high standard of proof is intentionally onerous[.]" *Gold v. City of Miami*, 151 F.3d at 1351 .10.

Like the plaintiff in *Perez*, Plaintiffs hope to "piece[ ] together" a hodgepodge of incidents "connected only by the fact that they generally involved police encounters with vehicles." *Perez*, 770 F.App'x at 975. Construing the record in their favor, however, Plaintiffs at most can only point to two prior incidents that resulted in constitutional violations under somewhat similar situations. But even those incidents are too factually dissimilar and too remote to give rise to liability. *See Connick*, 563 U.S. at 63 ("Because those incidents are not similar to the violation at issue here, they could not have put Connick on notice that specific training was necessary to avoid this constitutional violation."). Neither the *Favors* incident nor the *Hall* incident concerned an APD officer's use of deadly force while engaged in an altercation with the plaintiff who, admittedly, had just stolen the APD officer's vehicle.[6] Neither of those random or isolated instances of, what were determined to be, constitutional violations, establish the sufficient pattern necessary for liability here. Those individuals were subjected to deadly force for stealing either a fistful of dollars or a committing a traffic violation; Griffin stole a police vehicle from a police officer. And in any event, together they do not establish a *pattern. Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir.

---

[6] *See generally Favors v. City of Atlanta*, 849 F. App'x 813, 818 (11th Cir. 2021); *Hall v. City of Atlanta*, No. 1:18-cv-47100, 2021 WL 8998469,  (N.D. Ga. Dec. 16, 2021)

2002) ("Eleven incidents each ultimately offering equivocal evidence of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the Nation's largest cities and police forces.").

### 2. *There has been no deliberate indifference.*

More importantly, Plaintiffs cannot demonstrate that the City has been deliberately indifferent regarding the need to train officers in circumstances such as this. Even assuming *Favors* and *Hall* establish the requisite pattern— a point the City does not concede—the City has not been deliberately indifferent since either of those events.

As Chief Shields testified, APD's training in the years leading up to this incident (following those) specifically covered the use of deadly force and moving vehicles. [Deposition of Erika Shields ("Shields Depo.") at 89:1—90:15, 88:24-25 (reiterating that it was "very much a part of force usage [training])"]. This was so especially as a result of those prior events. Those officers were terminated swiftly, and it was made clear through training and directives that APD did not tolerate that sort of conduct. [*See* Deposition of Arthur Nixon ("Nixon Depo.") at Vol.1 at 134:14–24; *see id.* at 149:8–150:15]

Senior Patrol Officer ("SPO") Fite, the City's corporate representative on training, discussed this at length during the three depositions Plaintiffs' counsel took. Following the *Favors* incident in 2015, the City specifically provided additional training on this subject to all officers. [Deposition of Patrick Fite ("Fite Depo") Vol.1 at 184:7–188:16]. During APD's annual training, moreover, which SPO Fite has regularly conducted over the years, "shooting at a car . . . [is] brought up in the firearms training." [*Id.* Vol.1 at

191:9–24 (explaining that in firearms training, officers are taught on judgmental shooting involving cars, sticks, or knives)]. Indeed, in 2016, Officer Simmonds was given a specific firearms simulation on the exact circumstance Plaintiffs claim APD failed to train him on. [Fite Depo. Vol.2 at 281:16–285:21 (describing simulation scenario)]. As SPO Fite explained, Officer Simmonds was placed in a virtual training exercise in which he was required to decide whether to use deadly force when confronted with a potentially dangerous, fleeing vehicle. Officer Simmonds used force, when the situation did not call for it; and after the exercise, Officers Simmonds's instructors explained to him what he did incorrectly and why the decision to use force was inappropriate in those circumstances. Officer Simmonds was then given a similar training exercise immediately thereafter, in which he made the correct decision not to fire on a fleeing vehicle. [*See id.*]. Every officer received this simulation training that year on the use of deadly force and moving vehicles. [*Id.* at 285:17–24]. And APD regularly offered this simulation at other times over the years, varying the scenario. [*See* Deposition of David Jones ("Jones Depo.") at 136:19–137:24 (describing the sorts of training regarding deadly force and moving vehicles)].

