## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

GAYSHA GLOVER and
COURTNEY GRIFFIN, individually
and on behalf of the ESTATE OF
D'ETTRICK GRIFFIN,
    *Plaintiffs,*

v.

CITY OF ATLANTA; ERIKA
SHIELDS; OLIVER SIMMONDS;
and DOES 1–5,
    *Defendants.*

Civil Action File No.
1:20-cv-04302-VMC

**PLAINTIFFS' RESPONSE IN
OPPOSITION TO DEFENDANT
CITY OF ATLANTA'S MOTION
FOR SUMMARY JUDGMENT**

## <u>INTRODUCTION</u>

The City of Atlanta Police Department's Internal Affairs Unit concluded that Defendant Oliver Simmonds used unreasonable force when he shot D'Ettrick Griffin in the back. The Unit further concluded that Defendant Simmonds was not truthful in his statements to investigators about the shooting. The City now argues to the Court that its own conclusion is so obviously wrong that a jury could not possibly agree with the City's own findings.

The City further argues that it was justified and appropriate for Simmonds to use deadly force to prevent D'Ettrick's escape merely because he might have posed some hypothetical danger to the public generally by being in possession of

Simmonds' unmarked police vehicle.  Multiple independent bases for the City's liability under *Monell* are discussed below and in Plaintiffs' Motion for Summary Judgment ("Plaintiffs' MSJ") (ECF 153).  But the City's representation to the Court that it approves of Simmonds' shooting of D'Ettrick is conclusive proof that the City ratifies and accepts accountability for Simmonds' decision.

## FACTS

While the City states in its brief that Simmonds "had just finished his shift and was intending to return his vehicle to the APD lot at City Hall[,]" the City does not actually know what Simmonds was doing on the evening of January 15, 2019. Simmonds testified that he was shopping for clothes during his shift and stopped to get gas on the way back to City Hall to complete his shift.  Simmonds Dep. 113:1–20 (Exhibit 1).  He testified that after his shift he planned to go home to his residence in McDonough.  Simmonds Dep. 27:14–23.  But Simmonds also testified that he intended to stay in a "courtesy apartment" provided by the APD after his shift.  Simmonds Dep. 119:23–120:25.

Either way, while Simmonds was getting gas, Plaintiffs' son, D'Ettrick Griffin, got into the car and started to drive away in an apparent attempt to steal it. D'Ettrick was not armed.  Ex. 1 to Plaintiffs' MSJ ("OPS File"), at 2 (ECF 157-1). Simmonds was not inside the car when D'Ettrick entered.  OPS File, at 3.

Simmonds chased after the car on foot; drew a pistol that he was carrying in the waistband of his pants; and fired twice, striking D'Ettrick in the back once, killing him.  *See* OPS File, at 22–23; Ex. 4 to Plaintiffs' MSJ ("Autopsy"), at 2 (ECF 153-4); Ex. 5 to Plaintiffs' MSJ ("Roder Addendum") (ECF 157-2).  Simmonds was behind and to the driver's side of the car when he shot D'Ettrick.  *See* OPS File, at 22.  Simmonds was in no immediate danger.  OPS File, at 3–4; Nixon Dep. 154:10-155:2 (Exhibit 2).  The car never exceeded 28 miles-per-hour.  *See* Crash Data Retrieval Report ("CDR Report"), at 9 (Exhibit 3).  And the accelerator pedal was never pressed more than one-third of full throttle.  *Id.*

A reconstruction of the shooting created by expert Scott Roder provides a reasonably accurate depiction of the shooting.  *See* Report of Scott G. Roder ("Roder Report") (Exhibit 4).  The factual background is also discussed in additional detail in Plaintiffs' Motion for Summary Judgment.

## SUMMARY JUDGMENT STANDARD

"[S]ummary judgment is extreme relief which should be approached very cautiously[.]"  *Parsons v. Ford Motor Co.*, 669 F.2d 308, 312 (5th Cir. 1982).  All facts and inferences must be taken in favor of the non-movant.  *See, e.g.*, *Tolan v. Cotton*, 572 U.S. 650, 651 (2014).  The court "may not weigh conflicting evidence or make credibility determinations" and if there are "disputed issues of fact, the

court may not decide them; rather, [it] must deny the motion and proceed to trial."

*Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012).

## ARGUMENT

## I.   DEFENDANT OLIVER SIMMONDS' CONSTITUTIONAL VIOLATION

### A.   Legal Standard for Deadly Force Under the Fourth Amendment

The Fourth Amendment provides that individuals have the right to be free from unreasonable seizure.  "Using deadly force in a situation that clearly would not justify its use is unreasonable under the Fourth Amendment." *Mercado v. City of Orlando*, 407 F.3d 1152, 1160 (11th Cir. 2005).  To determine whether the force applied in making a seizure complies with the Fourth Amendment, "the question is 'whether the totality of the circumstances justifie[s] a particular sort of . . . seizure.'" *Graham v. Conner*, 490 U.S. 386, 396 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).

Under this standard, deadly force to prevent a suspect's escape is permissible only in where the officer:

(1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has committed a crime involving the infliction or threatened infliction of serious physical harm;

(2) reasonably believes that the use of deadly force was necessary to prevent escape; and

(3) has given some warning about the possible use of deadly force, if
feasible.

*McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009) (quoting Vaughan

v. Cox, 343 F.3d 1323, 1329-30 (11th Cir. 2003)).  *See also Morton v. Kirkwood*,

707 F.3d 1276, 1283 (11th Cir. 2013) ("a police officer can use deadly force to

prevent the escape of a fleeing non-violent felony suspect only when the suspect

poses an immediate threat of serious harm to police officers or others") (internal

quotations omitted).  To justify deadly force, the threat to the officer or others must

be immediate and not speculative.  *See Edwards v. Grubbs*, No. 1:19-CV-2047-

SCJ, 2022 U.S. Dist. LEXIS 174265, at *31 (N.D. Ga. Sep. 14, 2022) (finding

"there was no non-speculative evidence" that the suspect posed an immediate

threat to members of the public).

Both this Court and the Eleventh Circuit have analyzed the objective

reasonableness of police officers shooting fleeing suspects numerous times.  In

*Vaughn v. Cox*, a suspect believed to be in a stolen vehicle on I-85 fled from

sheriff's deputies.  343 F.3d 1323, 1326 (11th Cir. 2003).  The deputies attempted

to create a "rolling roadblock," and the suspect rammed into the back of one of the

deputy's vehicles.  *Id.*  The suspect then continued to flee, accelerating to eighty to

eighty-five miles per hour in a seventy-miles-per-hour zone.  *Id.* at 1327.  One of

the deputies "then fired three rounds into the truck without warning."  *Id.*  On these

4

facts, the Eleventh Circuit held that the deputies "did not have probable cause to believe that [the suspects'] flight posed an immediate threat of serious harm to Deputy Cox, other police officers, or innocent motorists[.]"  *Id.* at 1330.