Plaintiffs deposed numerous other APD command staff and officers during discovery, some of whom are no longer even employees of the City. They all agreed. For example, Chief Rodney Bryant, the Police Chief following Shields and the Assistant Chief of Police before that, concurred with Shields's and Fite's testimony. [Deposition of Rodney Bryant ("Bryant Depo") at 9:10–16 (explaining his positions)]. As Chief Bryant recounted, APD provided verbal,

situational, and classroom training on the intersection of deadly force and moving vehicles:

- APD trained officers to avoid shooting at unoccupied or moving vehicles, unless the circumstances necessarily warranted it. [*Id.* at 89:2–19].

- APD trained officers to avoid placing themselves in the path of a moving vehicle to justify deadly force. [*Id.* at 89:25–90:1].

When Plaintiffs deposed Officer Simmonds's immediate supervisor at the time of the incident, former APD Sgt. Michael Flisser, he reiterated the point. [Deposition of Michael Flisser ("Flisser Depo") at 5:16–22]. Sgt. Flisser confirmed:

- APD officers received training on the interplay of deadly force and moving vehicles. [*Id.* at 38 at 11–15].

- This training was provided in a classroom setting and at the firing range. [*Id.* at 38:16–39:3].

- APD officers were never instructed that they could shoot at a moving vehicle if it did not pose a threat [*Id.* at 39:6–14].

Captain David Jones, Sgt. Flisser and Officer Simmonds's direct supervisor in the EPU, also underscored this point. As he explained, APD's training taught officers how to make those split-second judgment calls based on the circumstances presented. Depending on the scenario presented, "it could involve a situation where, . . . you are authorized to shoot at a moving vehicle. Then it [could] be a situation where you're not—it's not warranted[.]" [Jones Depo. at 136:24–137:3].

Much to Plaintiffs' chagrin, even Officer Simmonds himself testified that he was specifically trained to handle the very situation he confronted, and he understood from his training that his ability to use deadly force when dealing

with moving vehicles was severely restricted by training and policy. As Officer Simmonds put it:

- He specifically was provided training on this, likely during the firearms/use of deadly force training in the classroom. [Simmonds Depo 41:2–42:8].

- He received simulation training on it in 2016. [Simmonds Depo at 41:25–42:8 (recalling 2016 training noted above in which interactive simulations were presented to him)].

- The training, as he understood it, was "[j]ust don't shoot the moving vehicles." [*Id.* at 41:19–21].

- APD officers were not trained to step into the path of the vehicle to justify a shooting. [*Id.* at 42:21–25].

- An APD officer is trained to try and move out of the way of the vehicle, if possible. [*Id.* at 46:10–12].

Plaintiffs' proffered expert may self-servingly disagree that APD's training is sufficient as a policy matter; the question, however, is whether it is sufficient as a *constitutional* matter. Section 1983 "does not provide plaintiffs or courts *carte blanche* to micromanage local governments throughout the United States." *Connick*, 563 U.S. at 68. Nor does it permit experts to opine on what are legal questions reserved for the judiciary. *See Brown v. City of Atlanta*, No. 21-13565, 2023 WL 3244833 at *2–3 (11th Cir. May 4, 2023) (holding the district court "properly rejected testimony from . . . [Plaintiffs'] expert" on a similar point).

Furthermore, aside from the unpublished decision in *Favors*, Plaintiffs cannot cite any binding case from the Eleventh Circuit holding that a record

such as this one demonstrates a genuine dispute of material fact on the deliberate indifference standard with respect to allegations for failure to train.

### 3.   Favors *is distinguishable.*

To that end, the Eleventh Circuit's non-binding decision in *Favors* does not support the denial of summary judgment in this case for multiple reasons. In fact, *Favors* does not advance Plaintiffs' theory at all; *Favors* destroys it.

First, as a factual matter, Officer Simmonds testified that he was trained on this specific issue on multiple occasions and in multiple formats over the years. The officer in *Favors*, on the other hand, testified that he was *never* trained on this issue before 2015, when the incident occurred. *Favors*, 849 F. App'x at 818 (officer testified "that he did not receive training on the use of deadly force in situations involving vehicles[.]"). Furthermore, whatever the training deficiencies were in 2015, they were remedied, in several different ways, as noted above. So, this sweeps away the Eleventh Circuit's holding in *Favors* that there was a question of fact on whether the City "made a deliberate choice not to take *any* action despite [its] notice." *Favors*, 849 F. App'x at 818 (emphasis added).