In 2014, the Eleventh Circuit considered a case in which an Atlanta police officer observed suspects forcibly break into and stealing a car and then "fired two shots at the SUV as it was exiting the parking lot."  *Arnold v. Bunn*, 565 F. App'x 812, 813 (11th Cir. 2014).  According to the officer, "he was in fear for his life when he shot" the suspect.  *Id.*  Just as in this case, evidence suggested that the officer "was beside the SUV at the time of the shooting, the vehicle was not being driven at a high rate of speed, was not accelerating or heading toward any person either prior to or during the shooting, and was not being used as a deadly weapon."  *Id.* at 814.  The court held:  "[a]n objectively reasonable officer would not have used deadly force under these circumstances, and therefore [the officer's] actions violated [the suspect's] clearly established Fourth Amendment right to be free from excessive force."  *Id.*

## B.   Defendant Simmonds Admits that He Did Not Provide a Warning

The only person still living who could possibly know whether Simmonds gave any warning to D'Ettrick is, of course, Simmonds himself.  And he testified that he did not say anything at all to D'Ettrick.  Simmonds Dep. 20:14–20.

5

Accordingly, there is no dispute that Simmonds violated the constitutional requirement that he give "some warning about the possible use of deadly force, if feasible." *McCullough*, 559 F.3d at 1206.

### C.   Defendant Simmonds' Use of Deadly Force Was Objectively Unreasonable Even if He Had Given a Warning

#### 1.   There Was No Immediate Threat of Serious Injury to Simmonds

There is no reasonable dispute that Defendant Simmonds' use of deadly force was objectively unreasonable. *See* Plaintiffs' MSJ, at 30–34. The City concluded that Simmonds used excessive force in violation of its firearms policy. OPS File, at 3–4. And a grand jury voted to indict Simmonds for murder. *See* Ex. 10 to Plaintiffs' MSJ. The City now argues to the Court that its own investigation was so clearly wrong that a reasonable jury could not possibly agree with the City's findings. This argument should be rejected outright.

#### a.   *Simmonds Was Not in Immediate Danger from the Vehicle*

Despite its opposite position before the Court, the City testified under oath that there was no imminent threat to Simmonds when he shot D'Ettrick. Nixon Dep. 154:10–155:2. Under the most generous view of the case for the defendants, there are, at the least, multiple material factual disputes. First, there are factual disputes simply between Defendant Simmonds' own conflicting statements

6

regarding the reasons that he killed D'Ettrick.  *See* Plaintiffs' Motion for Spoliation Sanctions ("Plaintiffs' Spoliation Motion"), at 5–9 (ECF 156).

There are also factual disputes between Simmonds' testimony on one hand, and the City's testimony and eyewitness accounts on the other hand.  In its brief, the City states that Simmonds "was clinging to the side of his police vehicle trying to regain control of it."  Defendant City of Atlanta's Brief in Support of Motion for Summary Judgment ("Def's Brief"), at 10 (ECF 162-1).  After giving other conflicting reasons for shooting D'Ettrick, Simmonds told the APD investigator and testified in this case that his jacket was stuck in the car door, he was being "dragged" down the street, and he was in danger of being hit by other cars on the street.  The City, however, concluded that these statements were false.  OPS File, at 4.  When asked what the APD's opinion is about whether Simmonds' jacket was in fact caught in the car door, the City testified:  "it didn't happen."  Nixon Dep. 151:12–17.

Multiple eyewitnesses stated that Simmonds was running alongside the car, not attached or clinging to it, when he shot D'Ettrick.  OPS File, at 188–190, 208. Photographs taken at the scene show no evidence of damage to Simmonds' clothes. Ex. 4 to Plaintiffs' Spoliation Motion.  And the City agrees that "there was no damage or tearing to his clothing visible in the photos."  OPS File, at 4.  Expert

7

reconstructionist Scott Roder determined that the muzzle of Simmonds' handgun was approximately 17 inches from the car window and Simmonds' center of mass was four feet away from the car when he fired the first shot.  Roder Dep. 159:6–21. And Simmonds was six to nine feet away from the car when he fired the second and fatal shot.  Roder Addendum, at 2.

Finally, a jury can—and likely will—conclude that Simmonds was not "clinging to the side" of the vehicle by the simple, undisputed fact that D'Ettrick was shot through the back.  Autopsy, at 3.

> **b.** ***There Was No Objective Basis for Simmonds to Believe D'Ettrick Was Armed***

The City argues that there was "a black coin purse dangling in Griffin's lap that could easily be mistaken for a gun."  Def's Brief at 11 n.3.  As an initial matter, the bag in question was blue and tan, not black.  Autopsy, at 4.  Handguns, of course, are typically black.

Second, an APD officer can be seen on body camera moving the small bag on D'Ettrick's lap.  Ex. 7 to Plaintiffs' MSJ, at , at 00:01–00:20 (ECF 153-9). There is no evidence to suggest where the bag was during the interaction, if any, between D'Ettrick and Simmonds, nor is there even evidence to suggest *whether* the bag was in D'Ettrick's possession or visible at all prior to the shooting.

Third, the jury will have to decide which of Simmonds' various conflicting statements to accept, if any.  In his statement to the GBI agent at the scene, Simmonds stated that he shot D'Ettrick merely because his foot was run over and did not mention the presumably unforgettable fact that he killed D'Ettrick because he believed D'Ettrick was armed and intended to shoot him.  OPS File, at 56–57.  In his deposition in this case, Simmonds expressly testified that he never in fact formed any belief as to what he claimed D'Ettrick reached for.  Simmonds Dep. 66:22–67:20.  Simmonds made very clear that the sole reason he shot D'Ettrick was because his jacket was allegedly stuck in the car door.  Simmonds Dep. 18:4–9, 61:24–62:2.

Fourth, the City concluded, eyewitnesses stated, and the video shows that Simmonds could not possibly have seen inside the vehicle before firing.  "There was tint on the windows of the City vehicle that prevented responding officers from being able to see into the car[.]"  OPS File, at 3.  "[An eyewitness] statement, the surveillance footage, and [Simmonds'] first statement to the GBI . . .  directly contradicts Officer Simmonds' statement to OPS that he was getting into the vehicle when the incident occurred."  *Id.* at 4.  Rather, the video "shows Officer Simmonds running on foot behind the car[.]"  *Id.*  There is no dispute that Simmonds fired through the side window of the car door while it was closed

because there are two bullet holes in the window.  *See* Roder Report, at 3.  And the entire encounter transpired in less than five seconds.  OPS File, at 4; Simmonds Dep. 96:25–97:8, 98:6–13.  Accordingly, other than some of Simmonds' various conflicting accounts, all other evidence—physical and testimonial—suggests that Simmonds could not possibly have seen D'Ettrick's lap at all prior to firing.