Second, training documents confirm that Officer Simmonds received a simulation training regarding deadly force and moving vehicles in 2016 following the *Favors* incident, unlike the minor paperwork deficiencies upon which the Eleventh Circuit grounded a lot of the reasoning in *Favors*. 849 F. App'x at 820.[7] SPO Fite explained, moreover, that the *Favors* incident was even

---

[7] Volume 2 of SPO Fite's Deposition is entirely about Exhibit 37, which is a compilation of Officer Simmonds's training file for the years 2012 through 2018 (the incident having occurred in January 2019), with the exception of

brought up in training courses as late as 2017, once the investigation had resolved. [*See* Fite Depo. Vol.1 at 184:7–189:1]. Following *Favors*, APD provided the video from the incident to all officers and explained why this incident was an impermissible use of deadly force. [*See id.* at 184:7–189:1]. That does not sound like deliberate indifference; that is the opposite of it. *Compare Favors*, 849 F. App'x at 819 ("That [the APD officer] received training on *other* matters of firearm usage is no answer to whether he received adequate training on the . . . use of deadly force *when pursuing a suspect in a vehicle*." (quotation omitted, emphasis added)).

Third, the undisputed testimony is that APD officers understood that incidents involving the use of deadly force with moving vehicles would trigger extraordinary scrutiny from the Department (especially following *Favors* and *Hall*); APD officers understood the Department would not tolerate questionable incidents. Indeed, following *Favors*, the officer in the *Hall* case was terminated immediately.[8] As Detective Nixon, APD's lead internal affairs investigator explained, and as Chief Shields reiterated:

- Det. Nixon: "We don't have that many shootings at vehicles . . . . But whenever there is a vehicle involved, it does raise the level of scrutiny to the shooting itself. Because what we don't want to have is an officer placing themselves in harm's way to justify a shooting . . . . So whenever we hear about a vehicle being involved in a shooting, we definitely take a closer look at what led up to the shooting. [Nixon Depo at Vol.1 at 134:14–24; *see id.* at 149:8–150:15]

---

2014; training records from 2014 were included as Exhibit 40 and discussed in Volume 3.

   8  The underlying incident in *Hall* occurred in February 2017.

- Chief Shields (referring to the *Hall* incident): "[T]o me it was very clearcut . . . . I terminated him as soon as we had . . . our internal affairs investigation done." [Shields Depo. at 34:15-20].

- Chief Shields (when asked if the City "train[s] its officers to avoid shooting at or into moving vehicles"): "Yes. I mean it wasn't—it wasn't part of our culture to promote it certainly[.]" [*Id.* at 89:3-9].

Here, the record is clear that—following whatever deficiencies the *Favors* decision reasoned existed previously—APD took specific and concerted action to address it. That's not deliberate indifference; that is the opposite of it. So Plaintiffs cannot continue to rely on those past instances to support their theory of liability. *See Khoury v. Miami-Dade School Bd.*, 4 F.4th 1118, 1131–33 (11th Cir. 2021); *Jackson v. City of Atlanta, Georgia*, No. 1:21-CV-2578-MHC, 2022 WL 4089823, at *15 (N.D. Ga. Aug. 18, 2022)

That APD took concerted and targeted actions to address what were perceived deficiencies in its training does not mean that even "better," or even "more training," will always "avoid the particular injury-causing conduct," *City of Canton*, 489 U.S. at 391. In the very decision Plaintiffs' entire case rests upon, the Supreme Court went to great lengths to explain this, and why failure-to-train liability is so precarious. "Such a claim could be made about almost any encounter resulting in injury," yet still have nothing to do with the training program entirely. *Id.*

### 4. *Deliberate indifference cannot be shown under* City of Canton *without a clearly established constitutional violation.*