Finally, even if we were to draw inferences in the defendants' favor and assume that the small bag was in fact in D'Ettrick's lap and visible to Simmonds prior to the shooting, whether it was reasonable for Simmonds to believe that bag was a gun is a jury question.  Questions of objective reasonableness are jury questions, virtually without exception.  The Supreme Court has repeatedly explained:  "we have long recognized across a variety of doctrinal contexts that, when the relevant question is how an ordinary person or community would make an assessment, the jury is generally the decisionmaker that ought to provide the fact-intensive answer."  *Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 422 (2015). *See also United States v. Gaudin*, 515 U.S. 506, 512 (1995) (delicate assessments of the inferences a 'reasonable decisionmaker' would draw from a given set of facts and the significance of those inferences to him, is peculiarly one for the trier of fact.") (internal quotations omitted); *Tsc Indus. v. Northway*, 426 U.S. 438, 450 n.12 (1976) (the jury has a "unique competence in applying the 'reasonable man'

standard"). The jury must look at the bag and determine if it is reasonable to believe that it is a gun. And the jury may take into account Simmonds' testimony that he believes it is acceptable for a police officer to shoot a person holding a cell phone, for example, if the officer feels an entirely subjective fear of injury. *See* Plaintiffs' MSJ, at 10–12.

### 2. There was No Immediate Threat of Serious Injury to Anyone Else

The City next argues that D'Ettrick "could have" impersonated a police officer and victimized "many," if he had escaped in the unmarked police vehicle. Def's Brief at 12. This is simply speculation about a hypothetical possibility of a future threat, and it cannot justify the use of deadly force. Instead, the law requires that before using deadly force, an officer have "probable cause to believe that the suspect posed a **direct** threat of serious physical harm or death[.]" *McCullough v. Antolini*, 559 F.3d 1201, 1208 (11th Cir. 2009) (emphasis added).

Even if there were a reasonable basis to believe D'Ettrick intended to—and knew how to—activate the car's blue lights, it would not justify the use of deadly force. Causing a motorist to pull over to the side of the road is not "serious physical harm or death." *Id.* Moreover, the mere fact that a suspect may be in possession of something that could potentially be used to create a threat in the future does not justify killing that suspect. If that were the law, officers could

11

shoot and kill any citizen who is legally carrying a firearm at any time merely because they possess the means to create a threat in the future. Possession of a firearm is a much more believable and direct threat than possession of blue strobe lights which are widely available to anyone who may want to purchase them.

Testimony in the case also refutes the City's argument. Simmonds supervisor, David Jones, testified to the obvious. When asked if merely being in a car that has a blue light is an immediate threat to a citizen, he answered: "No. I wouldn't think so, sir." Jones Dep. 150:6–9 (Exhibit 5).

Plaintiffs have similarly provided expert testimony contradicting the City's argument. When asked if D'Ettrick's being in the police car was "a dangerous situation to the community," law enforcement expert Scott DeFoe gave the opinion that it was not:

> I think most criminals, especially people, you know, younger — a young man like Mr. Griffin, at 18 years old, would probably not knowingly steal a police car — a blue Ford Explorer. So they would probably ditch that car, and leave it, and then flee, I would hope. Because they know they would probably be — law enforcement would be desirous to find that car more so if it were mine or your car stolen by someone. So I think there would be more of an emphasis to locate that vehicle than another car. So I think they would try to ditch the car and get out of it as soon as they can, would be my opinion on that.

DeFoe Dep. 58:15–59:3 (Exhibit 6).  Mr. DeFoe went on the explain the lack of

common sense in the City's argument that 18-year-old D'Ettrick Griffin could

have "impersonated a police officer:"

> [I]f your question is would I be concerned about them conducting
> vehicle stops, and conducting vehicle pullovers and impersonating a
> police officer, I don't think that applies to this matter because Mr.
> Griffin wouldn't be — I think anyone would look at Mr. Griffin and
> realize he's a teenager wearing a Nike hooded sweatshirt and not a
> police officer — a sworn police officer in the state of Georgia. So I
> don't think in this particular case, it's any real concern for the
> community, you know, other than any other type of stolen vehicle
> where they fled, they could be involved in a traffic collision. But not
> based on the fact that there were emergency lights and sirens were part
> of the vehicle.

DeFoe Dep. 59:16–60:2.

The Eleventh Circuit has expressly noted that Mr. DeFoe is correct—the

only threat posed by a suspect fleeing in a vehicle is the risk of an accident.

*Vaughan v. Cox*, 343 F.3d 1323, 1332 (11th Cir. 2003).  And "a reasonable officer

would have known that firing [into the moving vehicle] would transform the risk of

an accident on the highway into a virtual certainty."  *Id.*  Here, of course, that is

exactly what happened.  After D'Ettrick was shot in the back, the car crashed into

Ms. Lois Osborne's vehicle, injuring her.  *See* OPS File, at 63.  The black box data

shows that in the five seconds preceding the crash, the SUV's max speed was 28.3

miles per hour, and the maximum accelerator pedal actuation was 32 percent.

Exhibit 3, at 9.  The vehicle posed no immediate threat to anyone until the City's

officer killed its driver.

Finally, throughout his various conflicting statements regarding his reasons

for shooting D'Ettrick, Simmonds himself never stated that he shot D'Ettrick

because the young man posed a threat to the public.  *See* OPS File, at 3–4

("Simmonds did not articulate that the male had committed a felony involving

serious bodily harm, or that he intended to").

### 3.    There is No Evidence That D'Ettrick Committed "Carjacking"

In an effort to justify shooting D'Ettrick in the back, the City asserts without

evidence that he committed a "carjacking" under O.C.G.A. § 16-5-44.1.  That

statute provides:

> A person commits the offense of hijacking a motor vehicle when such
> person while **in possession of a fireman or weapon** obtains a motor
> vehicle from the person or presence of another **by force and violence
> or intimidation** or attempts or conspires to do so.

(Emphasis added).  It is undisputed that D'Ettrick was not in possession of a

weapon.  Nixon Dep. 181:6–11.  There is no evidence that D'Ettrick obtained the

vehicle by using "force and violence" or "intimidation."  Rather, the evidence is

that D'Ettrick entered the unlocked car unseen.  Here again, the City's own

statements disprove its brief.  The incident report states that D'Ettrick's attempted

offense was "autotheft" as opposed to carjacking.  OPS File, at 344.  In its own

Statement of Undisputed Material Facts, the City states:  "At approximately 7:30 p.m., **while Officer Simmonds was outside of his vehicle** and in the process of completing the refueling process, D'Ettrick Griffin unlawfully entered the vehicle and attempted to steal it."  ECF 162-5, at 2 (emphasis added).