One final point on deliberate indifference, *City of Canton*, and *Favors*, which is perhaps the most important one: In the context of a failure-to-train theory, where, as here, the allegations are that the *particular* training program

is inadequate—as opposed to a failure to provide any training entirely (*Favors*'s narrow fact pattern)—the consensus of the circuit courts requires that the constitutional violation at issue be clearly established. "[T]his is the only way to thread the needle between permitted failure-to-train liability under *City of Canton* and impermissible *respondeat superior* liability under *Monell*." A*rrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (6th Cir. 2017); *accord Stewart v. City of Euclid*, 970 F.3d 667, 676 (6th Cir. 2020) ("Thus, violation of [the plaintiff's] rights cannot be the known or obvious consequence disregarded by the City of Euclid through its training program and the *Monell* claim fails.").

As the Eight Circuit explained *en banc*, "requiring that the right be clearly established" in this context "does not give qualified immunity to municipalities; it simply follows *City of Canton*'s and *Brown*'s demand that deliberate indifference in fact be deliberate." A*rrington-Bey*, 858 F.3d at 995 (citing *Szabla*, 486 F.3d at 393). The First Circuit has reasoned in agreement, *en banc*, as well. *See Joyce v. Town of Tewksbury*, 112 F.3d 19, 23 (1st Cir. 1997) (en banc) ("However, our rationale here for granting qualified immunity to the officers—that the unsettled state of the law made it reasonable to believe the conduct in this case constitutional—also precludes municipal liability.").

So, too, has the Second Circuit, the Fifth Circuit, the Sixth Circuit, and district courts in the Third Circuit and elsewhere *See Sabla*, 486 F.3d 393 (citing *Young v. County of Fulton*, 160 F.3d 899 (2nd Cir. 1998); *accord Young*, 160 F.3d at 904 ("[A] claim for failure to train cannot be sustained unless the employees violated a clearly established federal constitutional right.");

*Arrington-Bey*, 858 F.3d at 995; *see also Bustillos v. El Paso Cnty. Hosp. Dist.*, 891 F.3d 214, 222 & n.6 (5th Cir. 2018) (same); *Ogrod v. City of Philadelphia*, 598 F. Supp. 3d 253, 276 (E.D. Pa. 2022). Here, in light of all of the above, Plaintiffs cannot possibly demonstrate that the City has been *deliberately* indifferent to the need for providing specific training with respect to the use of deadly force and moving vehicles. Undisputedly, training has been provided on the very circumstance Plaintiffs allege that the City *failed* to train on entirely. *Compare Connick*, 563 U.S. at 67 ("But it is undisputed here that the prosecutors in Connick's officer were familiar with the general *Brady* rule.").

Instead, Plaintiffs claim truly amounts to a claim that the *content* of the training was not sufficient, according to their expert, to prevent recurring, obvious violations of a constitutional right. But if that's *their theory*, then [t]he violated right . . . [itself] must be clearly established because a municipality cannot *deliberately* shirk a constitutional duty unless that duty is clear." *Arrington*, 858 F.3d at 995. Like the allegedly deficient training in *Connick* "[t]hat sort of nuance simply cannot support an inference of deliberate indifference here." *Connick*, 563 U.S. at 67. "[S]howing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability," *Connick*, 563 U.S. at 68, unless it is "obvious" that the deficiencies will lead to the same sort of conduct, and it is "obvious (*i.e.*, clearly established) that the conduct will violate constitutional rights." *Arrington-Bey*, 858 F.3d at 995.

Plaintiffs cannot demonstrate an obvious constitutional violation resulted from a concerted effort to train if the constitutional violation itself was

not a clearly established one. The Eleventh Circuit precedent discussed in Section I.A, *supra*, compels the conclusion that Officer Simmonds did not obviously violate Griffin's constitutional rights, and so it cannot be obvious that APD's policymakers, in turn, made a deliberate choice to violate Griffin's rights through APD's training regimen. *Compare, e.g.*, *Szabla*, 486 F.3d at 393.

### C.   Causation cannot be established under *Monell*.

Lastly, whatever the theory, Plaintiffs *Monell* claim fails on the causation element. The "final inquiry [under *Monell*] examines causation." *McDowell*, 392 F.3d at 1292. The deliberate indifference must be the "moving force" behind the constitutional injury. *Id.* (quotation omitted). "To hold a municipality liable for any conceivable constitutional violation, whether based on past concrete injury or mere speculation, would erode its ability to manage and govern." *Id.* at 1293.