### 4.    The "Relative Culpability" of the Parties Does Not Support Summary Judgment for the City

Here, the City repeats its argument that D'Ettrick created some general and imprecise risk to the "public."  The City relies on *Scott v. Harris*, 550 U.S. 372, 384 (2007) for the idea that the "relative culpability" of D'Ettrick justifies Simmonds' shooting him in the back.  In *Scott*, unlike this case, the suspect engaged in a "reckless, high-speed flight" while pursued by "[m]ultiple police cars, with blue lights flashing and sirens blaring . . . for nearly 10 miles, but he ignored their warning to stop."  *Id.*  Even then, the Court pointed out, the risk created by the suspect was "not the near certainty of death posed by, say, shooting a fleeing felon in the back of the head or pulling alongside a fleeing motorist's car and shooting the motorist."  *Id.* (internal citations omitted).

D'Ettrick, on the other hand, was given no warning.  There were no sirens, blue lights, or any instruction to stop.  D'Ettrick was driving at most 28 miles-per-hour with the accelerator pedal depressed less than one-third of full throttle. Exhibit 3, at 9.

5.    **Defendant Simmonds' Testimony Establishes that a Warning was Feasible**

The City asserts that a verbal warning prior to Simmonds' use of deadly force was not feasible, but cites no evidence to support the assertion.  Simmonds testified that D'Ettrick said something to him, but he did not say anything to D'Ettrick in response.  Simmonds Dep. 20:14–20.  Simmonds could have informed D'Ettrick that he was a police officer and intended to use force.  Simmonds also testified that he in fact would have done so, if the City had the simple Constitutionally mandated policy requiring a warning before using deadly force.  Simmonds Dep. 32:2–5.

II.    **THE CITY OF ATLANTA'S IS LIABLE UNDER *MONELL***

A.    **There Is No "Law of the Case"**

The City asserts that the Court's ruling on its Motion to Dismiss for failure to state a claim under Rule 12 is the "law of the case."  The City argues that Plaintiffs cannot recover on any "theory" that the Court did not expressly approve of in its order denying that motion to dismiss.  The City cites no authority for this proposition, and none exists.

The law of the case doctrine applies only where there has been a final judgment by an appellate court.  *Culpepper v. Irwin Mortgage Corp.*, 491 F.3d 1260, 1271 (11th Cir. 2007) ("The law-of-the-case doctrine holds that subsequent

courts will be bound by the findings of fact and conclusions of law made by the court of appeals in a prior appeal of the same case.").  "[A] district court's denial of a motion to dismiss is not a final order." *Alsobrook v. Alvarado*, 656 F. App'x 489, 493 n.3 (11th Cir. 2016) (citing *Vintilla v. United States*, 931 F.2d 1444, 1447 (11th Cir. 1991)).  Therefore, the Court's "order at the dismissal stage did not bind it at the summary judgment stage." *Id.*

In substance, the City is actually asking the Court to apply the antiquated "theory of the pleadings" doctrine.  "The 'theory of the pleadings' doctrine, under which a plaintiff must succeed on those theories that are pleaded or not at all, has been effectively abolished under the federal rules." *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 714 (8th Cir. 1979).  The federal rules plainly permit Plaintiffs to recover on any theory that is applicable after discovery.  Rule 8, in fact, does not require a plaintiff to plead any legal theory at all.  "[A] complaint need not pin plaintiff's claim for relief to a precise legal theory." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011).  Rather, Rule 8 "requires only a plausible 'short and plain' statement of the plaintiff's claim, not an exposition of his legal argument." *Id.  See also, e.g.*, *Story v. Equifax Info. Servs., LLC*, No. 1:22-CV-03921-SDG-JEM, 2023 U.S. Dist. LEXIS 51740, at *5 (N.D. Ga. Mar. 27, 2023); *Schofield v. Feminist Women's Health Ctr.*, No. 1:23-CV-00652-SEG-JEM, 2023

U.S. Dist. LEXIS 155927, at *9 (N.D. Ga. Aug. 28, 2023).  Indeed, Rule 54

requires the Court to "grant the relief to which each party is entitled, even if the

party has not demanded that relief in its pleadings."  FED. R. CIV. P. 54(c).

Accordingly, the Eleventh Circuit has held that it was error for a district

court to grant summary judgment on a claim made under Section 1983 for

discrimination when the plaintiff's complaint pleaded her claim only under Title

VII.  *King v. Butts Cty.*, 576 F. App'x 923, 931 (11th Cir. 2014) (citing *Oglala*

*Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 714 (8th Cir. 1979)).

In any event, Plaintiffs' "legal theory" is that the City is liable for the

deprivation of D'Ettrick Griffin's right to be free from excessive force and

unreasonable seizure under the Fourth Amendment.  Defendants misconstrue the

*facts* that Plaintiffs pleaded and the Court considered at the dismissal stage to

support that claim as "legal theories."  Obviously, Plaintiffs could not possibly

plead all of the facts in their complaint that would be uncovered in discovery to

support their claim of a Fourth Amendment violation by the City.

B.      <u>**Legal Standard for Municipal Liability Under 42 U.S.C. § 1983**</u>

The City asserts that it can be liable under *Monell* only for a "facially

unconstitutional policy."  This is an incorrect statement of the law.  Section 1983

expressly grants a cause of action for constitutional deprivations committed

pursuant to a "custom, or usage" in addition to "statute, ordinance, [or] regulation."

Section 1983 was enacted by the Klu Klux Klan Act of 1871.  *See St. Louis v.*

*Praprotnik*, 485 U.S. 112, 121 (1988).  In that act, Congress expressly allowed for

causes of action based upon unofficial customs and usages "because of the

persistent and widespread discriminatory practices of state officials" that were "not

authorized by written law."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691

(1978).  Accordingly, the City may be liable for any informal and unwritten

custom or practice, even if it is directly contrary to written policies or laws.  *See*

Plaintiffs' MSJ, at 25–29.

    **C.**   **<u>The City Is Liable for Its Refusal to Require a Warning Before</u>**
        **<u>the Use of Deadly Force</u>**

      The City argues that the lack of a warning requirement in its deadly force

policy does not automatically render it unconstitutional because it does "not reflect

a deliberate choice by policymakers to refrain from warning citizens."  Def's Brief

at 21.  The City is unable to cite any binding precedent and instead relies only on

the 8th Circuit.  Even assuming that its lack of a warning policy does not

*automatically render the City liable*, that does not mean that the City *cannot*

*possibly be liable* and therefore is entitled to summary judgment.