At most, that is the extent of Plaintiffs' causation theories, mere speculation: If the City would have provided 50, 100, 200 more hours of training; if the City would have adopted their expert's curriculum instead of another expert's curriculum; if the City would have just done whatever it actually did differently (in order to fit their counsel's narrative of the case), then Officer Simmonds would certainly not have acted in a way that allegedly violated Griffin's Fourth Amendment rights. This sort of causation theory simply begs for "the federal courts [to engage] in an endless exercise of second-guessing municipal employee-training programs," "an exercise . . . federal courts are ill suited to take, as well as one that would implicate serious questions of federalism." *City of Canton*, 489 U.S. at 392.

*City of Canton* is premised on a failure to provide any training at all. Plaintiffs cannot cite any case holding that a municipality is deliberately indifferent and directly causes a constitutional violation where the municipality actually trained officers in the specific circumstances the city was allegedly failing to train on entirely.

*   *   *

This brief ends where it began: around 7:30 p.m. on the night of January 15, 2019—when D'Ettrick Griffin made the calculated decision to steal a police vehicle from the immediate presence of a police officer. A decision that assuredly lasted longer than .297 seconds. No municipality's chief of police—no policymaker for any government entity—could ever design a training program ensuring that such a program would guarantee every one of its police officers confronted with *that* circumstance will always, every time, no matter what, make exactly the right judgment call—unless, of course, that policymaker had the benefit of 20/20 hindsight.

## CONCLUSION

The Court should GRANT Defendant City of Atlanta's Motion for Summary Judgment.

## CERTIFICATE OF COMPLIANCE

This Brief complies with Local Rule 5.1C in that it is exactly double-spaced, using 13-point Century Schoolbook Font, and is less than 40-page limit as extended by the Court.

Respectfully submitted this 25th day of October, 2023.

HALL BOOTH SMITH, P.C.

/s/ *Russell A. Britt*
R. DAVID WARE
Georgia Bar No. 737756
RUSSELL A. BRITT
Georgia Bar No. 473664
PEARSON K. CUNNINGHAM
Georgia Bar No. 391024

*Counsel for Defendant City of Atlanta*

191 Peachtree Street, N.E.
Suite 2900
Atlanta, GA 30303-1740
Tel:  404-954-5000
Fax:  404-954-5020
Email:  dware@hallboothsmith.com
Email:  rbritt@hallboothsmith.com
Email:   pcunningham@hallboothsmith.com

## CERTIFICATE OF SERVICE

I hereby certify that I filed **Defendant City of Atlanta's Brief in Support of Motion for Summary Judgment** through the Court's CM/ECF system, which will send electronic service to the following, and a hardcopy to Defendant Simmonds via U.S. mail.

Eric S. Frederickson
Matthew S. Harman
HARMAN LAW FIRM, LLC
3375 Piedmont Road NE,
Building 15, Suite 1040
Atlanta, Georgia 20505
*efrederickson@harmanlaw.com*
*mharman@harmanlaw.com*

Alex R. Merritt
DeWoskin Law Firm, LLC
535 North McDonough Street
Decatur, Georgia 30030
*alex@atlantatrial.com*

Oliver Simmonds
397 Whitney Lane
McDonough, GA 30253
*o_simmonds@yahoo.com*

Respectfully submitted this 25th day of October, 2023.

**HALL BOOTH SMITH, P.C.**

/s/ *Russell A. Britt*
R. DAVID WARE
Georgia Bar No. 737756
RUSSELL A. BRITT
Georgia Bar No. 473664
PEARSON K. CUNNINGHAM
Georgia Bar No. 391024

*Counsel for Defendant City of Atlanta*

191 Peachtree Street, N.E.
Suite 2900
Atlanta, GA 30303-1740
Tel:  404-954-5000
Fax:  404-954-5020
Email:  dware@hallboothsmith.com
Email:  rbritt@hallboothsmith.com
Email:   pcunningham@hallboothsmith.com