      In any event, Plaintiffs do not rely merely on the lack of an obviously

necessary written policy.  The Chief of Police's testimony clearly indicates that it

was a deliberate choice not to require officers to give a warning before the use of deadly force.  Plaintiffs' MSJ at 18–20; Shields Dep. 59:18–60:6 (Exhibit 7).  And the City itself testified that it did not train officers to give a warning until after it changed the policy—in 2020 after Simmonds' shooting of D'Ettrick—to require officers to give a verbal warning before using deadly force.  Plaintiffs' MSJ at 14; Fite Dep. 76:16–20 (Exhibit 8).

Even following the policy change, the APD's training on verbal warnings remains plainly deficient.  The City testified that after the 2020 policy change they began training officers only to give any "command" such as "stop resisting" before shooting a suspect.  Fite Dep. 75:10–14.  But the law is clear that "the officer must give some warning **regarding the possible use of deadly force** whenever feasible."  *Acoff v. Abston*, 762 F.2d 1543, 1547 (11th Cir. 1985) (emphasis added).  *See also Vaughan v. Cox*, 343 F.3d 1323, 1330 (11th Cir. 2003) (officers must give "some warning **about the possible use of deadly force**, if feasible") (emphasis added).

### D.    <u>The City is Liable for its Refusal to Implement Any Policy Regarding Shooting at Vehicles</u>

The City distorts Plaintiffs' position by asserting that Plaintiffs argue for a policy providing "detailed guidance" on the use of firearms against people in vehicles.  The City again relies on 8th Circuit caselaw for the proposition that

"detailed guidance" is not *always* required.  The law in this Circuit, however, is that the City is liable for constitutional deprivations caused by a "lack of well-established policies and procedures[.]"  *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991).  *See also* Plaintiffs' MSJ at 26–27.

Here, the City has no policy whatsoever—detailed or otherwise—governing its officers' repeated and predicable use of deadly force against suspects merely driving away in a car.  Police practices expert Scott DeFoe has given the opinion that the City could prevent unnecessary death and injury by simply adopting the same policy as the GBI, which is a single paragraph governing the firing of guns at vehicles.  Ex. 14 to Plaintiffs' MSJ, at 23.  Alternatively, the City could simply do what it continues to tell the public it has already done, and implement a ban on shooting at moving vehicles.  *See* Plaintiffs' MSJ, at 21.

### E.   The City Is Liable for Its Custom and Practice of Killing Non-Dangerous Fleeing Suspects

Any widespread custom may be considered a municipal policy for purposes of *Monell*.  The City's argument that there is no custom or usage of shooting non-dangerous fleeing suspects in vehicles relies only upon whether the prior incident was ratified.  The question is not how or whether the City responded to certain individual prior incidents after they occurred.  The question is whether the practice was sufficiently widespread that "policy-making officials . . . must have known

21

about it but failed to stop it" before it happened to Plaintiffs' son. *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991).

As explained in Plaintiffs' Motion to Exclude Ken Katsaris ("Motion to Exclude Katsaris"), every single year a large portion of the City's officer-involved-shootings involve suspects in vehicles. Motion to Exclude Katsaris, at 10 (ECF 167). The City testified that the situation is predictable, as did its former Chief of Police. *Id.* at 10–11. These shootings frequently involve unarmed and non-dangerous suspects and, therefore, result in officers being charged with crimes. *Id.* at 11–13.

In fact, the City has testified that they are so certain their officers will shoot at vehicles that they intentionally purchase ammunition designed to penetrate vehicles: "the ammunition that we buy for our officers is specifically bought and tested and considered for its performance in glass, because **we assume that if an officer is involved in a shooting, a car is going to be involved** either there, near them or in it." *Rogers v. Atlanta*, 30(b)(6) Deposition of Patrick Fite ("Fite *Rogers* Dep.") 40:7–12 (Exhibit 9) (emphasis added). Yet the City refuses to make any policy or training changes to address the recurring deadly situation. This is precisely the type of informal custom or usage that §1983 was intended to remedy.

**F.**    **The City Is Liable for Its Failure to Adequately Train Officer Simmonds in the Use of Deadly Force**

**1.    The City's Notice of the Need to Train, Failure to Train, and Other Factual Background**

The City's failure to adequately train officers, specifically including Simmonds, is covered at length in Plaintiffs' Motion for Summary Judgment.  *See* Plaintiffs' MSJ at 9–18.  Plaintiffs incorporate that brief here rather than recite the evidence again.

**2.    The City Did Not Change Its Training After *Favors***

Undoubtedly recognizing that *Favors* squarely precludes summary judgment in this case, the City spends considerable space throughout its brief attempting to distinguish that case.  As an initial matter, the City misstates both the facts and the holding of *Favors*.  The City asserts that this case is distinguishable from *Favors* because this case concerns "the particular training program" at issue, while *Favors*, the City claims, concerned "a failure to provide any training entirely."  Def's Brief at 32–33.  The *Favors* Court, however, expressly noted that the APD officer received "additional basic training beyond that required by the Peace Officers Standards and Training Counsel[;]" that he received "training on the use of force generally and also received annual in-service training[;]" and that he received "training on other matters of firearm usage[.]"  *Favors v. City of Atlanta*, 849 F.

App'x 813, 819 (11th Cir. 2021).  But the 11th Circuit found the District Court's

focus on that overall training was "misplaced."  *Id.*  Instead, "the focus must be on

**adequacy of the training program in relation to the tasks** the particular officers

must perform." *Id.*  (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)

(emphasis added).  Here, like in *Favors*, the question is whether Simmonds

"received **adequate** training on the 'usual and recurring' use of deadly force when

pursuing a suspect fleeing in a vehicle." *Favors*, 849 F. App'x at 819 (citing

*Canton*, 489 U.S. at 391) (emphasis added).

     The City goes on to argue that it made dramatic changes to its training after

the *Favors* shooting.  This argument conflicts with the evidence in this case.  And

it directly contradicts the City's own prior sworn testimony.  Each of these are

addressed briefly below.

### a.      *Judicial Estoppel Should Preclude the City's Wildly Changing Positions Before This Court*

     "The equitable doctrine of judicial estoppel is intended to protect courts

against parties who seek to manipulate the judicial process by changing their legal

positions to suit the exigencies of the moment." *Slater v. United States Steel*

*Corp.*, 871 F.3d 1174, 1176 (11th Cir. 2017).  *See also S. J. Groves & Sons Co. v.*

*Fulton Cty.*, 967 F. Supp. 501, 503 (N.D. Ga. 1996) ("this court applied Georgia

principles of judicial estoppel to prevent Defendants from arguing contrary

propositions in two suits").  Two factors are considered in the application of

judicial estoppel:  "First, it must be shown that the allegedly inconsistent positions

were made under oath in a prior proceeding.  Second, such inconsistencies must be

shown to have been calculated to make a mockery of the judicial system."

*Salomon Smith Barney, Inc. v. Harvey, M.D.*, 260 F.3d 1302, 1308 (11th Cir.

2001).  This doctrine should apply to multiple of the City's positions in this case.

First, the City states in this case, among many similar representations:

"APD's training in the years leading up to this incident (following those)

specifically covered the use of deadly force and moving vehicles."  Def's Brief, at

26.  In prior cases, however, the City stated under oath:

> Q. Does the city of Atlanta currently train its officers to avoid shooting at or into moving vehicles?
>
> A. Not specifically, no, sir.

*Hall v. City of Atlanta*, 30 (b)(6) Deposition of Patrick Fite February 11, 2021

("Fite *Hall* 2021 Dep.") 110:25–111:3 (Exhibit 10).

> Q. Okay. All right. Tell me what specifically is done in the training since 2011 regarding moving vehicles, if anything .
>
> A. Not specifically involving moving vehicles.
>
> . . .
>
> Q. Okay. You don't go and do any field training or anything on moving vehicles, do you?

A. No, sir.

Fite *Rogers* Dep. 37:19–38:16.

Second, the City states in this case:  "Following Favors, APD provided the video from the incident to all officers and **explained why this incident was an impermissible use of deadly force**."  Def's Brief, at 31 (emphasis added).  In *Favors*, however, the City testified:

> Q. Okay. Do you know what reason Major Schierbaum decided to use this video in-service training?
>
> A. It was used at our urging to show it because we had seen the video and it was a—wanting to use it as a—as a tool to show officers that— you know, about telling the truth versus saying what they know they should say.
>
> Q. Okay. So it's being used for purposes of training on truthfulness; right?
>
> A. Yes, sir.
>
> **Q. Is it being used for purposes of training on use of force?**
>
> **A. No.**

Favors v. City of Atlanta, 30(b)(6) Deposition of Patrick Fite (Fite Favors Dep.")

108:9–22 (Exhibit 11) (emphasis added).  In *Hall*, the City similarly testified:

> Q.  And other than discussing the video in the classroom, has any — have you formulated any training based on that video, any tactical or judgmental use of force training based on that video?
>
> A  No, sir.

*Hall v. City of Atlanta*, 30 (b)(6) Deposition of Patrick Fite ("Fite *Hall* 2020 Dep.")

86:18–22 September 29, 2020  (Ex. 17 to Plaintiffs' MSJ).

Third, the City states in this case:  "Following the *Favors* incident in 2015,

the City specifically provided additional training on this subject [of shooting at

vehicles] to all officers."  Def's Brief, at 26.  In a prior case, however, the City

stated under oath:

> Q. . . . From 2011through 2017 identify any changes in training regarding use of force or firearms?
>
> A. Again, you said it best earlier that the two cornerstone case laws haven't changed or haven't been, you know, I guess overturned or overruled, that they still stand and the law hasn't changed as far as 17-4-20 or 16-3-21.· So it really would be no substantial changes in it.

Fite *Hall* 2020 Dep. 80:11–19.

Prior to the 11th Circuit's 2021 decision in *Favors*, the City simply asserted

that its general, all-purpose use of force training satisfied any and all legal

obligations regardless of what specific situations its officers were actually

encountering.  The City maintained that it is not required to provide any specific

training regarding the predicable and frequently-recurring use of firearms against

suspects in vehicles:

> And Favors introduced deposition testimony from the City's Rule 30(b)(6) witness in another excessive force case, concerning the City's training on the use of force. That testimony indicated that the City did not provide training on the appropriate use of force in apprehending a

27

suspect in a vehicle. The City, for its part, countered that its training
was not inadequate. It asserted that it was entitled to judgment as a
matter of law, because the City provided hours of training in excess of
that required under state law, including on the use of force.

*Favors v. City of Atlanta*, 849 F. App'x 813, 816 (11th Cir. 2021).  The Court held

that the City was wrong:  "That Thompson received training on other matters of

firearm usage is no answer to whether he received adequate training on the 'usual

and recurring' use of deadly force when pursuing a suspect fleeing in a vehicle."

*Id.* at 819.

Having now been told that it should have been providing training on this

specific, deadly, and recurring situation, the City simply states to the Court that it

was doing so all along.  This new position contradicting its prior testimony is

clearly calculated to avoid liability for its officers' conduct and "to make a

mockery of the judicial system."  *Salomon Smith Barney, Inc. v. Harvey, M.D.*, 260

F.3d 1302, 1308 (11th Cir. 2001).  Accordingly the City should be estopped

making the following, or similar, arguments contradicting its own sworn

testimony:  (1) "APD's training in the years leading up to this incident (following

those) specifically covered the use of deadly force and moving vehicles;" (2)

"Following Favors, APD provided the video from the incident to all officers and

explained why this incident was an impermissible use of deadly force;" or (3)

"Following the Favors incident in 2015, the City specifically provided additional
training on this subject [of shooting at vehicles] to all officers."

### b. The Evidence in This Case Shows That the City Failed To Change Its Training Program After Favors

In addition to the City's contradictory testimony from prior cases, there is
ample evidence in this case to create questions of fact regarding the adequacy of
the City's training. The City states that a simulation involving a vehicle was used
in 2016 in direct response to the Favors incident. But under oath, the City in fact
testified only that there are "a vast number" of scenarios that the simulator can use
(Fite Dep. Vol. II 270:20–21), and only "one of the scenarios involve a vehicle
being used as a weapon." Fite Dep. 190:20–191:8. Regarding the scenario used in
2016, the City is "vaguely" familiar and "believe[s] it's a vehicle fleeing the scene
of a crime." Fite Dep. Vol II 281:21–22. Regardless of what exactly the
simulation involved, no officer has done it since 2016. Fite *Hall* Dep. 86:23–87:3.
There is nothing to indicate that the City made a change to "the training program."
*Favors*, 849 F. App'x at 819.

Next, the City represents to the Court that it provided the video of the Favors
shooting "to all officers and **explained why this incident was an impermissible
use of deadly force**." Def's Brief, at 31 (emphasis added). In addition to the prior
testimony noted above, the City's argument also contradicts its own testimony in

this case.  The City testified that it showed officers the *Favors* video "for purposes of training on truthfulness."  Fite Dep. 187:1–5, 188:22–189:1.  When asked if the video was used for purposes of training officers on "tactical or judgment use of force decisions," the City testified, "[i]t didn't have anything, per se, with, you know, actually shooting at a car."  Fite Dep. 187:6–188:2.

Even if we were to resolve the factual disputes discussed above in the City's favor, the training is still woefully deficient.  First, as law enforcement expert Soctt DeFoe explains, "training is perishable."  DeFoe Dep. 117:25.  "[T]raining opportunities, and simulation training, and videos, and what not, that's all perishable skills."  DeFoe Dep. 118:2–4.  Therefore, the City should enact appropriate policies and "those policies should be trained in all of in-service trainings that involve the use of a firearm, as to what not to do—even during policy training, in-service training, situational based training, that should all be accentuated during those training opportunities and not just show a video of what not to do."  DeFoe Dep. 117:8–13.

Second, the City clearly received notice that its training—whatever the training actually included—remained deficient in the years after the 2015 *Favors* shooting.  The City's main training program is conducted in March or April of each year.  Fite Dep. Vol. II 295:23–296:20.  On June 22, 2016, APD Officer

James Burns shot and killed unarmed suspect Deravis Rogers who was driving away in a vehicle. *See Rogers v. City of Atlanta*, 214 F. Supp. 3d 1314, 1315 (N.D. Ga. 2016). James Burns, of course, was fired from the APD and charged with murder. *See* Motion to Exclude Katsaris, at 11–12. On February 27, 2017, APD Sergeant Mathieu Cadeau shot unarmed Noel Hall who was driving away in a vehicle. *See Hall v. City of Atlanta*, No. 1:18-CV-4710-CAP, 2021 U.S. Dist. LEXIS 260485, at *2 (N.D. Ga. Dec. 16, 2021). Mathieu Cadeau was similarly fired and charged criminally. *See* Motion to Exclude Katsaris, at 12.

If we take the City at its word, it is even more obvious that the City has been deliberately indifferent. According to the City's brief, after the 2015 *Favors* shooting it recognized this serious problem and so it showed a single surveillance video to officers a single time and conducted a single simulation exercise a single time. Mere months after that so-called training, the City knew without a doubt that the problem persisted, recurring in both 2016 and 2017. Yet instead of conducting actual, hands-on training on the issue, the City chose not to even show the video or use the simulation again after doing each a single time. The City admits that more training on this subject was necessary, but only via video and only in 2016? What about officers hired in 2017? Newly hired officers do not need the training that the City admits here for the first time it concluded was necessary?

Finally, here, unlike in *Favors*, Officer Simmonds received less than the statutorily required 20 hours of training during each year of his employment by the City after his initial pre-swearing academy training.  *See* Plaintiffs' MSJ at 12–14. Like the APD officer in *Favors*, the City did not provide Simmonds a copy of O.C.G.A § 17-4-20 as required by that statute.  Simmonds Dep. 128:6–23; *See Favors*, v. 849 F. App'x at 820 ("The City also failed to provide Thompson with a copy of the statute, as required.").  Like the APD officer in *Favors*, the City did not provide Simmonds a copy of its use of force policy, SOP 3010.  Fite Dep. Vol I 201:9–19.

*Favors* is distinguishable from this case only in that (1) following the *Favors* incident, the City received further, concrete notice that its training continued to be deficient, and (2) the officer in *Favors* at least received the state-mandated minimum amount of training while Simmonds did not.

### 3.    There are Numerous Questions of Fact Regarding the Adequacy of the City's Training

In its attempt to show that it has increased training in the relevant area, the City relies on the testimony of nothing but former employees – the former Chief of Police (who the City forced to resign), Defendant Simmonds (who the City forced to resign), and other low-ranking former employees.  The testimony on behalf of

the City by its current representatives and employees, however, conflicts with the

testimony cited in the City's brief and clearly creates questions of fact.

The City relies on Simmonds' testimony that he "specifically was provided

training on this, likely during the firearms/use of deadly force training in the

classroom." Def's Brief, at 29. But the City testified that it provides no such

training:

> Q.  On the next page, September 7, 2017, this is, I guess, a repeat. So
> let me ask it this way. Every year on here, there's a firearms requal
> and use of deadly force?
>
> A. Yes, sir.
>
> Q. Do any of these specifically address shooting at a moving vehicle?
>
> A. No, sir.
>
> Q. At any year did the Atlanta in-service training involve firing at
> moving vehicles?
>
> A. No, sir

Fite Dep. 228:2–12.  The City also relies on Simmonds' testimony that he was

trained to "just don't shoot the moving vehicles." Def's Brief, at 29.  But the City

testified that it provides no such training.  When asked if the APD provides any

training on "how to avoid" using deadly force with moving vehicles, the City

testified:  "No, sir. Not—not specifically. No." Fite *Rogers* Dep. 41:13–20.

33

Additionally, Simmonds contradicted himself and also testified that he was trained
to shoot moving vehicles:

> Q. So in the event that an officer is on foot and a suspect is fleeing in
> a vehicle, what does APD train you to do?
>
> A. If the vehicle is a danger to you, you're required to take action.
>
> Q. And what kinds of action?
>
> A. Lethal action, if necessary.

Simmonds Dep. 42:9–15.

Finally, on this topic the City asserts that Former Chief Shields' testimony
conclusively establishes that they adequately trained officers on the relevant
subjects.  But in fact, in the testimony the City relies upon, Ms. Shields does not
even refer to training, stating only that "it wasn't part of our culture to promote
it[.]"  Def's Brief at 32.  Moreover, it is telling that the City has to attempt to rely
only on the testimony of its former Chief, rather than its own testimony.  That is of
course because the City's own testimony is that they provide virtually no training
on this particular type of deadly force that comprises a large portion of its deadly
force incidents every single year.  *See* Plaintiffs' MSJ, at 17.

The City's argument boils down to its assertion that shooting at cars "is
brought up" during training, and during one single year in its history, officers
participated in what is essentially a video game that it vaguely believes may have

34

involved a vehicle.  This paltry evidence is not sufficient to withhold the question

of the adequacy of the training from a jury.  This is precisely the argument the City

made in *Favors*, where the 11th Circuit held that evidence of "some training" does

not entitle the City to Summary Judgment.  *Favors v. City of Atlanta*, 849 F. App'x

813, 819 (11th Cir. 2021).

### 4. "Scrutiny" By Internal Affairs Does Not Excuse the City's Failure To Train

The City states that "the undisputed testimony is that APD officers

understood that incidents involving the use of deadly force with moving vehicles

would trigger extraordinary scrutiny from the Department[.]"  The City then cites

no such testimony.  Internal Affairs investigator Nixon simply stated that "We

don't have that many shootings at vehicles . . . But . . . it does raise the level of

scrutiny."  Nixon Dep. 134:14–18.  This testimony indicates nothing about what

"APD officers" outside of Internal Affairs "understood."  More importantly, when

he made that statement, Detective Nixon did not even realize how many of the

APD's shootings involve vehicles.  When he was later shown the shocking number

of APD shootings that involve vehicles, Detective Nixon testified on behalf of the

City as follows:

> Q. Okay. So I don't want to recount all those numbers, but we've
> established that for 2014 through 2021 there are more than one -- there
> is more than one shooting every year --

A. Correct.

Q. -- in which a suspect is in a vehicle?

A. Correct.

. . .

Q. Were you aware of these numbers before today?

A. No, I was not. No, I was not.

**Q. As an OPS investigator, do the numbers concern you?**

**A. Yeah. Yes.** I need to keep records like this myself just so I can have it in my database how many, you know, numbers.

Nixon Dep. Vol. II 401:3–403:10 (emphasis added).

In any event, the "rais[ed] . . . level of scrutiny" on these incidents by OPS after the fact in no way suggests that the City's training on the subject is adequate. It suggests the opposite. The City admits that its OPS is continually investigating these types of incidents and is subjecting them to increased scrutiny because they are likely to be unjustified uses of force. This further begs the question of why the City refuses to make any policy or training changes to prevent the shootings from happening in the first place.

The City next cites the testimony of its former Chief of Police for the proposition that "the officer in the *Hall* case was terminated immediately." In fact, however, he was terminated in May of 2017, months after the February shooting.

*See* Mathieu Cadeau Separation Notice (Exhibit 12).  More importantly, here again, the City offers no explanation as to why its clear acknowledgement after the fact that its officer engaged in an illegal shooting excuses its failure to train officers on the subject going forward.

### G.    The Violation At Issue Need Not Be "Clearly Established"

The City continues its reliance on out-of-circuit authority for the proposition that the constitutional right at issue must be "clearly established."  There is no authority in the 11th Circuit imposing such a requirement on Plaintiffs' claim. Nonetheless, neither is there a more clearly established constitutional violation than shooting an unarmed person suspected of a nonviolent property crime in the back.  When the Supreme Court endeavored to conceive of the most obvious possible constitutional violation that a City must prevent, it described exactly the type of force at issue in this case:

> [C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989).

Additionally, the City cannot seriously deny that the constitutional violation at issue is clearly established for the same reason that it was on notice of its training deficiency: Both this Court and the 11th Circuit have told the City exactly that. *See Hall v. City of Atlanta*, No. 1:18-CV-4710-CAP, 2021 U.S. Dist. LEXIS 260485, at *30 (N.D. Ga. Dec. 16, 2021); *Favors v. City of Atlanta*, Civil Action No. 1:17-cv-03996-SDG, 2020 U.S. Dist. LEXIS 130593, at *22 (N.D. Ga. July 23, 2020); *Favors v. City of Atlanta*, 849 F. App'x 813, 818 (11th Cir. 2021).

### H.   The City's Has Ratified Simmonds' Conduct

When "authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality[.]" *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

Plaintiffs explained in their Motion for Summary Judgment that the City's decision to impose no discipline on Simmonds indicates that it ratified his decision. The City has now removed any doubt. The City unequivocally states on public record before this Court that, according to the City, Simmonds did nothing at all wrong—Simmonds complied entirely with the City's policies and training. The City's motion clearly states that it approves of Simmonds' decision to kill D'Ettrick. And the City explains in great detail exactly how and why it approves of the bases for Simmonds' decision. There could be no clearer admission of

ratification than the City's representations to the Court.  The Court should take the City at its word and hold it to that word.  Because the City approves of Simmonds' conduct, Simmonds' conduct is chargeable to the City.

## I.     The City's Unconstitutional Customs, Policies, and Inadequate Training Caused D'Ettrick's Death

The City's argument regarding causation addresses only failure to train.  As explained in Plaintiffs' Motion for Summary Judgment, Defendant Simmonds has admitted that the City's written use of force policy was the "moving force" behind his shooting of D'Ettrick.  Plaintiffs' MSJ, at 37–38.  Defendant Simmonds has admitted that he would have given a verbal warning if the City's policy required it.  Simmonds Dep. 32:2–5.  Defendant Simmonds has admitted that he would have complied with a restriction on shooting at vehicles, if the City had one.  Simmonds Dep. 31:12–22.

To establish causation specifically regarding failure to train, the question is: "[w]ould the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?"  *City of Canton v. Harris*, 489 U.S. 378, 391 (1989).  The unrebutted expert testimony is that upon seeing the attempted vehicle theft, a well-trained officer would have simply "moved to position for cover and utilized a radio or cell phone to contact law enforcement to

advise them of the incident." DeFoe Dep. 61:2–4. Simmonds admits that if he had done this, he would never have been in any danger. Simmonds Dep. 94:22–95:1.

In any event, causation is entirely a question for the jury. As this Court has recognized multiple times, the Supreme Court made clear in *Canton* that [p]redicting how a hypothetically well-trained officer would have acted under the circumstances may not be an easy task for the factfinder . . . . But judge and jury, doing their respective jobs, will be adequate to the task." *Id.* "Thus, it appears that the Supreme Court anticipated that causation could not be determined at the summary judgment stage." *Yancey v. Gregory Tillman in His Individual Capacity As An Officer for the Clayton Cty. Police Dep't*, Civil Action No. 1:20-cv-03269-VMC, 2023 U.S. Dist. LEXIS 200856, at *44 (N.D. Ga. Sep. 29, 2023). *See also Favors v. City of Atlanta*, 849 F. App'x 813, 821 (11th Cir. 2021) (noting "the role of the factfinder in determining the element of causation").

## CONCLUSION

For the reasons stated above, Plaintiffs ask that the Court deny Defendant's Motion for Summary Judgment.

Dated: This December 1, 2023.

/s/Eric S. Fredrickson
Eric S. Fredrickson
Georgia Bar No. 489783
Matthew S. Harman
Georgia Bar No: 327169

**HARMAN LAW FIRM LLC**
3575 Piedmont Road, NE
Bldg 15, Suite 1040
Atlanta, GA 30505
Telephone:  (404) 554-0777
Facsimile:  (404) 424-9370
Email:  mharman@harmanlaw.com
        efredrickson@harmanlaw.com

Alex R. Merritt
Georgia Bar No. 143308
DeWoskin Law Firm, LLC
535 North McDonough Street
Decatur, Georgia 30030
alex@atlantatrial.com
(404) 987-0026
***Attorneys for Plaintiffs***

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing pleading complies with the font and point selections approved by the Court in Local Rule 5.1B.  This pleading has been prepared in Times New Roman font, 14 point.

## CERTIFICATE OF SERVICE

I certify that today I served a true and correct copy of the following document using the Court's CM/ECF system, which will automatically serve a copy on all counsel of record, and on Defendant Oliver Simmonds via first class mail addressed as follows:

Oliver Simmonds
397 Whitney Lane
McDonough, GA  30253

**DATED**:  December 1, 2023.

/s/Eric S. Fredrickson
Eric S. Fredrickson
Georgia Bar No. 489783